UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
ELIYOHU MINTZ and ERIC SCHWARTZ,

                      Plaintiffs,

    -against-

STEVEN NIGRELLI, in his official capacity,            **COMPLAINT FOR**
RONALD STEVENS, in his official capacity,           **DECLARATORY AND**
and SUSAN J. MALLERY, in her official capacity,   **INJUNCTIVE RELIEF**
                                      Case No.: 1:23-CV-0795 (MAD/CFH)

                      Defendants.
-----------------------------------------------------------------------x

       Plaintiffs, ELIYOHU MINTZ and ERIC SCHWARTZ, by and through their attorneys The Bellantoni Law Firm, PLLC, as and for their Complaint respectfully state:

### NATURE OF THE ACTION

       1.     This is an action for, *inter alia*, declaratory, and injunctive relief, and presumed nominal damages for the plaintiffs' constitutional harms, proximately resulting from the defendants' enforcement of laws criminalizing the presumptively protected constitutional right to possess and carry firearms for self-defense.

       2.     New York State's fabrication of "gun free" zones through the enactment of the Concealed Carry Improvement Act in 2022 calculatedly leaves our most vulnerable people - children - defenseless and at the mercy of violent and predatory and evildoers.

       3.     Plaintiffs Eliyohu Mintz and Eric Schwartz are concealed carry license holders who live and work on property that, during the summer months, serves as a summer camp for adolescent boys and girls.

4.      For years, Mintz, Schwartz, and other patrons and staff have exercised the right to possess and carry firearms on the camp properties and inside of the various dual-purpose buildings in which religious observation and activities are conducted.

5.      However, Plaintiffs and other patrons and staff members can no longer lawfully engage in conduct presumptively protected by the plain text of the Second Amendment because of New York's enactment of Penal Law 265.01-e (c) and (f), which bars their right to possess firearms in their homes and on the 1000+ acres of property upon which the camps sit.

6.      Plaintiffs seek an injunction of the enforcement of Penal Law sections 265.01-e (c) and (f) because they face a credible risk of enforcement of the criminal statutes and are no longer able to exercise their right to possess and carry firearms for self-defense.

## JURISDICTION AND VENUE

7.      Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(3) in that this action seeks to redress the deprivation, under of color of the laws, statutes, ordinances, regulations, customs, and usages of the State of New York, of rights, privileges or immunities secured by the United States Constitution.  This action seeks relief pursuant to 28 U.S.C. §§ 2201, 2202, 42 U.S.C. §§ 1983 and 1988. Venue in this district is proper pursuant to 28 U.S.C. § 1391.

## THE PARTIES

8.      Plaintiffs, ELIYOHU MINTZ and ERIC SCHWARTZ are all natural persons who are employed by, and reside on the property owned and operated by, Oorah, Inc. located in Schoharie County, New York.

9.      Defendant STEVEN NIGRELLI is the Acting Superintendent of the New York State Police (NYSP) whose principal place of business is in Albany, New York. Superintendent Nigrelli is sued in his official capacity only.

10.      As the Acting Superintendent of the New York State Police, Nigrelli is duty-bound to enforce all provisions of the New York State Penal Law, as are his troopers and investigators.

11.      Acting Superintendent Nigrelli is properly named herein as the individual responsible for ensuring that the requested preliminary and permanent injunctive relief is carried out. See, *Koehl v. Dalsheim*, 85 F.3d 86, 89 (2d Cir. 1996).

12.      Defendant RONALD STEVENS ("Sheriff Stevens"), sued in his official capacity only, is the Sheriff of Schoharie County.

13.      As the Sheriff of Schoharie, Sheriff Stevens is duty-bound to enforce all provisions of the New York State Penal Law, as are his deputies.

14.      Sheriff Stevens is properly named herein as the individual responsible for ensuring that the requested preliminary and permanent injunctive relief against enforcement of the challenged Penal Law provisions is carried out in Schoharie County. See, *Koehl v. Dalsheim*, 85 F.3d 86, 89 (2d Cir. 1996).

15.      Defendant SUSAN J. MALLERY, ("DA Mallery") sued in her official capacity only, is the District Attorney in and for Schoharie County, New York.

16.      In that capacity, DA Mallery is duty-bound to enforce all provisions of the New York State Penal Law, as are her prosecutors and investigators, who have arrest power. State law provides that it shall be the duty of each District Attorney in New York City "to prosecute all crimes and offenses cognizable by the courts" of their respective counties. County Law § 927; see also, County Law § 700 which places a similar duty on all the State's District Attorneys.

**New York State Penal Law section 265.01-e**

17.    As Judge Van Woert wisely observed in 1933 in response to the enactment of the Sullivan Law,

> "This law does not keep the hand gun from the possession of any crook; yet by its exactions and sanctions, repugnant to many citizens, heretofore duly licensed, it has rendered thousands potentially criminal. The law has failed signally and has brought about precisely the opposite of that which was intended by it. It has not disarmed the crook or rendered his possession of weapons impossible and has simply embarrassed and rendered criminal those very substantial people who are entitled to protect themselves and whose protection was sought by this legislation.
>
> Such an exercise of police power, well recognized as ineffective in promoting 'public safety,' may not be supported." [1]

18.    Like the Sullivan Law, Penal Law sections 265.01-e (c) and (f) turn lawful gun owners into criminals for simply exercising a right guaranteed by the plain text of the Second Amendment. See, *D.C. v. Heller,* 554 U.S. 570, 592 (2008) (declaring that the plain text of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation.").

19.    New York State's enactment of Penal Law section 265.01-e, which bans the possession of handguns, rifles, and shotguns in (i) any place of worship or religious observation [subsection (c)] and (ii) summer camps [subsection (f)] is repugnant to the plain text of the Second Amendment.[2] Section 265.01-e does not provide any exception for individuals who are licensed to possess and/or carry a handgun.

---

[1] *People ex rel. Ferris v. Horton*, 147 Misc. 506, 511, 264 N.Y.S. 84, 91 (Co. Ct. 1933), aff'd, 239 A.D. 610, 269 N.Y.S. 579 (App. Div. 1934).
[2] See, *Hardaway v. Nigrelli*, No. 22-CV-771 (JLS), 2022 WL 16646220, at *17 (W.D.N.Y. Nov. 3, 2022) ("For these reasons, New York's place of worship exclusion violates the Fourteenth Amendment in that it prevents law-abiding

20.    Penal Law section 265.01-e subsection (c) also violates Plaintiffs' First Amendment rights by forcing them to choose between exercising their right to worship freely and their Second and Fourteenth Amendment right to possess and carry a firearm for protection.

## CONSTITUTIONAL FRAMEWORK

21.    The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." The Second Amendment is fully applicable to the states through the Fourteenth Amendment.  See, *McDonald v. Chicago*, 561 U.S. 742 (2010).

22.    The rights protected by the Second Amendment – the right to possess and carry weapons - are "pre-existing" and "individual rights". They are not "granted" by the government.

> "Putting all of these textual elements together, we find that they **guarantee the individual right to possess and carry weapons in case of confrontation**. This meaning is strongly confirmed by the historical background of the Second Amendment. We look to this because it has always been widely understood that the **Second Amendment, like the First and Fourth Amendments, codified a pre-existing right**. The **very text** of the Second Amendment **implicitly recognizes the pre-existence of the right and declares only that it "shall not be infringed**." As we said in *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1876), "[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed ....

*District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (emphasis added).

23.    Plaintiffs' right to possess and carry weapons for self-defense is presumptively guaranteed. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126, 2135 (2022) ("In keeping with *Heller*, we <u>hold</u> that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."); see also, *Caetano v.*

---

citizens with ordinary self-defense needs from exercising their right to keep and bear arms.") quoting, *Bruen*, 142 S.Ct. at 2156 (internal quotation marks omitted).

*Massachusetts,* 577 U.S. __ (2016) (weapons in common use for self-defense are protected within the scope of the Second Amendment).

24.     Under the *Bruen* test:

> "When the regulated conduct falls within the plain text of the Second Amendment, the Constitution **presumptively protects** that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.
>
> Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"

*Bruen*, at 2126 (emphasis added).

25.     Handguns, rifles, and shotguns are weapons in common use for self-defense in this country and, as such, are protected within the scope of the Second Amendment, which protects those weapons "typically possessed by law-abiding citizens for lawful purposes." *Heller*, at 625; *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (stun guns); *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J. on denial of cert) ("The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons.") (cleaned up) citing, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767-768 (2010); *Heller*, at 628–629.

26.     Plaintiffs' conduct – possessing and/or carrying handguns, rifles, and shotguns – is conduct that falls within the plain text of the Second Amendment, and is presumptively protected thereunder.

27.     Penal Law section 265.01-e (c) and (f) directly conflict with this Nation's historical traditions of firearm regulation.

> "If there be any fixed stars in our constitutional constellation, it is that no official high or petty, shall dictate whether we can exercise our fundamental constitutional rights."

Reply Brief for Petitioners, *New York State Rifle & Pistol Assn. v. Bruen*, 2021 WL 943564 citing, *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943).

28.     When a "challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, at 2131.

29.     *Heller* rebuked laws banning firearms in the home. *Bruen* rejected laws banning ordinary citizens from carrying firearms in public for self-defense.

30.     Penal Law 265.01-e bans possession in one's home and/or place of abode, and bans possession and carrying on private property, which is also religious property. Penal Law 265.01-e concerns the same alleged societal problem addressed in *Heller*: "gun violence."

31.     Because there is no historical tradition in the Founding Era of criminalizing citizens for the peaceable carriage of firearms in the locations identified under Penal Law 265.01-e (c) and (f), the statutes must be stricken.

### *Penal Law 265.01-e (c) and (f) are Inconsistent with the Plain Text*

32.     Penal Law 265.01-e (c) and (f) are contemporary control measures and inconsistent with the plain text of the Second Amendment. And because "[where] later history contradicts what the text says, the text controls"[3] the regulations must be declared unconstitutional and stricken.

> "But when it comes to interpreting the Constitution, not all history is created equal.

---

[3] *Bruen*, at 2137.

> "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–635, 128 S.Ct. 2783. The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates or postdates either time may not illuminate the scope of the right."

*Bruen*, at 2136.[4]

33.     Under the *Bruen* test, if the regulated conduct falls under the plain text of the Second Amendment, which this does, the government has the burden of justifying its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Bruen*, at 2126.

34.     Defendants cannot meet their burden.

## MATERIAL FACTS

35.     Plaintiffs are employed by Oorah, Inc. ("Oorah"), a non-profit corporation that provides year-round activities for Orthodox Jewish children, adults, and families on 1000+ acres in a rural part of Schoharie County, New York. [See attached Declaration of Eliyohu Mintz at ¶¶ 1-6; Declaration of Eric Schwartz at ¶¶3-5, 8].

36.     Oorah's summer camp program ("The Zone") consists of two sleepaway camps – one for boys and one for girls - ages 9 through 18. The Boys' camp is located in the Town of Jefferson and the Girls' camp is located in the Town of Gilboa. Each campus consists of 500+ acres and numerous buildings. At any given point in the day, the campers are engaged in a wide variety of indoor and outdoor activities; from arts and crafts to swimming to playing with the animals on the farm, campers are on the go - traveling between numerous locations and activities. [Mintz ¶¶ 7-9; Schwartz ¶¶ 5-7, 9].

---

[4] Thus, "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, at 2137 (citations omitted).

37.     There are also numerous multi-purpose buildings at each of the campuses in which camp-focused activities and worship/religious instruction take place, including synagogues where religious services are held. [Mintz ¶13].

38.     Plaintiffs reside at the camp year-round on a full-time (Schwartz) and part-time (Mintz) basis. [Mintz ¶22; Schwartz ¶8]. Schwartz's residence is located on the Boys' summer camp property. [Schwartz ¶8].

39.     In the event of an active threat, the campers could be located anywhere from boating on the lake, swimming in the pool, hiking, or engaging in any number of outdoor activities. [Mintz ¶16; Schwartz ¶11]. An immediate response from law enforcement to an acute emergency involving an active threat to life and safety at the camps is highly improbable, as the Schoharie County Sheriff's Office is located approximately 40 minutes away and traveling to the Oorah campuses requires traversing winding rural local roads and State routes. [Mintz ¶¶16-17; Schwartz ¶12]. Likewise, the New York State police barracks are a similar distance away, if not farther, and likely suffer the same challenges as the Sheriff's Office. [Mintz ¶ 18; Schwartz ¶13]. Apart from a human threat event, the presence of wild animals places the adult and child patrons, Plaintiffs, and their families at physical risk. [Mintz ¶19; Schwartz ¶14]. Wild animals inhabit the woods surrounding the campus, including bear, fox, and coyote. [Mintz ¶19; Schwartz ¶15].

40.     The Zone is a well-known facility in upstate New York - among the Orthodox Jewish community as well as the local community. As Orthodox Jews, Plaintiffs and the staff and patrons of The Zone are easily recognizable and identifiable to the public as such, based on their manner of dress and customs, and have been openly targeted over the years for discriminatory acts including yelling ethnic and hateful slurs and throwing objects, including Molotov cocktails. [Mintz ¶20; Schwartz ¶17].

41.     There have been prior incidents where intruders passing by the camp have stopped their cars, entered onto the camp properties, and chased children while shouting ethnic slurs. In the Winter of 2022, three of the residential buildings across from the main girls' campus were burned down under mysterious circumstances. [Mintz ¶21; Schwartz ¶18].

42.     Unlike a singular school building in which all classes are conducted and which can (theoretically) be locked down as one continuous compound, a "lock down" of either campus would be virtually impossible in the event of an active threat emergency. [Mintz ¶10; Schwartz ¶10]. In such case, which would necessarily be an unannounced event, the campers could be located anywhere from boating on the lake swimming in the pool, hiking, or engaging in any number of outdoor activities on the campuses – each of which span 500+ acres. [Mintz ¶11; Schwartz ¶11].

43.     Each Plaintiff holds an unrestricted New York State handgun license that authorizes them to possess handguns in their homes and carry handguns concealed on their person for self-defense. [Mintz ¶24; Schwartz ¶19]. Since the issuance of their licenses, Plaintiffs have possessed and carried their firearms on a regular basis for protection while at the Oorah property. [Mintz ¶22; Schwartz ¶20]. Before New York enacted laws criminalizing the possession of firearms at "summer camps" and "places of religious observation," Mintz encouraged other licensed patrons and staff members to carry a handgun while on the property, including Schwartz. [Mintz ¶25].

44.     Because of the passage and enforcement of Penal Law 265.01-e (c) and (f), which arbitrarily criminalized the peaceable possession and/or carriage of firearms at "summer camps" and "places of worship," Plaintiffs' exercise of such protected conduct subjects them to felony arrest and prosecution, state prison, the permanent loss of Second Amendment rights, and other penalties. [Mintz ¶26; Schwartz ¶22].

45.     Summer camp began on June 22, 2023. [Mintz ¶ 30; Schwartz ¶24].

46.     Plaintiffs have expressed their intention to continue possessing and carrying firearms on the Oorah properties, during summer camp, in the synagogues, and buildings in which religious observation is held throughout the year and into the future, as they did before the laws were enacted. [Mintz ¶29; Schwartz ¶25].

47.     Plaintiffs face a credible and concrete risk of enforcement of criminal penalties against them because they have expressed their intention to continue possessing and carrying firearms on the Oorah properties during/at the summer camp, in the synagogues, and in other buildings in which religious observation is held. [Mintz ¶¶29-33; Schwartz ¶¶25-29].

48.     Plaintiffs seek a preliminary injunction of Penal Law sections 265.01-e (c) and (f), without which they will continue to suffer irreparable harm in the nature of the bar to conduct protected by the Second and Fourteenth Amendments. [Mintz ¶¶30-34; Schwartz ¶29].

49.     When the challenged laws were passed, Acting Superintendent Nigrelli publicly thanked Governor Hochul as "someone [he] looks up to" for her "leadership on this topic…laser-like focus on *eradicating guns*, illegal guns, and gun crimes...we appreciate that at the State Police."[5] (36:10). (emphasis added).

50.     Nigrelli publicly vowed that the NYSP – who are under his direction and control - will enforce the State's gun laws against everyone who violates them:

> "Governor, it's an easy message. I don't have to spell it out more than this. We'll have zero tolerance. If you violate this law, you will be arrested. Simple as that. Because the New York State Troopers are *standing ready to do our job to ensure* .. *all laws are enforced*." *Id.* (emphasis added).

---

[5] https://www.youtube.com/watch?v=gC1L2rrztQs

51.     In her August 31, 2022 public address, Gov. Hochul lauded herself and her "partners" in the yearlong project with New York City, NYPD Commissioner and "advocates" like the Gifford Law Center and "Everytown for Gun Safety" with whom she has "been joined at the hip" who were "helpful in the whole process of writing legislation (the CCIA) that we believe is responsive to the Supreme Court decision [in Bruen]". She informed that, for over a year, she and her "partners" worked to counter the Bruen decision and she "was ready for it." Had the Supreme Court not decided Bruen, Gov. Hochul confessed, "we would not be having this conversation." (2:41). https://www.youtube.com/watch?v=gC1L2rrztQs

Penal Law § 265.01-e (c) and (f) will be enforced by the NYSP against anyone who violates the law by possessing and/or carrying a handgun, rifle, and/or shotgun on the Property, including Plaintiffs.

52.     By the threat of enforcement of Penal Law 265.01-e (c) and (f), Plaintiffs face a credible and imminent risk of arrest, incarceration, and prosecution for violating the statutes are banned from exercising a presumptively protected and guaranteed right – the right to possess and carry firearms for self-defense in their homes and in areas now public.

53.     Given the recency of the statutes and lack of any indication that they will be repealed, the Court should be "willing to presume that the government will enforce" them. *Hardaway v. Nigrelli*, No. 22-CV-771 (JLS), 2022 WL 16646220 at *5 (W.D.N.Y. Nov. 3, 2022) citing, *Picard v. Magliano*, 42 F.4th 89 (2d Cir. 2022) (quoting *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016).

54.     Absent and injunction of sections 265.01-e (c) and (f), Plaintiffs will continue to suffer irreparable harm, as a monetary award will not adequately compensate them for the constitutional violations.

55.     As with First Amendment violations, a violation of Second Amendment freedoms even for minimal amounts of time, constitute irreparable harm.

56.     Plaintiffs seek a judicial declaration that Penal Law sections 265.01-e (c) and (f) violate the Second and Fourteenth Amendments and a preliminary and permanent injunction of the statutes.

57.     An injunction preventing the defendants, their successors, officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with them who receive actual notice thereof from enforcing Penal Law sections 265.01-e (c) and (f) will provide Plaintiffs the relief they are seeking.

58.     Absent the requested injunctive relief, Plaintiffs will continue to suffer irreparable harm in the nature of the violations of their constitutional rights under the Second, Fourteenth, and First Amendments.

WHERFORE, a Judgment and Order is respectfully requested:

- Declaring that Penal Law sections 265.01-e (c), and (f) violate the Second and Fourteenth Amendments to the U.S. Constitution;

- Declaring that Penal Law sections 265.01-e (c) violates the First Amendment to the U.S. Constitution separation of church and state;

- Granting a preliminary and permanent injunction against the enforcement of Penal Law sections 265.01-e (c) and (f);

- Awarding in favor of Plaintiffs presumed nominal damages against Defendants for the violation of their Second and Fourteenth Amendment rights;

- Declaring Plaintiffs prevailing parties under 42 U.S.C. § 1988;

- Awarding in favor of Plaintiffs costs, disbursements, and reasonable statutory attorney's fees pursuant to 42 USC 1988; and

- Granting such other, further, and different relief as to this Court seems just, equitable, and proper.

Dated: June 29, 2023
Scarsdale, New York

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiffs*

By:   *Amy L. Bellantoni*
Amy L. Bellantoni (AB3061)
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090 (t)
(888) 763-9761 (f)
abell@bellantoni-law.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
ELIYOHU MINTZ and ERIC SCHWARTZ,

                              Plaintiffs,               23 Civ.

    -against-

                                   **DECLARATION OF**
STEVEN NIGRELLI, in his official capacity,  **ELIYOHU MINTZ**
RONALD STEVENS, in his official capacity,
and SUSAN J. MALLERY, in her official capacity,

                         Defendants.
----------------------------------------------------------------------x

ELIYOHU MINTZ, declares pursuant to 28 U.S.C. § 1746 that:

1.    I, Eliyohu Mintz, am over the age of 18 and a plaintiff in the above-captioned matter. I make this Declaration of my own personal knowledge and if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2.    I submit this Declaration in support of Plaintiffs' application to preliminarily and permanently enjoin portions of the New York State Penal Law that criminalize conduct protected by the Second Amendment.

3.    I am the CEO of Oorah, Inc. ("Oorah"), a non-profit corporation that provides year-round activities for Orthodox Jewish children, adults, and families.

4.    Oorah owns over 1,000 acres of property located in a remote and rural part of Schoharie County, New York that is used year-round to host many programs and activities, including a boys and girls' summer camp, a winter program for families (Shabbos Zone), Torah

1

Mates retreats[1], a retreat for participants in its singles program (The Rebbetzins), and a retreat for the staff of Oorah/Kars 4 Kids and their families, among other things.[2]

5.     The kids' summer camp program – "The Zone" – consists of two sleepaway camps – one for boys and one for girls - ages 9 through 18.

6.     The Boys' camp is located in the Town of Jefferson and the Girls' camp is located in the Town of Gilboa. Each campus is comprised of 500+ acres upon which numerous buildings are located.

7.     The activities at The Zone are numerous and it is common for the campers to travel from building to building to engage in various activities.

8.     The Zone summer camp offers a whole host of fun activities for the kids, which in the past has included arts and crafts, culinary arts, woodworking, photography, painting, music instruction; dancing and singing; swimming and water sports; outdoor sports including archery, bike riding, ziplining, and rock climbing; an animal farm where the kids can feed camels, ride horses, and play with bunnies; and inside games that include ping pong, gaming, and billiards.

9.     At any given moment, the kids at each campus can be any number of places – inside and outside, spread out across the properties and buildings.

10.    Unlike a singular school building in which all classes are conducted and which can (theoretically) be locked down as one continuous compound, a "lock down" of either campus would be virtually impossible in the event of an active threat emergency.

---

[1] Torah Mates is a free Jewish learning program partnering thousands of Torah study partners globally. Oorah hosts separate TorahMates retreats for men and women at the Schoharie County facility annually.
[2] The property operates under separate a New York State Department of Health permits, (i) a children's camp during the summer, and (ii) a temporary residence permit (hotel/resort) at all other times of the year.

11.     In such case, which would necessarily be an unannounced event, the kids could be located anywhere from boating on the lake swimming in the pool, hiking, or engaging in any number of outdoor activities on the campuses – each of which span 500+ acres.

12.     The Zone summer camp provides a fun summer camp experience for the kids while also incorporating the Jewish spirit and educational experiences into daily activities to provide the campers with "an unforgettable Jewish summer camp experience."

13.     There are numerous multi-purpose buildings at each of the campuses in which camp-focused activities and worship/religious instruction take place; among the buildings at the two campuses are synagogues in which religious services are held.

14.     Outside of the summer months, the Boys' camp location is also used to host programs during the Jewish holidays of Rosh Hashanah, Sukkot, Passover, and Shavuot.

15.     As an Orthodox Jewish program incorporating the Jewish faith and teaching into daily life, all of the activities, whether outside or in the various buildings on the Property, involve religious observation and teaching.

16.     An immediate response from law enforcement to an acute emergency involving an active threat to life and safety at the camps is highly improbable. The Schoharie County Sheriff's Office is located approximately 40 minutes away and is closed at night. The Sheriff's website notes that there are 620 square miles in Schoharie County that "are patrolled by the Chief Deputy and several Deputy Sheriff's" when they are not also "serving warrants, making arrests, investigating crime scenes, responding to motor vehicle accidents and a wide gamut of complaints…appearing in court, assisting other agencies, transporting prisoners and mental health patients, providing police escorts and relays, and performing counter-drug surveillance's [sic] [and] [m]ore recently,

due to a large number of community and school requests, Deputies participate in various educational and preventive activities for many schools and civic organizations."[3]

17.     Traveling to the Oorah campuses requires traversing winding rural local roads and State routes. I have been informed by the Schoharie County Sheriff's office that the response time varies depending on whether an officer is 'available' to respond, and would likely be a minimum of 40 minutes.

18.     Likewise, the New York State police barracks are a similar distance away, if not farther, and suffer the same challenges as the Sheriff's Office – both geographically and with regard to manpower.

19.     Apart from a human threat event, the presence of wild animals places the adult and child patrons, my staff, and myself at physical risk. Both campuses are subject to the presence of wild animals, including foxes, coyotes, bears, and rabid raccoons. Due to their aggressive nature, we have even had to dispatch migratory geese in the past, for which Oorah has a permit.

20.     The Zone is a well-known facility in upstate New York - among the Orthodox Jewish community as well as the local community. As Orthodox Jews, myself and the staff and patrons of The Zone are easily recognizable and identifiable to the public as such, based on our manner of dress and customs, and have been openly targeted over the years for discriminatory acts including yelling ethnic and hateful slurs and throwing objects, including Molotov cocktails.

21.     There have been prior incidents where intruders passing by the camp have stopped their cars, entered onto the camp properties, and chased children while shouting ethnic slurs. In the Winter of 2022, three of the residential buildings across from the main girls' campus were burned down under mysterious circumstances.

---

[3] https://www4.schohariecounty-ny.gov/departments/sheriffs-office/sheriffs-road-patrol/

22.     As stated above, unlike an elementary or secondary school, the campuses are not conducive to a lock-down scenario should an active threat – human or animal - occur.

23.     Particularly with an armed attacker, such homicidal events generally occur quickly, without notice, with the killer seeking to harm and kill as many individuals as possible in a short timeframe and before law enforcement can respond.

24.     I have held a New York State concealed carry license since 2019 and a New Jersey non-carry license for approximately 25 years. When I am at the Oorah campuses, where I reside on a part-time basis throughout the year, it has been my custom and practice to possess a handgun for protection inside of my residence as well as throughout the Oorah property to protect myself, my staff, and the Oorah patrons and guests, which includes the hundreds of children attending summer camp. It cannot be overstated that Oorah and its staff are responsible for the health, life, and safety of the children in our care. I am most able to effectively provide for their safety and the safety of my staff when armed with a firearm.

25.     Before New York enacted laws criminalizing the possession of firearms at "summer camps" and "places of religious observation," I encouraged other licensed patrons and staff members to carry a handgun while on the property, including co-plaintiff Eric Schwartz. Due to the size and expanse of the facility, the fact that the kids' activities are spread out in numerous indoor and outdoor locations, multiple armed staff are required throughout the camp in the event of an active threat.  I was previously informed by the Sheriff's office and NYSP that 1-2 armed individuals would not be sufficient due to the openness of the property.

26.     With the enactment of statutes prohibiting the possession of firearms at "summer camps" and "places of religious observation" my right to possess a handgun in my New York home and to carry a handgun on the Oorah properties and inside of the numerous buildings thereon

now subjects me to felony criminal penalties, including arrest, incarceration, prosecution, and the permanent loss of my Second Amendment rights.

27.     The violent attacks on Jewish people[4] targeting places of worship and places where children are – the most vulnerable of the population - are random and provide the victims with no notice or advance warning.

28.     For the benefit of the adult and child patrons of The Zone, my staff, my family, and myself, I cannot be left unprepared and unarmed in the event that an evildoer decides to attack one or both of the campuses, nor can the other licensed staff members.

29.     It is my intention to continue to exercise my right on a daily basis to possess a handgun in my home on the Oorah campus, and to carry a handgun concealed outside and throughout all of the buildings at the Oorah properties, including the synagogues, during the children's summer camp, which begins on June 22, 2023, and permanently thereafter into the future. The only reason that I cannot continue to engage in the same constitutionally protected conduct is because of the enforcement of Penal Law sections 265.01-e (c) and (f), which subject me to severe criminal penalties.

30.     I am requesting that this Court preliminarily and permanently enjoin the defendants' enforcement of Penal Law sections 265.01-e (c) and (f) because I face a credible risk of enforcement of unconstitutional firearm regulations, which has become more imminent based on my public declarations herein.

---

[4] It is well-documented that Antisemitic hate crimes are disproportionately higher than other forms of hate crimes. See e.g. https://www.justice.gov/crs/highlights/2021-hate-crime-statistics https://jewishinsider.com/2023/03/hate-crimes-antisemitism-fbi-rep-kathy-manning-anti-defamation-league-american-jewish-committee/                          ; https://www.jewishvirtuallibrary.org/statistics-on-religious-hate-crimes https://www.nytimes.com/2023/03/23/us/antisemitism-anti-defamation-league-report.html

31.     I am aware that the Acting Superintendent of the New York State Police has vowed to enforce all criminal firearm statutes, which includes Penal Law sections 265.01-e (c) and (f).

32.     Neither the Sheriff and his deputies, who are charged with enforcing the Penal Law, nor the district attorney and her assistants, who are charged with prosecuting violations of the Penal Law, have disavowed their intention to enforce Penal Law sections 265.01-e (c) and (f).

33.     Sections 265.01-e (c) and (f) also interfere with the separation of church and state to the extent that they dictate which constitutional rights I can and cannot exercise at the synagogues and other religious buildings on the campuses, and impose severe punishment for violators. I should not be required to forego the exercise of my Second Amendment rights in order to practice those protected under the First Amendment.

34.     Without the requested injunctive relief, I will suffer irreparable harm, including felony arrest, incarceration, prosecution and, if convicted, the permanent loss of the right to possess firearms – harm that will not be adequately compensated by any monetary award.


I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 23, 2023                                    _____
                                                                          Eliyohu Mintz

7

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
ELIYOHU MINTZ and ERIC SCHWARTZ,

                                Plaintiffs,                 23 Civ.

     -against-

                                                           **DECLARATION OF**
STEVEN NIGRELLI, in his official capacity,        **ERIC SCHWARTZ**
RONALD STEVENS, in his official capacity,
and SUSAN J. MALLERY, in her official capacity,

                                Defendants.
-----------------------------------------------------------------------x

ERIC SCHWARTZ, declares pursuant to 28 U.S.C. § 1746 that:

    1.     I, Eric Schwartz, am over the age of 18 and a plaintiff in the above-captioned matter. I make this Declaration of my own personal knowledge and if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

    2.     I submit this Declaration in support of Plaintiffs' application to preliminarily and permanently enjoin portions of the New York State Penal Law that criminalize conduct protected by the Second Amendment.

    3.     I am employed by Oorah, Inc. ("Oorah") at its Schoharie County, New York location.

    4.     Oorah is a non-profit company that provides year-round activities for Orthodox Jewish children, adults, and families.

    5.     Oorah owns over 1,000 acres of property located in a remote and rural part of Schoharie County, New York that is used year-round to host many programs and activities, including a summer camp.

1

6.      The kids' summer camp program – "The Zone" – consists of two sleepaway camps – one for boys and one for girls - ages 9 through 18.

7.      The Boys' camp is located in the Town of Jefferson and the Girls' camp is located in the Town of Gilboa. Each campus is comprised of 500+ acres upon which numerous buildings are located.

8.      I have been involved with Oorah as a patron and guest for many years, and have been employed full-time at The Zone for over a year as the Assistant Manager of the Boys' Camp. In that connection, I reside full-time at The Zone property in a residence located on the Boys' Camp campus.[1]

9.      The activities at boys' camp are numerous; it is common for the boys to travel from building to building to engage in various activities. The summer camp offers a whole host of fun activities for the boys, which in the past has included arts and crafts, culinary arts, woodworking, photography, painting, music instruction; dancing and singing; swimming and water sports; outdoor sports including archery, bike riding, ziplining, and rock climbing; an animal farm where they can feed camels, ride horses, and play with bunnies; and inside games that include ping pong, gaming, and billiards.

10.      At any given moment, the children can be located at any number of places – inside and outside, spread out across the boys' campus, which spans over 500 acres. Unlike a singular school building in which all classes are conducted and which can (theoretically) be locked down as one continuous compound, a "lock down" of the Boys' Camp would be virtually impossible in the event of an active threat emergency.

---

[1] Outside of the summer months, the Boys' Camp location is hosts various programs during the Jewish holidays of Rosh Hashanah, Sukkot, Passover, and Shavuot.

11.     In the event of an active threat, the children could be located anywhere from boating on the lake, swimming in the pool, hiking, or engaging in any number of outdoor activities.

12.     An immediate response from law enforcement to an acute emergency involving an active threat to life and safety at the camps is highly improbable, as the Schoharie County Sheriff's Office is located approximately 40 minutes away and traveling to the Oorah campuses requires traversing winding rural local roads and State routes.

13.     Likewise, the New York State police barracks are a similar distance away, if not farther, and likely suffer the same challenges as the Sheriff's Office.

14.     Apart from a human threat event, the presence of wild animals places the adult and child patrons, myself, and my family at physical risk.

15.     Wild animals inhabit the woods surrounding the campus, including bear, fox, and coyote.

16.     Unlike a school, the campus is not conducive to a lock-down scenario should an active threat – human or animal - occur. Attacks generally occur quickly and without notice, with physical harm occurring before law enforcement can be notified and/or respond.

17.     The Zone is a well-known facility in upstate New York - among the Orthodox Jewish community as well as the local community. As Orthodox Jews, myself, the staff, and patrons of The Zone are easily recognizable and identifiable to the public as such, based on our manner of dress and customs, and have been openly targeted over the years for discriminatory acts including yelling ethnic and hateful slurs and throwing objects, including Molotov cocktails.

18.     There have been prior incidents where intruders passing by the camp have stopped their cars, entered onto the camp properties, and chased children while shouting ethnic slurs. In

the Winter of 2022, three of the residential buildings across from the main girls' campus were burned down under mysterious circumstances.

19.     I have held a New York State concealed carry license since the around the late-80's/early 90's; I grew up around firearms, and am versed in firearms safety, and marksmanship.

20.     It has been my custom and practice over the years to carry a handgun concealed on my person as a patron and as a staff member at the Oorah properties, including when the Boys' summer camp is in session, as well as in the synagogues, and other buildings where religious observation is conducted, for my protection and the protection of others.

21.     Before New York enacted laws criminalizing the possession of firearms at "summer camps" and "places of religious observation," I and other Oorah staff and patrons were encouraged by Rabbi Mintz to carry a handgun while on the property, particularly during the summer camp. Due to the size of the campus and the fact that the kids' activities are spread out in numerous indoor and outdoor locations, multiple armed staff are required throughout the camp in the event of an active threat.

22.     But with the enactment of statutes prohibiting the possession of firearms at "summer camps" and "places of religious observation" my right to possess a handgun in my home and to carry a handgun on the Boys' Camp campus and inside of the numerous buildings thereon now subjects me to felony criminal penalties, including arrest, incarceration, prosecution, and the permanent loss of my Second Amendment rights.

23.     The violent attacks on Jewish people[2] targeting places of worship and places where children are – the most vulnerable of the population - are random and provide the victims with no notice or advance warning.

---

[2] It is well-documented that Antisemitic hate crimes are disproportionately higher than other forms of hate crimes. See e.g. https://www.justice.gov/crs/highlights/2021-hate-crime-statistics https://jewishinsider.com/2023/03/hate-crimes-

24.     It is my intention to continue to exercise my right on a daily basis to possess a handgun in my home on the Oorah campus, and to carry a handgun concealed outside and throughout all of the buildings at the Oorah properties, including the synagogues, during the children's summer camp, which began on June 22, 2023, and permanently thereafter into the future, as I have in the past. The only reason that I cannot continue to engage in the same constitutionally protected conduct is because of the enforcement of Penal Law sections 265.01-e (c) and (f), which subject me to severe criminal penalties.

25.     I am requesting that this Court preliminarily and permanently enjoin the defendants' enforcement of Penal Law sections 265.01-e (c) and (f) because I face a credible risk of enforcement of unconstitutional firearm regulations, which has become more imminent based on my public declarations herein.

26.     I am aware that the Acting Superintendent of the New York State Police has vowed to enforce all criminal firearm statutes, which includes Penal Law sections 265.01-e (c) and (f).

27.     Neither the Sheriff and his deputies, who are charged with enforcing the Penal Law, nor the district attorney and her assistants, who are charged with prosecuting violations of the Penal Law, have disavowed their intention to enforce Penal Law sections 265.01-e (c) and (f).

28.     Sections 265.01-e (c) and (f) also interfere with the separation of church and state to the extent that they dictate which constitutional rights I can and cannot exercise at the synagogues and other religious buildings on the campuses, and impose severe punishment for violators. I should not be required to forego the exercise of my Second Amendment rights in order to practice those protected under the First Amendment.

---

antisemitism-fbi-rep-kathy-manning-anti-defamation-league-american-jewish-committee/                                    ;
https://www.jewishvirtuallibrary.org/statistics-on-religious-hate-crimes
https://www.nytimes.com/2023/03/23/us/antisemitism-anti-defamation-league-report.html

29.     Without the requested injunctive relief, I will suffer irreparable harm, including felony arrest, incarceration, prosecution and, if convicted, the permanent loss of the right to possess firearms – harm that will not be adequately compensated by any monetary award.


I declare under penalty of perjury that the foregoing is true and correct.


Dated: June 20 , 2023                         _____
                                              Eric Schwartz