UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ELIYOHU MINTZ and ERIC SCHWARTZ,

Plaintiffs, Case No.: 1:23-CV-0795 (MAD/CFH)

-against-

STEVEN NIGRELLI, in his official capacity,
RONALD STEVENS, in his official capacity,
and SUSAN MALLERY, in her official capacity,

Defendants.
-------------------------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE

**THE BELLANTONI LAW FIRM, PLLC**
***Attorneys for Plaintiffs***
**2 Overhill Road, Suite 400**
**Scarsdale, New York 10583**
**abell@bellantoni-law.com**

**TALE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ........ i

PRELIMINARY STATEMENT ........ 1

CONSTITUTIONAL FRAMEWORK ........ 1

MATERIAL FACTS ........ 3

LEGAL ARGUMENT ........ 6

I. PLAINTIFFS HAVE STANDING ........ 6

II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ........ 8

A. The *Bruen* Test – Step One ........ 8

B. The *Bruen* Test – Step Two ........ 9

III. PLAINTIFFS WILL CONTINUE TO SUFFER IRREPARABLE HARM ........ 10

IV. AN INJUNCTION IS IN THE PUBLIC INTEREST ........ 7

V. ENJOINING UNCONSTITUTIONAL LAWS FAVORS PLAINTIFFS ........ 17

CONCLUSION ........ 17

## TALE OF AUTHORITIES

Page(s)

**Cases**

*Am. C.L. Union v. Ashcroft*,
322 F.3d 240 (3d Cir. 2003) ........................................................................................ 17

*Antonyuk v. Bruen*,
2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) ........................................................... 11

*Antonyuk v. Hochul*,
2022 WL 4367410, n.1 (N.D.N.Y.) ............................................................................ 7

*Antonyuk v. Hochul*,
2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ............................................................ 6

*Brenntag Int'l Chem., Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999) .................................................................................. 10, 11

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) ................................................................................................... 2

*Cayuga Nation v. Tanner*,
824 F.3d 321 (2d Cir. 2016) ..................................................................................... 7, 8

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ........................................................................................... 2, 9, 12

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
46 F.4th 226 (5th Cir. 2022) ....................................................................................... 9

*Duncan v. Becerra*,
265 F. Supp. 3d 1106 (S.D. Cal. 2017) .................................................................... 16

*Hardaway v. Nigrelli*,
2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ........................................................... 7

*Hobby Lobby Stores, Inc. v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) ................................................................................ 16

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ................................................................................................... 6

*McDonald v. Chicago*,
561 U.S. 742 (2010) ................................................................................................ 1, 9

*New York Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013) ........................................ 17

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022)........................................ 2, 9, 10, 11

*Picard v. Magliano*,
42 F.4th 89 (2d Cir. 2022) ........................................ 8

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ........................................ 6, 7

*United States v. Cruikshank*,
92 U.S. 542 (1876) ........................................ 2

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........................................ 6

*Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co.*, Ltd.,
339 F.3d 101 (2d Cir. 2003) ........................................ 10

**Rules**

Fed. R. Civ. P. 65 ........................................ 1

## PRELIMINARY STATEMENT

Plaintiffs, Eliyohu Mintz and Eric Schwartz, by and through their attorneys, The Bellantoni Law Firm, seek a preliminary injunction of two criminal statutes that prohibit conduct presumptively protected by the Second and Fourteenth Amendments.

Penal Law sections 265.01-e (c) and (f) prohibit the possession of firearms at places recently deemed by New York State to be 'sensitive locations' where the peaceable possession of firearms for self-defense is a felony offense: summer camps and places of worship. New York State's restrictions are repugnant to the plain text of the Second Amendment and should be enjoined.

Pursuant to Fed. R. Civ. P. 65, Plaintiffs seek an Order preliminary enjoining Acting Superintendent of the New York State Police Steven Nigrelli, Sheriff Ronald Stevens, and District attorney Susan Mallery, all their successors, officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with them who receive actual notice thereof from enforcing Penal Law sections 265.01-e (c) and (f).

## CONSTITUTIONAL FRAMEWORK

The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." The Second Amendment is fully applicable to the states through the Fourteenth Amendment. See, *McDonald v. Chicago*, 561 U.S. 742 (2010).

The rights protected by the Second Amendment – the right to possess and carry weapons - are "pre-existing" and "individual rights". They are not "granted" by the government.

> "Putting all of these textual elements together, we find that they **guarantee** the individual right to possess and carry weapons in case of confrontation. This meaning is strongly confirmed by the historical background of the Second Amendment. We look to this because it has always been widely understood that

> the Second Amendment, like the First and Fourth Amendments, codified a **pre-existing right**. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it "shall not be infringed." As we said in *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1876), "[t]his is **not a right granted by the Constitution**. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed ...."

*District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (emphasis added).

Plaintiffs' right to possess and carry weapons for self-defense is presumptively guaranteed. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126, 2135 (2022) ("In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."); see also, *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (weapons in common use for self-defense are protected within the scope of the Second Amendment).

Under the *Bruen* test for determining challenges to regulations implicating the rights protected by the Second Amendment:

> "When the regulated conduct falls within the plain text of the Second Amendment, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.
>
> Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"

*Bruen*, at 2126 (emphasis added).

And "to the extent later history contradicts what the text says, the text controls. *Bruen*, at 2137.

## MATERIAL FACTS

Plaintiffs are employed by Oorah, Inc. ("Oorah"), a non-profit corporation that provides year-round activities for Orthodox Jewish children, adults, and families on over 1000 acres of land in a rural part of Schoharie County, New York. [Declaration of Eliyohu Mintz at ¶¶ 1-6; Declaration of Eric Schwartz at ¶¶3-5, 8].

Oorah's summer camp program ("The Zone") consists of two sleepaway camps – one for boys and one for girls - ages 9 through 18. The Boys' camp is located in the Town of Jefferson and the Girls' camp is located in the Town of Gilboa. Each campus consists of over 500 acres and numerous buildings. At any given point in the day, the campers are engaged in a wide variety of indoor and outdoor activities; from arts and crafts to swimming to playing with the animals on the farm, campers are on the go - traveling between numerous locations and activities. [Mintz ¶¶ 7-9; Schwartz ¶¶ 5-7, 9].

There are also numerous multi-purpose buildings at each of the campuses in which camp-focused activities and worship/religious instruction take place, including synagogues where religious services are held. [Mintz ¶13].

Plaintiffs reside at the camp year-round on a full-time (Schwartz) and part-time (Mintz) basis. [Mintz ¶22; Schwartz ¶8]. Schwartz's residence is located on the Boys' summer camp property. [Schwartz ¶8].

In the event of an active threat, the campers could be located anywhere on the campus from boating on the lake, swimming in the pool, hiking, or engaging in any number of outdoor and indoor activities. [Mintz ¶16; Schwartz ¶11]. An immediate response from law enforcement to an acute emergency involving an active threat to life and safety at the camps is highly improbable, as the Schoharie County Sheriff's Office is located approximately 40 minutes away and traveling to

the Oorah campuses requires traversing winding rural local roads and State routes. [Mintz ¶¶16-17; Schwartz ¶12]. The New York State police barracks are a located similar distance away, if not farther, and likely suffer the same challenges as the Sheriff's Office. [Mintz ¶ 18; Schwartz ¶13]. Apart from a human threat event, the presence of wild animals places the adult and child patrons, Plaintiffs, and their families at physical risk. [Mintz ¶19; Schwartz ¶14]. Wild animals inhabit the woods surrounding the campus, including bear, fox, and coyote. [Mintz ¶19; Schwartz ¶15].

The Zone is a well-known facility in upstate New York - among the Orthodox Jewish community as well as the local community. As Orthodox Jews, Plaintiffs and the staff and patrons of The Zone are easily recognizable and identifiable to the public as such, based on their manner of dress and customs, and have been openly targeted over the years for discriminatory acts including yelling ethnic and hateful slurs and throwing objects, including Molotov cocktails. [Mintz ¶20; Schwartz ¶17].

There have been prior incidents where intruders passing by the camp have stopped their cars, entered onto the camp properties, and chased children while shouting ethnic slurs. In the Winter of 2022, three of the residential buildings across from the main girls' campus were burned down under mysterious circumstances. [Mintz ¶21; Schwartz ¶18].

Unlike a singular school building in which all classes are conducted and which can (theoretically) be 'locked down' as one compound, a 'lock down' of either campus would be virtually impossible in the event of an active threat emergency. [Mintz ¶10; Schwartz ¶10]. In such case, which would necessarily be an unannounced event, the campers could be located anywhere from boating on the lake swimming in the pool, hiking, or engaging in any number of outdoor and indoor activities on the campuses – each of which span over 500 acres. [Mintz ¶11; Schwartz ¶11].

Each Plaintiff holds a valid and unrestricted New York State concealed carry handgun license that authorizes them to possess handguns in their homes and carry handguns concealed on their person for self-defense. [Mintz ¶24; Schwartz ¶19]. Since the issuance of their licenses, Plaintiffs have possessed and carried their firearms on a regular basis for protection while at the Oorah property. [Mintz ¶22; Schwartz ¶20]. Before New York enacted laws criminalizing the possession of firearms at "summer camps" and "places of religious observation," Mintz encouraged the concealed carriage of handguns by other licensed patrons and staff members while on the property, including Schwartz. [Mintz ¶25].

Because of the passage and enforcement of Penal Law 265.01-e (c) and (f), which arbitrarily criminalized the peaceable possession and/or carriage of firearms, conduct that Plaintiffs and other Oorah staff and patrons freely engaged in before now subjects them to felony arrest and prosecution, state prison, the permanent loss of Second Amendment rights, and other penalties. [Mintz ¶26; Schwartz ¶22].

Summer camp began on June 22, 2023. [Mintz ¶ 30; Schwartz ¶24]. Plaintiffs have expressed their intention to continue possessing and carrying firearms on the Oorah campuses during summer camp and throughout the year, in the synagogues, and buildings in which religious observation is held throughout the year and into the future, as they did before the laws were enacted. [Mintz ¶29; Schwartz ¶25].

Plaintiffs face a credible and concrete risk of enforcement of criminal penalties against them by Defendants because they have expressed their intention to continue possessing and carrying firearms on the Oorah properties during/at the summer camp, in the synagogues, and in other buildings in which religious observation is held. [Mintz ¶¶29-33; Schwartz ¶¶25-29].

Plaintiffs seek a preliminary injunction of Penal Law sections 265.01-e (c) and (f), without which they will continue to suffer irreparable harm in the nature of the bar to conduct protected by the Second and Fourteenth Amendments. [Mintz ¶¶30-34; Schwartz ¶29].

## LEGAL ARGUMENT

A party seeking a preliminary injunction must establish the following three elements: (1) that there is either (a) a likelihood of success on the merits and a balance of equities tipping in the party's favor or (b) a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping in the party's favor; (2) that the party will likely experience irreparable harm if the preliminary injunction is not issued; and (3) that the public interest would not be disserved by the relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## I. PLAINTIFFS HAVE STANDING

To establish standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

An injury-in-fact exists where a plaintiff suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical. Where, as here, plaintiffs challenge a law not yet been applied to them, they need not show that they are subject to an actual arrest, prosecution, or other enforcement action as a prerequisite to challenging the law. *Antonyuk v. Hochul*, No. 122CV0986GTSCFH, 2022 WL 16744700, at *8 (N.D.N.Y. Nov. 7, 2022), reconsideration denied sub nom. *Antonyuk v. Nigrelli*, No. 122CV0986GTSCFH, 2022 WL 19001454 (N.D.N.Y. Dec. 13, 2022) quoting, *Susan B. Anthony* at 158-59 ("When an

individual is subject to such a threat [of enforcement], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law.")

A plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution or enforcement thereunder. *Id.* citing, *Susan B. Anthony* at 158-59 ("Instead, we have permitted pre-enforcement review under circumstances that render the *threatened enforcement* sufficiently imminent.") [emphasis added].

The plaintiffs have established that they are suffering an injury-in-fact. The public statements made by New York Governor Kathy Hochul threatening that individuals "who carry concealed weapons in sensitive locations ... will face criminal penalties" [https://on.ny.gov/3nXWrvA], and criticizing the Supreme Court's decision in *Bruen* as an attempt to "strip away the rights of a governor to protect her citizens from gun violence"[1] and Acting State Police Superintendent Steven Nigrelli threatened, if "you violate this law, you will be arrested. Simple as that"[2] explaining that, in New York State, troopers "are standing ready" to ensure that "all laws are enforced" and emphasizing that the troopers will have "zero tolerance," and it is an "easy message" that he does not need to "spell it out more than this" [*Hardaway v. Nigrelli*, No. 22-CV-771 (JLS), 2022 WL 16646220, at *4–5 (W.D.N.Y. Nov. 3, 2022) citing, *Antonyuk*, supra] demonstrate the "threatened enforcement of a law" that is "sufficiently imminent." *Hardaway*, at *5 citing, *Susan B. Anthony*, at 158-59; *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016)

[1] *Hardaway v. Nigrelli*, No. 22-CV-771 (JLS), 2022 WL 16646220, at *4 (W.D.N.Y. Nov. 3, 2022) citing, Buffalo News, Hochul: Last-Minute Pistol Permit Seekers May be too Late to Avoid NY's New Gun Requirements, Aug 31, 2022 updated Oct. 9, 2022, available at https://buffalonews.com/news/local/crime-and-courts/hochul-last-minute-pistol-permit-seekers-may-be-too-late-to-avoid-nys-new-gun/article_ad5100a0-2943-lled-af06-cbe41e631955.html (last visited Nov. 3, 2022).

[2] *Antonyuk v. Hochul*, No. 22-CV-0986, 2022 WL 4367410, at 9 n.1 (N.D.N.Y.) (quoting statement by then-First Deputy Superintendent of the State Police Steven Nigrelli, "Governor Hochul Delivers a Press Conference on Gun Violence Prevention," https://www.youtube.com/watch?v=gC1L2rrztQs at 37:40).

(credible threat of prosecution exists when Defendant has "announced its intention to enforce the [law] against the [plaintiffs]"). Given the recency of the statutes and lack of any indication that they will be repealed, the court should be "willing to presume that the government will enforce" them. *Hardaway*, at *5 quoting, *Picard v. Magliano*, 42 F.4th 89 (2d Cir. 2022) quoting *Cayuga Nation*, at 331.

Plaintiffs have changed their conduct because of the threatened enforcement of the challenged statutes. Before the laws were passed, Mintz possessed a handgun in his residence and carried it throughout the Oorah properties and buildings thereon for protection. [Mintz ¶ 24]. It was also Schwartz's custom practice over the years to carry a handgun concealed on his person as a patron and as a staff member at the Oorah properties, including when the Boys' summer camp is in session, as well as in the synagogues, and other buildings where religious observation is conducted, for his protection and the protection of others; he and other patrons were encouraged to be armed for protection over the years and he intends to continue to engage in the same conduct into the future. [Mintz ¶¶24-25; Schwartz ¶¶20-21]. But because of the laws criminalizing the possession of firearms at "summer camps" and "places of religious observation," Plaintiffs can no longer continue to engage in the same conduct for fear of arrest, prosecution, and other criminal and civil penalties. [Mintz ¶¶25-34; Schwartz ¶¶24-25].

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A. The Bruen Test – Step One

"When the regulated conduct falls within the plain text of the Second Amendment, the Constitution presumptively protects that conduct." *Bruen*, at 2126.

The conduct being regulated by each of the regulations challenged by Appellants is the public carriage of handguns for self-defense.

The *Bruen* Court had "little difficulty concluding" that "the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct - carrying handguns publicly for self-defense" – a conclusion that the New York State defendants did not dispute. *Bruen*, at 2134.

The plain text of the Second Amendment protects carrying handguns publicly for self-defense; therefore, the Constitution presumptively protects Appellants' conduct. *Bruen*, at 2126; 2129-30.

The burden now shifts to the State to prove that the regulations – banning the possession of firearms at summer camps and in places of religious observation – is consistent with this Nation's historical tradition of firearm regulation.

**B. The Bruen Test – Step Two**

"To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, at 2126.

The scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791. *Bruen*, 2137.

"When it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Bruen*, at 2136 quoting, *D.C. v. Heller*, 554 U.S. 570, 634–635 (2008) (emphasis supplied); see also, *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 245 (5th Cir. 2022) (Ho, J. concurring) ("Bill of Rights protections like the Second Amendment must be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.") quoting *McDonald*, 561 U.S. at 765 (cleaned up) (emphasis supplied); *Bruen*, 142 S.Ct. 2111 (same).

"To the extent later history contradicts what the text says, the text controls. Liquidating indeterminacies in written laws is far removed from expanding or altering them." *Bruen*, at 2137.

"Thus, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (citation omitted).

To meet its burden, the State is constrained to identifying laws from the Founding Era (1791) that establish a tradition of criminalizing the peaceable possession and carriage of firearms in summer camps and places of religious observation.

Failure to do so requires the injunction of Penal Law sections 265.01-e (c) and (f) because failure on the part of the government to justify its regulations requires a finding that the regulations violate the Second Amendment; all remaining factors fall in Plaintiffs' favor.

## III. PLAINTIFFS WILL CONTINUE TO SUFFER IRREPARABLE HARM

Plaintiffs are suffering and will continue to suffer irreparable harm without the requested relief.

'Irreparable harm' is certain and imminent harm for which a monetary award does not adequately compensate. *Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co.*, Ltd., 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

Plaintiffs, who reside on property that serves as a summer camp, are barred from possessing firearms in their residence and from carrying firearms for protection while on the 1000+ acres of Oorah property.

Plaintiffs are also barred from possessing a firearm in any of the numerous buildings on the properties in which religious activities take place, which include two synagogues. As an Orthodox Jewish organization and facility, many of the buildings are multi-use and involve programs and activities involving religious expression and observation. In that respect, Plaintiffs are being forced to forego their Second Amendment rights to exercise their First Amendment rights to the free exercise of religion, and vice versa. And they are forced to give up their rights to armed self-defense outside the home, "being left to the mercy of opportunistic, lawless individuals who might prey on them and have no concern about the place of worship exclusion." *Hardaway*, at *17.[3]

**IV. AN INJUNCTION IS IN THE PUBLIC INTEREST**

When a plaintiff establishes a likelihood that the government's regulations violate the U.S. Constitution, the public interest is served by enjoining the continued constitutional violations.

The public has a significant interest in the "strong sense of the safety that a licensed concealed handgun regularly provides, or would provide, to the many law-abiding responsible citizens in the state too powerless to physically defend themselves in public without a handgun." *Hardaway*, at *18 quoting, *Antonyuk v. Bruen*, No. 22-CV-0734, ––– F.Supp. 3d ––––, ––––, 2022 WL 3999791, at *36 (N.D.N.Y. Aug. 31, 2022).

'Gun free' zones are inherently harmful to the public interest because they place a bullseye on innocent people and intentionally disarm those individuals who are in the best position to neutralize a violent attacker - gun owners. The only people who benefit from gun-free zones are

[3] Citing, *Bruen*, at 2157-58 (Alito, J concurring) (querying whether "a person bent on carrying out a mass shooting be stopped if he knows that it is illegal to carry a handgun outside the home?" and observing that Some are members of groups whose members feel especially vulnerable. And some of these people reasonably believe that unless they can brandish or, if necessary, use a handgun in the case of attack, they may be murdered, raped, or suffer some other serious injury." *Id.* Indeed, "[o]rdinary citizens frequently use firearms to protect themselves from criminal attack. According to survey data, defensive firearm use occurs up to 2.5 million times per year." *Id.* (citation omitted).

criminals; like a neon sign, gun-free zones announce to the world that ***everyone*** inside the zone of danger is disarmed and utterly defenseless.

Particularly here, where the children and staff are Orthodox Jews – a population that has historically been the target of violent attacks – being armed in case of violent confrontation is paramount.[4] The violent attacks on Jewish people, children, and places of worship – the most vulnerable of the population - are random and provide the victims with no notice or advance warning. The most efficient and successful means of protection is the use of a firearm – the most preferred means of self-defense. See, *Heller*, at 629. And because firearms "are also the most popular weapon chosen by perpetrators of violent crimes", the ability to successfully defend against an armed attacker is paramount.[5]

The Jewish people have, for centuries, been the target of governmental, individual, and societal eradication on a local, national, and international scale, making Plaintiffs and the people at the Oorah properties a unique target group.

[4] It is well-documented that Antisemitic hate crimes are disproportionately higher than other forms of hate crimes. See, e.g. https://www.justice.gov/crs/highlights/2021-hate-crime-statistics
https://jewishinsider.com/2023/03/hate-crimes-antisemitism-fbi-rep-kathy-manning-anti-defamation-league-american-jewish-committee/
https://www.jewishvirtuallibrary.org/statistics-on-religious-hate-crimes
https://www.nytimes.com/2023/03/23/us/antisemitism-anti-defamation-league-report.html

[5]Take as merely one example the Buffalo, New York killings in May 2022: because of the now-stricken "proper cause" requirement for the issuance of a handgun license and the State's discretionary may-issue licensing scheme, regular citizens were unable to defend against the mass killer in the predominantly black area of Buffalo. "There were virtually no concealed handgun permits [issued] in Buffalo where the attack occurred." As the killer's manifesto indicates, "areas where CCW permits are low may also" be good areas of attack. Ten people were killed and thirteen shot. "(REDACTED) has the highest black population percentage (zip code *****) and isn't that far away. Plus NY has heavy gun laws so it would ease me if I knew that any legally armed civilian was limited to 10 round magazines or cucked firearms." The Buffalo killer, a self-proclaimed white supremacist, also declared: "I wish all JEWS to HELL! Go back to hell where you came from DEMON!" https://crimeresearch.org/2022/05/new-york-mass-public-shooter-explicitly-targeted-areas-where-ccw-are-outlawed-or-prohibited-may-be-good-areas-of-attack-areas-with-strict-gun-laws-are-also-great-places-of-attack/

**Response Time And Resources In Schoharie County**

Law enforcement cannot respond to a violent attacker faster than an armed victim. And the police are a reactionary force – responding only when they are made aware that a violent act is occurring or has already occurred.

The Schoharie County Sheriff's website notes that there are 620 square miles in Schoharie County that "are patrolled by the Chief Deputy and several Deputy Sheriff's" when they are not also "serving warrants, making arrests, investigating crime scenes, responding to motor vehicle accidents and a wide gamut of complaints…appearing in court, assisting other agencies, transporting prisoners and mental health patients, providing police escorts and relays, and performing counter-drug surveillance's [sic] [and] [m]ore recently, due to a large number of community and school requests, Deputies participate in various educational and preventive activities for many schools and civic organizations."[6]

Schoharie County is a rural part of New York State, and its roadways, including those leading to the two Oorah properties are winding local roads and State routes. Plaintiff Mintz was informed by the Schoharie County Sheriff's office that the response time varies depending on whether an officer is 'available' to respond, and would likely be a minimum of 40 minutes. [Mintz ¶17]. In an active threat situation, time is of the essence. Plaintiffs, staff, and the children they are responsible for protecting while at camp cannot remain defenseless, unarmed, targets unable to respond and mitigate or neutralize an active threat until the police show up.

Again, these properties are 1000+ acres, multiple buildings, numerous outdoor and indoor activities with hundreds of kids at various places having fun. Lockdown is not a possibility.

---

[6] https://www4.schohariecounty-ny.gov/departments/sheriffs-office/sheriffs-road-patrol/

## *Bruen* Confirmed (Again) The Right To Defensive Gun Use

> "Ordinary citizens frequently use firearms to protect themselves from criminal attack. According to survey data, defensive firearm use occurs up to 2.5 million times per year."

*Bruen*, at 2159 (Alito, J. concurring) citing, Brief for Law Enforcement Groups et al. as *Amici Curiae*.

Justice Alito also highlighted a Centers for Disease Control and Prevention report commissioned by former President Barack Obama, which reviewed the literature surrounding firearms use:

> "[s]tudies that directly assessed the effect of actual defensive uses of guns ... have found consistently lower injury rates among gun-using crime victims compared with victims who used other self-protective strategies."

*Bruen*, at 2159 citing, Institute of Medicine and National Research Council, Priorities for Research To Reduce the Threat of Firearm-Related Violence 15–16 (2013) (referenced in Brief for Independent Women's Law Center as *Amicus Curiae* 19–20).

> "Many of the amicus briefs filed in this case tell the story of such people. Some recount incidents in which a potential victim escaped death or serious injury only because carrying a gun for self-defense was allowed in the jurisdiction where the incident occurred. Here are two examples. One night in 1987, Austin Fulk, a gay man from Arkansas, "was chatting with another man in a parking lot when four gay bashers charged them with baseball bats and tire irons. Fulk's companion drew his pistol from under the seat of his car, brandished it at the attackers, and fired a single shot over their heads, causing them to flee and saving the would-be victims from serious harm." Brief for DC Project Foundation et al. as Amici Curiae 31 (footnote omitted).
>
> On July 7, 2020, a woman was brutally assaulted in the parking lot of a fast food restaurant in Jefferson City, Tennessee. Her assailant slammed her to the ground and began to drag her around while strangling her. She was saved when a bystander who was lawfully carrying a pistol pointed his gun at the assailant, who then stopped the assault and the assailant was arrested. Ibid. (citing C. Wethington, Jefferson City Police: Legally Armed Good Samaritan Stops

> Assault, ABC News 6, WATE.com (July 9, 2020), https://www.wate.com/news/local-news/jefferson-city-police-legally-armed-good-samaritan-stops-assault/).
>
> In other incidents, a law-abiding person was driven to violate the Sullivan Law because of fear of victimization and as a result was arrested, prosecuted, and incarcerated. See Brief for Black Attorneys of Legal Aid et al. as Amici Curiae 22–25.
>
> Some briefs were filed by members of groups whose members feel that they have special reasons to fear attacks. See Brief for Asian Pacific American Gun Owners Association as Amicus Curiae; Brief for DC Project Foundation et al. as Amici Curiae; Brief for Black Guns Matter et al. as Amici Curiae; Brief for Independent Women's Law Center as Amicus Curiae; Brief for National African American Gun Association, Inc., as Amicus Curiae."

*Bruen*, at 2159.

Indeed, studies demonstrate that defensive gun use is four – five times more common than gun related crime.[7, 8, 9, 10] The CDC has even reported, "Defensive use of guns by crime victims is a common occurrence"[11] and a 2020 report published by the FBI supports the fact that armed citizens are their own best and last line of defense - not law enforcement.[12,13, 14] Since 1990, over 69 mass shootings have been stopped by armed civilians.[15]

[7] https://www.breitbart.com/politics/2021/09/23/john-lott-defensive-gun-uses-four-or-five-times-more-common-than-gun-crimes/

[8] "Gun control advocates raise the concern that concealed handgun permit holders who stop an attack might accidentally shoot a bystander. They are also fearful that the police might accidentally kill the permit holder. While such incidents are a possibility, they have yet to occur. We probably do not have all the cases where a permit holder stopped a mass public shooting, but if a permit holder were to shoot a bystander, it seems clear that such an event would get news coverage." https://crimeresearch.org/2023/02/uber-driver-in-chicago-stops-mass-public-shooting/

[9] https://crimeresearch.org/tag/defensive-gun-use/

[10] https://datavisualizations.heritage.org/firearms/defensive-gun-uses-in-the-us/

[11]See,https://www.forbes.com/sites/paulhsieh/2018/04/30/that-time-the-cdc-asked-about-defensive-gun-uses/?sh=707b03af299a (citing a 2013 study ordered by the Centers for Disease Control and Prevention (CDC) and conducted by The National Academies' Institute of Medicine and National Research Council).

[12] https://www.personaldefenseworld.com/2021/09/fbi-report-armed-citizens/

[13] https://www.ccrkba.org/fbi-report-says-armed-citizens-killed-more-criminals-than-police-ccrkba/ ("The FBI Uniform Crime Report for 2020 indicates that armed private citizens killed more criminals during the commission of a felony than were killed by police").

[14]Survey data indicates that in 95% of cases, when people use guns defensively, they merely show the gun to make the criminal back off; such defensive gun uses rarely make the news. https://crimeresearch.org/2022/02/responding-to-gvpedias-claims-about-constitutional-carry-laws/

[15]https://www.thewashingtongazette.com/2021/04/69-mass-shootings-have-been-stopped-by.html?utm_source=reddit&utm_medium=social&utm_campaign=socialshare (since the publication of this article

> "In this case, petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. We too agree, and now hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."

*Bruen*, at 2122.

Observing that "*Heller* correctly recognized that the Second Amendment codifies the right of ordinary law-abiding Americans to protect themselves from lethal violence by possessing and, if necessary, using a gun", the Court noted that "in 1791, when the Second Amendment was adopted, there were no police departments, and many families lived alone on isolated farms or on the frontiers. If these people were attacked, they were on their own. It is hard to imagine the furor that would have erupted if the Federal Government and the States had tried to take away the guns that these people needed for protection. Today, unfortunately, many Americans have good reason to fear that they will be victimized if they are unable to protect themselves. And today, no less than in 1791, the Second Amendment guarantees their right to do so." *Bruen*, at 2161.

The public interest favors the exercise of Second Amendment rights by law-abiding responsible citizens. And it is always in the public interest to prevent the violation of a person's constitutional rights. *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1136 (S.D. Cal. 2017), aff'd, 742 F. App'x 218 (9th Cir. 2018) (granting preliminary injunction of California's magazine ban statute) citing, *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), aff'd sub nom., *Burwell v. Hobby Lobby Stores, Inc.*, —— U.S. ——, 134 S.Ct. 2751 (2014).

---

in 2021, even more armed civilians have stopped mass killers, as detailed herein, which is not an exhaustive accounting). "Another reason the 'good guy with a gun' notion is true is because, according to surveys with convicted felons, 40% decided not to commit a crime because they thought the victim had a gun. Additionally, more than 1 in 3 convicted felons had been 'scared off, shot at, wounded, or captured by an armed victim.' This shows that guns do regularly stop crimes in progress and even may stop premeditated crimes from occurring." *Id.*

## V. ENJOINING UNCONSTITUTIONAL LAWS FAVORS PLAINTIFFS

In the context of enjoining an unconstitutional statute, the balance of harms will always favor the plaintiff because "the public interest is not served by the enforcement of an unconstitutional law, and securing Second Amendment rights "is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (First Amendment) citing, *Am. C.L. Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003), aff'd and remanded, 542 U.S. 656, 124 S. Ct. 2783, 159 L. Ed. 2d 690 (2004) (the "Government does not have an interest in the enforcement of an unconstitutional law.").

Moreover, *Heller, McDonald,* and *Bruen* have affirmatively rejected 'interest balancing' in the context of Second Amendment rights. In that regard, balancing an individual's harm against the government interests is improper.

## CONCLUSION

Based on the foregoing, along with the Declarations and Exhibits submitted herewith, Defendants, their officers, agents, servants, and employees, all other persons who are in active concert or participation with Defendants receiving actual notice of such order by personal service or otherwise, should be preliminary enjoined from enforcing Penal Law sections 265.01-e (c) and (f) through the pendency of this action.

Dated: June 30, 2023
Scarsdale, New York

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiffs*

By: Amy L. Bellantoni

Amy L. Bellantoni (AB3061)
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090 (t)
(888) 763-9761 (f)
abell@bellantoni-law.com