UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

ELIYOHU MINTZ and ERIC SCHWARTZ,

                Plaintiffs,

       -against-                            Case No. 23 Civ. 795 (MAD) (CFH)

STEVEN NIGRELLI, in his official capacity as
Acting Superintendent of the New York State Police,
RONALD STEVENS, in his official capacity as Sheriff
of Schoharie County, and SUSAN J. MALLERY, in her
official capacity as District Attorney for Schoharie
County,

                Defendants.

-------------------------------------------------------------------X

**SUPERINTENDENT NIGRELLI'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
AGAINST THE PROHIBITION ON GUNS IN SUMMER CAMPS
AND PLACES OF WORSHIP**

LETITIA JAMES
Attorney General
State of New York
The Capitol
Albany, New York 12224-0341
Attorney for Superintendent Nigrelli

Michael G. McCartin, Bar Roll No. 511158
James M. Thompson, Bar Roll No. 703513
July 14, 2023

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ..............................................................................5

    A. Bruen and the CCIA..................................................................5

    B. Facts Alleged in the Complaint....................................................6

STANDARD OF REVIEW ...........................................................................7

ARGUMENT.............................................................................................8

    I.  PLAINTIFFS' YEAR-LONG DELAY NEGATES ANY FINDING OF
        IRREPARABLE HARM ........................................................8

    II.  PLAINTIFFS HAVE NOT SHOWN A CLEAR LIKELIHOOD OF SUCCESS
        ON THE MERITS......................................................................10

        A. Plaintiffs' Pre-enforcement Facial Challenge Requires Them To Show That
            There Is No Set of Circumstances Where The Bans On Guns In Summer Camps
            Or Places Of Worship Could Be Constitutional.......................................11

        B. The Constitution Does Not Require Guns In Summer Camps ..................12

            1.  Plaintiffs Have Not Carried Their Burden To Demonstrate That The Second
                Amendment's Text Applies.........................................................13

            2.  The Supreme Court's Jurisprudence Makes Clear That Schools And Places
                Like Them Are Sensitive Locations Where Guns May Be Prohibited............16

            3.  Prohibiting Guns In Summer Camp Is Consistent With American Legal
                History And Tradition .................................................................19

        C. The Constitution Does Not Require Guns In Places Of Worship..............23

            1.  The Law Protecting Places Of Worship Contains Exceptions That Require
                Dismissal..............................................................................24

            2.  Plaintiffs Have Not Carried Their Burden To Demonstrate That The
                Second Amendment Applies.........................................................25

            3.  Prohibiting Guns In Places of Worship Is Consistent With American
                Legal History And Tradition.........................................................27

    III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST DO NOT
        SUPPORT GUNS IN SUMMER CAMP OR PLACES OF WORSHIP .......................33

IV. ANY INJUNCTION SHOULD BE LIMITED TO THE PARTIES AND STAYED
    PENDING APPEAL ................................................................................................ 35

CONCLUSION .................................................................................................................... 36

## TABLE OF AUTHORITIES

<span style="font-variant: small-caps">Cases</span>

Andrews v. State,
    50 Tenn. 165 (1871)..................................................................................... 29

Antonyuk v. Bruen ("Antonyuk I"),
    624 F. Supp. 3d 210 (N.D.N.Y. 2022) ......................................................... 32

Antonyuk v. Hochul ("Antonyuk II"),
    _F.Supp.3d_, No. 1:22-CV-0986, 2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022) .................. 32

Antonyuk v. Hochul ("Antonyuk III"),
    __ F. Supp. 3d __, No. 1:22-CV-0986, 2022 WL 16744700
    (N.D.N.Y. Nov. 7, 2022)................................................................ 18-19, 31-32

Babbitt v. UFW Nat'l Union,
    442 U.S. 289 (1979)........................................................................................ 9

Carson Optical, Inc. v. Alista Corp.,
    No. 19-CV-1725, 2019 WL 3729460 (E.D.N.Y. Aug. 8, 2019).......................... 10

Christopher v. Ramsey County,
    621 F. Supp. 3d 972 (D. Minn. 2022) ............................................................ 18

Clapper v. Amnesty Int'l USA,
    568 U.S. 398 (2013)...................................................................................... 24

Community Housing Improvement Program v. City of New York,
    59 F.4th 540 (2d Cir. 2023)...................................................................... 11-12

Defense Distributed v. Bonta,
    No. CV 22-6200, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022)..................... 10, 13, 16, 26

Deferio v. City of Syracuse,
    306 F. Supp. 3d 492 (N.D.N.Y. 2018) ........................................................... 35

Dickerson v. Napolitano,
    604 F.3d 732 (2d Cir. 2010) .......................................................................... 12

District of Columbia v. Heller,
    554 U.S. 570 (2008)...................................................................................... 17

English v. State,
    35 Tex. 473 (1871) ........................................................................................ 30

Faiveley Transp. Malmo AB v. Wabtec Corp.,
    559 F.3d 110 (2d Cir. 2009) ............................................................. 8

Frey v. Nigrelli,
    __ F. Supp. 3d __, No. 21-CV-5334, 2023 WL 2473375
    (S.D.N.Y. Mar. 13, 2023) ....................................................passim

Gazzola v. Hochul,
    __ F. Supp. 3d __, No. 22-CV-1134, 2022 WL 17485810
    (N.D.N.Y. Dec. 7, 2022) ............................................14, 26

GeorgiaCarry.Org, Inc. v. Georgia,
    687 F.3d 1244 (11th Cir. 2012), ...........................................25-26

Goldstein v. Hochul,
    __ F. Supp. 3d __, No. 22-CV-8300, 2023 WL 4236164
    (S.D.N.Y. June 28, 2023) ....................................................passim

Hall v. Garcia,
    No. C 10-3799, 2011 WL 995933 (N.D. Cal. Mar. 17, 2011) ............................. 18

Hardaway v. Nigrelli,
    No. 22 Civ. 771, 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ........................ 31

Hill v. State,
    53 Ga. 472 (Ga. 1874) ................................................................ 30

Hornig v. Trustees of Columbia Univ. in City of New York,
    No. 17-CV-3602, 2018 WL 5800801 (S.D.N.Y. Nov. 5, 2018) ........................ 8

Jacoby & Meyers v. Presiding Justices,
    852 F.3d 178 (2d Cir. 2017) ........................................................ 11

Kane v. De Blasio,
    19 F.4th 152 (2d Cir. 2021) ........................................................ 35

Kearns v. Cuomo,
    981 F.3d 200 (2d Cir. 2020) ........................................................ 24

Kennedy v. Bremerton Sch. Dist.,
    142 S.Ct. 2407 (2022) ................................................................ 13

Koons v. Platkin,
    _ F.Supp.3d _, No. 22-CV-7464, 2023 WL 3478604 ...................................... 31

Levola v. Fischer,
    403 F. App'x 564 (2d Cir. Dec. 14, 2010) ........................................... 8

Livery Round Table, Inc. v. New York City FHV & Limousine Comm'n,
  No. 18-CV-2349, 2018 WL 1890520 (S.D.N.Y. Apr. 18, 2018)...........................................9

Maryland Shall Issue, Inc. v. Montgomery Cty., Md.,
  No. TDC 21-1736, 2023 WL 4373260 (D. Md. July 6, 2023)...........................18-19, 23, 31

McDonald v. City of Chicago,
  561 U.S. 742 (2010)...................................................................................17

Miller v. Smith,
  No. 18-CV-3085, 2022 WL 782735 (C.D. Ill. Mar. 14, 2022)..........................................18

Moore v. Con. Edison Co.,
  409 F.3d 506 (2d Cir. 2005)...........................................................................11

N.Y. State Corr. Officers & Police Benevolent Ass'n, Inc. v. Hochul,
  607 F. Supp. 3d 231 (N.D.N.Y. 2022)...............................................................25

Nken v. Holder,
  556 U.S. 418 (2009)..............................................................................33, 35

Nordyke v. King,
  563 F.3d 439 (9th Cir. 2009).........................................................................17

NRA v. Bondi,
  61 F.4th 1317 (11th Cir. 2023).......................................................................28

NYSRPA v. Bruen,
  142 S.Ct. 2111 (2022)............................................................................passim

Oakland Tactical Supply, LLC v. Howell Township,
  No. 18-cv-13443, 2023 WL 2074298 (E.D. Mich. Feb. 17, 2023)..............................14-15

Ocean State Tactical, LLC v. Rhode Island,
  __ F. Supp. 3d __, No. 22-CV-246, 2022 WL 17721175
  (D.R.I. Dec. 14, 2022)...............................................................................14

Oliver v. N.Y. State Police,
  No. 1:15-CV-00444, 2019 WL 2009182 (N.D.N.Y. May 6, 2019).......................................8

Or. Firearms Fed'n, Inc. v. Brown,
  __ F. Supp. 3d __, No. 2:22-CV-01815, 2022 WL 17454829 (D. Or. Dec. 6,
  2022)..............................................................................................14, 16

People ex. Rel. Schneiderman v. Actavis PLLC,
  787 F.3d 638 (2d Cir. 2015).........................................................................7-8

Picard v. Magliano,
    42 F.4th 89 (2d Cir. 2022)..................................................................... 12

Restaurant Law Ctr. v. City of N.Y.,
    360 F. Supp. 3d 192 (S.D.N.Y. 2019).................................................. 12

Solomon v. Cook Cty. Bd. of Commissioners,
    559 F. Supp. 3d 675 (N.D. Ill. 2021)................................................... 17

State v. Reando,
    (Mo. 1878) .......................................................................................... 30

Susan B. Anthony List v. Driehaus,
    573 U.S. 149 (2014)............................................................................. 9

Trump v. Hawaii,
    138 S.Ct. 2392 (2018)......................................................................... 35

Two Hands IP LLC v. Two Hands Am., Inc.,
    563 F. Supp. 3d 290 (S.D.N.Y. 2021)................................................. 9

United States v. Alaniz,
    69 F.4th 1124 (9th Cir. 2023).............................................................. 28

United States v. Lucha El Libertad,
    __ F. Supp. 3d __, No. 22-CR-644, 2023 WL 4378863
    (S.D.N.Y. July 7, 2023)................................................................... 15-16

United States v. Masciandaro,
    638 F.3d 458 (4th Cir. 2011)............................................................... 18

United States v. Reyna,
    No. 21-CR-41, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ............... 14-15, 26

United States v. Robertson,
    No. 22-po-867, 2023 WL 131051 (D. Md. Jan. 9, 2023)...................... 17

United States v. Salerno,
    481 U.S. 739 (1987)......................................................................... 2, 11

United States v. Siddoway,
    No. 21-cr-205, 2022 WL 4482739 (D. Idaho, Sept. 27, 2022)............ 13

United States v. Walter,
    No. 20 Cr. 39, 2023 WL 3020321 (D.V.I Apr. 20, 2023).................... 18

Vt. Right to Life Cmte. v. Sorrell,
    758 F.3d 118 (2d Cir. 2014)............................................................... 12

Warden v. Nickels,
    697 F. Supp. 2d 1221 (W.D. Wash. 2010)........................................................ 18

Winter v. NRDC, Inc.,
    555 U.S. 7 (2008) ...............................................................................................7, 33

Wrenn v. District of Columbia,
    864 F.3d 650 (D.C. Cir. 2017)............................................................................ 16

## CONSTITUTIONS

Second Amendment.............................................................................................passim

Fourteenth Amendment .......................................................................3, 19, 27-28

Ariz. Const.
    art. XXII § 2 (1912)........................................................................................... 22

Okla. Const. Schedule
    § 2.......................................................................................................................... 22

## STATE STATUTES

1890 Okla. Stat. 495-96 .......................................................................................23, 28

1889 Ariz. Sess. Laws 16 .......................................................................................... 28

1889 Ariz. Sess. Laws 17 .......................................................................................... 22

1870 Ga. Laws 421 ..................................................................................................21, 28

1883 Mo. Laws 76 ..................................................................................................... 22

N.Y. Penal Law
    § 265.01-e ....................................................................................................passim

1869-70 Tenn. Pub. Acts 23 ..................................................................................... 21

1870 Tex. Gen. Laws 63 .........................................................................................21, 28

## RULES

Fed. R. App. P. 8(a)(1)............................................................................................. 35

MISCELLANEOUS AUTHORITIES

Andrew Willinger, The Territories Under Text, History, and Tradition, 101 Wash.
   U. L. Rev. __ (forthcoming) ................................................................. 22

Eric Ruben and Saul Cornell, Firearm Regionalism and Public Carry: Placing
   Southern Antebellum Case Law in Context, 125 Yale L.J. Forum 121 (2015) .................... 29

Joseph Blocher, Firearms Localism, 123 Yale L.J. 82, 112-16 (2013) ...................................... 29

Joseph Reimer, Making Shabbat – Celebrating And Learning At American Jewish
   Summer Camps 27-28 (Brandeis Univ. Press 2022) ........................................... 20

Michael B. Smith, "'The Ego Idea of the Good Camper' and the Nature of
   Summer Camp." Environmental History 11 (January 2006) ................................. 20

Press Release, Governor Kathy Hochul, Governor Hochul Signs Landmark
   Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed
   Carry Weapons in Response to Reckless Supreme Court Decision,
   (July 1, 2022) ............................................................................................ 5

W. Barksdale Maynard, "'An Ideal Life in the Woods for Boys': Architecture and
   Culture in the Earliest Summer Camps." Winterthur Portfolio 34, no. 1 (1999) ................. 20

Defendant Steven A. Nigrelli, sued in his official capacity as Acting Superintendent of the New York State Police, by his attorney Letitia James, Attorney General of the State of New York, respectfully submits this memorandum of law in opposition to the motion for a preliminary injunction, ECF No. 4, filed by Plaintiffs Eliyohu Mintz and Eric Schwartz ("Plaintiffs").

## PRELIMINARY STATEMENT

Parents and children across New York State count on summer camps to be safe places, where young people can learn and play free from fear. People of faith across New York State count on places of worship to be safe, so that prayer, fellowship, and quiet contemplation can take place. The presence of firearms is a threat to the safety of these and other sensitive locations, and New York law wisely prohibits people from carrying weapons within them, subject to certain exceptions for well-trained persons who can keep the peace, such as current and retired law enforcement officers, licensed security guards, and (in the case of places of worship) persons chosen by religious leaders or by the congregation to provide security. The Plaintiffs seek a preliminary injunction declaring the laws that protect these places facially unconstitutional. Neither the Second Amendment nor the Supreme Court's recent decision in NYSRPA v. Bruen, 142 S.Ct. 2111 (2022), supports such a result.

As an initial matter, Plaintiffs' unexplained delay of nearly a year negates any finding of irreparable harm and requires that preliminary relief be denied. The statute protecting summer camps and places of worship was passed on July 1, 2022 and went into effect on September 1, 2022, but Plaintiffs waited until June 30 of this year – all while regularly using the campgrounds in question for holidays, singles clubs, religious meetings, internal corporate retreats, and the beginning of this year's summer camp – without taking any action. Precedent within the Second Circuit establishes that a delay of two-and-a-half to three months is sufficient to bar preliminary

injunctive relief, and Plaintiffs have offered no reason why their delay of 364 days would warrant a different outcome.

Plaintiffs have also failed to establish a clear likelihood of success on the merits of their Second Amendment challenge. Because Plaintiffs are bringing a pre-enforcement suit against a law that has never been enforced against them, they have brought "the most difficult challenge to mount successfully," as they "must establish that no set of circumstances exist under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). They have not come close to doing so. Bruen lays out a two-step analysis: first, a plaintiff must establish that the text of the Second Amendment covers his or her conduct, at which point the burden shifts to the government to demonstrate that its measure is "consistent with the Nation's historical tradition of firearm regulation" by identifying analogous historical measures that are "relevantly similar." 142 S.Ct. at 2129-30, 2132-33. Plaintiffs' moving brief makes no effort to carry their burden at Step One of the Bruen test to demonstrate that the Second Amendment applies to their conduct, instead simply asserting without authority that "[t]he conduct being regulated by each of the regulations challenged by Appellants is the public carriage of handguns for self-defense." ECF No. 4-4 (the "PI Br.") at 8. This is simply wrong: the protections Plaintiffs are challenging prohibit guns in two different *private* locations where weapons do not belong, and contain significant exceptions that Plaintiffs do not acknowledge, let alone grapple with. Because Plaintiffs, as preliminary injunction movants and the party bearing the burden at Bruen Step One, do not demonstrate that the Second Amendment covers their conduct, the analysis can begin and end there.

If the Court reaches the history-and-tradition test at Bruen Step Two, both of the challenged laws comfortably survive constitutional scrutiny. Summer camps are closely

analogous to schools – a paradigmatic sensitive location and one that the Supreme Court has repeatedly designated as worthy of protection from guns.  See Bruen, 142 S.Ct. at 2133 ("[W]e are also aware of no disputes regarding the lawfulness of such prohibitions").  Federal courts both before and after Bruen have found prohibitions on guns in analogous places – such as playgrounds, fairgrounds, daycares, nursery schools, schoolgrounds, community centers, and childcare facilities – to be constitutional.  There is no reason why a summer camp, the place schoolchildren go after schools close in June, would result in a different analysis.  And as demonstrated by a host of historical sources adduced by New York and expert historian Patrick Charles, our forefathers wisely prohibited guns in a host of analogous places – not only "schoolroom[s]," but also any "other place where persons are assembled for educational, literary or scientific purposes," ballrooms, circuses, public exhibitions, and other places people visit for education, recreation, or amusement.

Plaintiffs have not demonstrated a clear likelihood of success on the challenge to the law protecting places of worship, either.  To start, they trip over the law's exception for "those persons responsible for security at such place of worship."  N.Y. Penal Law § 265.01-e(2)(c).  If Plaintiffs have been entrusted with security at the synagogues where they wish to carry guns, then they have no standing because the prohibition on armed carriage does not apply to them.  On the other hand, if they are not responsible for security, then they have not shown (and cannot show) that the Second Amendment conveys a right to carry guns to protect a congregation that has not asked them to do so.  Moreover, laws protecting places of worship by prohibiting firearms were well-known to American history.  The brief below and the Declaration of Patrick Charles identify six different states that had similar laws at around the time of the adoption of the Fourteenth Amendment, along with a host of representative local laws – cities and towns being

3

the level at which Nineteenth-century Americans most commonly regulated the carriage of firearms. Plaintiffs have adduced no history as part of their case-in-chief, meaning that the Superintendent's historical showing is uncontradicted.

Plaintiffs' motion also fails on the equities and the public interest. The harm to Plaintiffs if the motion is denied is negligible – operations at their campground will continue just as they have over the entirety of the past year, during which the law has been in effect. If Plaintiffs' organization determines that the presence of armed guards is indispensable, it can hire a licensed security guard or off-duty law enforcement officer – or simply have Plaintiffs Mintz and Schwartz obtain a security guard license. And to the extent that Plaintiffs Mintz and Schwartz wish to carry firearms in a synagogue, they can do so if the synagogue wishes them to provide security. But if the Court were to grant Plaintiffs' motion, and enjoin the prohibition on guns in summer camps and places of worship, the effect could be devastating. Parents across New York would suddenly have to grapple with a situation where their children's camps were open to firearms, and children would have to come to terms with a new threat in a place they formerly considered safe.

The Second Amendment does not require that guns be carried in summer camps and houses of worship. Plaintiffs have not shown otherwise, and the uncontradicted history demonstrates that our ancestors would have considered these locations sensitive places where people can – and should – be protected from gun violence. Plaintiffs' motion for a preliminary injunction should be denied.

**STATEMENT OF FACTS**

**A.  Bruen and the CCIA**

On July 1, 2022, the Concealed Carry Improvement Act ("CCIA") was passed by the New

York State Legislature in special session and signed into law.  The bill was specifically designed

"to align with the Supreme Court's recent decision in []Bruen."  Press Release, Governor Kathy

Hochul (July 1, 2022) (available at https://on.ny.gov/3BM6Hz7).   In Bruen, the Supreme Court

found that a single provision of New York's gun licensing regime was unconstitutional – the

provision that required an applicant to demonstrate "proper cause" to obtain a license to carry a

concealed weapon.  The Court held that requiring such a heightened, individualized need for self-

defense to obtain a license violated the Second Amendment.  See Bruen, 142 S.Ct. at 2156; see

also id. at 2157 (Alito, J., concurring) ("[T]oday's decision therefore holds that a State may not

enforce a law, like New York's Sullivan Law, that effectively prevents its law-abiding residents

from carrying a gun for [self-defense].  That is all we decide.").  The Court did not address any

other provision of New York's gun licensing or related statutes, and in fact held that "nothing in

our analysis should be interpreted to suggest the unconstitutionality of . . . 'shall-issue' licensing

regimes, under which 'a general desire for self-defense is sufficient to obtain a permit.'"  Id. at

2138 n.9 (cleaned up).

The Sponsor's Memo of the CCIA makes it clear that the Legislature enacted the bill to

comply with Bruen and to respect Second Amendment rights:

> The proposed legislation creates a new licensing procedure that satisfies the
> requirements set forth by the United States Supreme Court decision in New York
> State Rifle & Pistol Association, Inc., v. Bruen, et al.  Notably, this replaces the
> "proper cause" requirements of New York's current conceal carry law, with a new
> set of requirements that protects individuals' Second Amendment rights as
> determined by the Supreme Court.  Under this bill, applicants who successfully
> meet New York's conceal carry license applications requirements will receive their
> license.  The bill furthers the State's compelling interest in preventing death and

5

injury by firearms.

See Sponsor Memo, Senate Bill S51001 (2021).  As part of the new law, New York enumerated the vulnerable locations where guns should not be permitted, in keeping with Bruen's recognition of "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment."  142 S.Ct. at 2133; see also id. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (recognizing the constitutionality of "longstanding . . . laws forbidding the carrying of firearms in sensitive places," which are "presumptively lawful." (quoting District of Columbia v. Heller, 554 U.S. 570, 626-27 (2008)).

Among the sensitive places protected under the CCIA are "places of worship" and "summer camps." See Penal Law §§ 265.01-e(2)(c) and (f).  The State Legislature also included a number of commonsense exceptions allowing certain trained professionals or sworn officers to carry weapons inside a sensitive location, including specially-qualified active or required law enforcement officers, licensed security guards, or active-duty military personnel.  See generally, N.Y. Penal Law § 265.01-e(3).  In the most recent Legislative Session, New York adopted an additional exception to the prohibition on carrying weapons at a place of worship, allowing for armed carriage by "those persons responsible for security at such place of worship."  N.Y. Penal Law § 265.01-e(2)(c); see 2023 N.Y. Sess. Laws ch. 55 (A. 3005-C).  The law became effective on May 3, 2023.  See id.

### B.  Facts Alleged in the Complaint

Plaintiffs are employees of Oorah, Inc. ("Oorah"), a non-profit corporation that, according to the Complaint, provides year-round activities for Orthodox Jewish children, adults, and families on over 1,000 acres of land in a rural part of Schoharie County, New York.  ECF No. 1 at ¶ 35. Oorah's summer camp program consists of two "sleepaway camps", one for boys and one for girls,

ages 9 through 18.  Id. at ¶ 36.  This year, Plaintiffs' summer camp began on June 22, 2023, eight days before they filed suit.  Id. at ¶ 45.  Plaintiff Schwartz resides at the camp year-round on a full-time basis, and Plaintiff Mintz resides there on a part-time basis.  Id. at ¶ 38.  During the day, the campers engage in a wide variety of indoor and outdoor activities, like arts and crafts, swimming, and playing with the animals on the farm.  Id. at ¶ 36.  According to Plaintiffs' Complaint, their community has been openly targeted over the years for discriminatory acts based on their Orthodox Jewish religion and heritage.  Id. ¶ 40-41.  Plaintiffs have possessed and carried their firearms on a regular basis while at the summer camp, and have expressed their intention to continue possessing and carrying firearms on the Oorah campuses during summer camp and throughout the year, in the synagogues, and buildings in which religious observation is held throughout the year. Id. at ¶¶ 43, 46.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right."  Winter v. NRDC, Inc., 555 U.S. 7, 24 (2008).  The burden is on Plaintiffs to establish (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest.  Id. at 20.  In addition, the Second Circuit has "held the movant to a heightened standard" where, as here: (i) an injunction is "mandatory" (i.e., altering the status quo rather than maintaining it) or (ii) the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." People ex. Rel. Schneiderman v. Actavis PLLC, 787 F.3d 638, 650 (2d Cir. 2015); see, e.g. Frey v. Nigrelli __ F. Supp. 3d __, No. 21-CV-5334, 2023 WL 2473375, at *4 (S.D.N.Y. Mar. 13, 2023) (applying heightened standard to Second Amendment challenge to New York's sensitive places

laws); <u>Goldstein v. Hochul</u>, __ F. Supp. 3d __, No. 22-CV-8300, 2023 WL 4236164, at *8-9 (S.D.N.Y. June 28, 2023) (same).   Plaintiffs must therefore show a "clear" or "substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm, in addition to showing that the preliminary injunction is in the public interest.  <u>Actavis</u>, 787 F.3d at 650.  They cannot meet this standard.

## <u>ARGUMENT</u>

### I.   PLAINTIFFS' YEAR-LONG DELAY NEGATES ANY FINDING OF IRREPARABLE HARM

Plaintiffs waited 364 days to file this lawsuit: the CCIA was passed on July 1, 2022, but they waited until June 30, 2023, well into the following summer camp season, to bring this action.  <u>See</u> Press Release, Governor Kathy Hochul (July 1, 2022) (available at <u>https://on.ny.gov/3BM6Hz7</u>); ECF No. 1.  Under settled law, this delay by Plaintiffs negates any possible finding of irreparable harm and is reason enough to deny relief.

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." <u>Faiveley Transp. Malmo AB v. Wabtec Corp.</u>, 559 F.3d 110, 118 (2d Cir. 2009) (quoting <u>Rodriguez v. DeBuono</u>, 175 F.3d 227, 234 (2d Cir. 1999)).  Under the case law in this Circuit, waiting nearly a year to seek injunctive relief is simply too long of a delay, as a matter of law, to obtain a preliminary injunction.  <u>See</u>, <u>e.g.</u>, <u>Levola v. Fischer</u>, 403 F. App'x 564, 565 (2d Cir. Dec. 14, 2010) (affirming the district court's finding that the plaintiff failed to demonstrate "that he faced an immediate danger of irreparable harm," in light of his delay in seeking injunctive relief); <u>Oliver v. N.Y. State Police</u>, No. 1:15-CV-00444, 2019 WL 2009182, at *6 (N.D.N.Y. May 6, 2019) ("'Though such delay may not warrant the denial of ultimate relief, it may, 'standing alone, . . . preclude the granting of preliminary injunctive relief.'") (Sannes, J.); <u>Hornig v. Trustees of Columbia Univ. in City of New York</u>, No. 17-CV-

3602, 2018 WL 5800801, at *7 (S.D.N.Y. Nov. 5, 2018) (holding that the plaintiff's two and a half month delay in seeking injunctive relief undermined a finding of irreparable injury); Livery Round Table, Inc. v. New York City FHV & Limousine Comm'n, No. 18-CV-2349, 2018 WL 1890520, at *9 (S.D.N.Y. Apr. 18, 2018) ("A delay of about three months undercuts a showing of immediate and irreparable injury."); Two Hands IP LLC v. Two Hands Am., Inc., 563 F. Supp. 3d 290, 300 (S.D.N.Y. 2021) (a delay of just over three months was too long to obtain a preliminary injunction).

Although Plaintiffs assert in a recent letter that they chose to wait for their claim to become ripe, see ECF No. 12 at 1, their argument makes no sense. It is well-established that "[one] does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." Babbitt v. UFW Nat'l Union, 442 U.S. 289, 298 (1979). And the injury need not even be certain, as a claim is justiciable so long as "there is a 'substantial risk that the harm will occur.'" Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014). The law challenged today was on the books for a year, and Plaintiffs were well-aware that their summer camp would be opening in the summer. If Plaintiffs brought this action many months ago, the question before the court would not have been "conjectural or hypothetical." Id. at 158. Moreover, Plaintiffs' challenge became ripe long before the opening of summer camp season, as Plaintiffs acknowledge that they have regularly used the property at issue in the meantime, while the law has been effect. See Mintz Dec., ECF No. 1 at 17 ¶ 14 ("Outside of the summer months, the Boys' camp location is also used to host programs during the Jewish holidays of Rosh Hashanah, Sukkot, Passover, and Shauvot."); see also id. ¶ 4 (acknowledging that the camp "is used year-round to host many programs and activities" and providing multiple examples). Plaintiffs manifestly could have brought this lawsuit at any time

they were using the campground, and their 364-day delay is sufficient reason in itself to deny relief, particularly when district courts in the Second Circuit regularly hold that a delay of two to three months is sufficient to negate a finding of irreparable harm.[1]  See, e.g., Carson Optical, Inc. v. Alista Corp., No. 19-CV-1725, 2019 WL 3729460, at *5 (E.D.N.Y. Aug. 8, 2019).

## II.    PLAINTIFFS HAVE NOT SHOWN A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS

Denial is equally warranted if the Court chooses to reach the merits, as Plaintiffs have not carried their burden to demonstrate a clear likelihood of success.  "The party seeking the injunction carries the burden of persuasion to demonstrate, 'by a clear showing,' that the necessary elements are satisfied."  Goldstein v. Hochul, No. 22-CV-8300, 2023 WL 4236164, at *8 (S.D.N.Y. June 28, 2023) (denying preliminary injunction against one of the sensitive places laws challenged in this case) (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam)).

Here, Plaintiffs have barely even attempted to carry that burden.  Plaintiffs argue that the first step of the Bruen test is met because "[t]he conduct being regulated by each of the regulations challenged by Appellants [sic] is the public carriage of handguns for self-defense," See PI Br. at 8, but they cite to no legal authority for the proposition and do not acknowledge that the actual laws they are challenging – which prohibit the carriage of guns only in summer camps and places of worship – are nothing like general restrictions on public carriage of weapons.  Plaintiffs then skip directly to Step Two of the Bruen test, assert that the burden falls entirely on the State, and

---

[1] After waiting 364 days to bring this action, Plaintiffs inexplicably did so in an emergency posture and on a truncated briefing schedule, providing a separate and sufficient reason to deny a preliminary injunction.  See Defense Distributed v. Bonta, No. CV 22-6200, 2022 WL 15524977, at *5 n.9 (C.D. Cal. Oct. 21, 2022) ("[Plaintiff] obtaining a preliminary injunction . . . was wishful thinking, at best" because it was unreasonable to expect California "to be able to present the type of historical analysis conducted in Bruen on 31 days' notice (or even 54 days' notice).").

that only laws from at or around 1791 are relevant to the <u>Bruen</u> analysis. <u>Id.</u> at 9-10. At no point do Plaintiffs attempt to introduce any historical or legal argument of their own.

This falls far short of the showing required from a party seeking a preliminary injunction, which is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." <u>Moore v. Con. Edison Co.</u>, 409 F.3d 506, 510 (2d Cir. 2005) (quoting <u>Mazurek</u>, 520 U.S. at 972). And it falls far, far, below what is required of a movant raising a facial challenge to a lawfully-enacted statute, which is "the most difficult challenge to mount successfully." <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987).

A. **Plaintiffs' Pre-enforcement Facial Challenge Requires Them To Show That There Is No Set of Circumstances Where The Bans On Guns In Summer Camps Or Places Of Worship Could Be Constitutional**

Because the Plaintiffs are making a facial challenge to the law prohibiting guns in summer camps and places of worship, they "must establish that no set of circumstances exist under which the Act would be valid." <u>Salerno</u>, 481 U.S. at 745; <u>accord</u> <u>Community Housing Improvement Program v. City of New York</u>, 59 F.4th 540, 548 (2d Cir. 2023) (reaffirming <u>Salerno</u> as the governing standard for facial challenges). Plaintiffs' challenge is clearly facial in nature, as their Complaint demands an injunction against any enforcement of the prohibition on guns in summer camps or places of worship, with no attempt to tie the relief requested to any particular set of circumstances applicable to the Plaintiffs' situation. *See* Compl. ¶¶ 6, 56-58; *see also* PI Br. at 1 ("Plaintiffs seek an Order preliminar[il]y enjoining [Defendants], . . and all other persons who are in active concert or participation with them . . . from enforcing Penal Law sections 265.01-e (c) and (f)."). And any attempt by Plaintiffs to reframe this case as an as-applied challenge would be unavailing, as a long line of precedent within the Second Circuit establishes that a "pre-enforcement" challenge to a state law, defined as one brought "before [any plaintiffs] have been charged with any violation of law," is properly considered as a facial challenge. <u>Jacoby & Meyers</u>

v. Presiding Justices, 852 F.3d 178, 184 (2d Cir. 2017) (citing N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 265 (2d Cir. 2015)); see Restaurant Law Ctr. v. City of N.Y., 360 F. Supp. 3d 192, 208 (S.D.N.Y. 2019) ("Plaintiffs bring their challenge to the [] Law before it has been enforced.  As such, their challenge is a facial challenge.").  And Plaintiffs acknowledge that they "challenge a law [that has] not yet been applied to them."  PI Br. at 6.

Facial challenges to a state statute's constitutionality are "generally disfavored" for a number of reasons, particularly because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution."  Dickerson v. Napolitano, 604 F.3d 732, 741-42 (2d Cir. 2010) (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008)).  Accordingly, the burden facing Plaintiffs is a severe one: "[a] facial [] challenge will succeed only when the challenged law can *never* be validly applied."  Vt. Right to Life Cmte. v. Sorrell, 758 F.3d 118, 128 (2d Cir. 2014) (emphasis added); accord Community Housing, 59 F.4th at 548 ("In other words, the plaintiff must show that the statute is unconstitutional in all of its applications.").  Even if the Court were to have concerns about whether a challenged statute could be unconstitutionally applied in some circumstances offered by a movant, the proper course is to affirm a law's facial constitutionality and leave the task of narrowing the statute to the Legislature, or to future courts dealing with genuine as-applied challenges.  See, e.g., Picard v. Magliano, 42 F.4th 89, 106 (2d Cir. 2022) (reversing grant of facial injunction and refusing to "delve into . . . whether a more narrowly drawn statute could surgically identify conduct that may be constitutionally restricted without impinging on other conduct that is constitutionally protected").

### B.   The Constitution Does Not Require Guns In Summer Camps

Neither the text of the Second Amendment nor the history of American firearm regulation support the proposition that the Constitution enshrines a fundamental right to carry guns in summer

camps.  The governing standard comes from the Supreme Court's recent opinion in <u>Bruen</u>, which laid out a new two-part test for analyzing Second Amendment claims.  First, the plaintiff must demonstrate that "the Second Amendment's plain text covers an individual's conduct."  <u>See</u> 142 S.Ct. at 2129-30.  If so, then "the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  <u>Id.</u>; <u>see</u> <u>United States v. Siddoway</u>, No. 21-cr-205, 2022 WL 4482739, at *2 (D. Idaho, Sept. 27, 2022) ("The first prong of the <u>Bruen</u> test is textual . . . . The second prong is historical").

1. <u>Plaintiffs Have Not Carried Their Burden To Demonstrate That The Second Amendment's Text Applies</u>

Plaintiffs have not carried their burden to demonstrate that "the right of the people to keep and bear arms," U.S. Const. Amend. II, includes a right to carry guns in summer camps.  <u>See</u> <u>Bruen</u>, 142 S.Ct. 2111, 2129-30 (only "[w]hen the Second Amendment's plain text covers an individual's conduct" must the government "then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation").  It was the Plaintiffs' burden to make that showing – as federal courts across the country have recognized post-<u>Bruen</u>, the burden of adducing historical evidence does not shift onto the government until the plaintiff has shown his or her conduct to be constitutionally protected.[2]  <u>See</u> <u>Defense Distributed v. Bonta</u>, No. CV 22-6200, 2022 WL 15524977, at *3 (C.D. Cal. Oct. 21, 2022) (collecting cases and noting

---

[2] This framework corresponds to that used by the Supreme Court with respect to other constitutional rights, where a movant must first demonstrate that a constitutional right applies to his or her situation before the burden shifts to the government to show that its actions are constitutionally justified.  <u>See, e.g.</u>, <u>Kennedy v. Bremerton Sch. Dist.</u>, 142 S.Ct. 2407, 2421 (2022) ("Under this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses.  If the plaintiff carries these burdens, the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of our case law.").

that "[w]hatever else may be said of Bruen, these parts of the opinion are crystal-clear"); see, e.g., Gazzola v. Hochul, __ F. Supp. 3d __, No. 22-CV-1134, 2022 WL 17485810, at *14 (N.D.N.Y. Dec. 7, 2022) (rejecting Bruen argument where movant failed to show that their conduct was covered by the text of the Second Amendment); Or. Firearms Fed'n, Inc. v. Brown, __ F. Supp. 3d __, No. 2:22-CV-01815, 2022 WL 17454829, at *11 (D. Or. Dec. 6, 2022) (same); Ocean State Tactical, LLC v. Rhode Island, __ F. Supp. 3d __, No. 22-CV-246, 2022 WL 17721175, at *15 (D.R.I. Dec. 14, 2022) (same); United States v. Reyna, No. 21-CR-41, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022) (same).

Plaintiffs do not even attempt to carry this burden.  Instead, their analysis at Step One of the Bruen test amounts to a single sentence, asserting that "[t]he conduct being regulated by each of the regulations challenged by Appellants is the public carriage of handguns for self-defense." PI Br. at 8.  This assertion is offered without any citation to legal authority, and it is simply *wrong* – the ban on carrying guns in summer camp does not restrict "the public carriage of handguns for self-defense," but rather the carriage of handguns in a very specific *nonpublic* place full of vulnerable children, where the presence of firearms is fundamentally inappropriate.  Cf. Oakland Tactical Supply, LLC v. Howell Township, No. 18-cv-13443, 2023 WL 2074298, at *3 (E.D. Mich. Feb. 17, 2023) ("Plaintiffs' mischaracterization of the scope of the proposed conduct undermines the majority of their argument").  One federal court applying Bruen recently cautioned against allowing attempts by movants to "distill the challenged regulation to so abstract a level as mere possession or mere carrying of a firearm" because if the "regulated conduct is mere possession, any number of other challenged regulations would similarly boil down to mere possession, then promptly and automatically proceed to [Bruen] Step Two.  For Step One to have any meaning, the regulated conduct must be defined specifically enough that it can meaningfully

compare to the Second Amendment's plain text – a plain text that is more complex than mere possession."  Reyna, 2022 WL 17714376 at *4.

Oakland Tactical is instructive in the ways post-Bruen federal courts define the conduct at issue in a Second Amendment case, and the ways that plaintiffs sometimes try to duck the first step of the Bruen inquiry.  In Oakland Tactical, the plaintiffs tried to define their purported conduct as "simply 'training with firearms,'" but the Court found that this definition did not match either their proposed conduct or the scope of the law they were challenging, noting that "[t]he proposed conduct could not be simply 'training with firearms' because the zoning ordinance does not prohibit 'training with firearms.'  Rather, their proposed conduct is the construction and use of an outdoor, open-air 1,000-yard shooting range.  And that conduct is clearly not covered by the plain text of the Second Amendment."  Oakland Tactical, 2023 WL 2074298 at *3 (emphasis in the original).  Likewise, Plaintiffs here want the Court to view their conduct as "the public carriage of handguns for self-defense," PI Br. at 8, but Penal Law § 265.01-e(2)(c) and (2)(f) do not prohibit "the public carriage of handguns for self-defense," but rather only the carriage of handguns in summer camps and places of worship, and only by persons who do not meet the many exceptions in Penal Law § 265.01-e(3).  And Plaintiffs have offered no argument for why the text of the Second Amendment would cover carrying deadly weapons in these locations.

In addition to not establishing that the right to "keep and bear" arms extends to sensitive locations such as summer camps, Plaintiffs have not demonstrated that any burden on the Second Amendment right from not being able to carry guns in summer camps is significant enough to constitute an "infringement."  As federal courts in this Circuit have recognized both before and after Bruen, "any number of regulations may incidentally, minimally, or not substantially burden the exercise of a right without being considered to actually 'infringe' it."  United States v. Lucha

El Libertad, __ F. Supp. 3d __, No. 22-CR-644, 2023 WL 4378863, at *3 (S.D.N.Y. July 7, 2023) (quoting United States v. Decastro, 682 F.3d 160, 167-68 (2d Cir. 2012)). While Bruen enshrines "the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions," 142 S.Ct. at 2156, it nowhere establishes that the text of the Second Amendment extends to nonpublic sensitive locations such as summer camps, or that a restriction on certain untrained people carrying guns in summer camps is significant enough to constitute an "infringement." See Wrenn v. District of Columbia, 864 F.3d 650, 662 (D.C. Cir. 2017) (no Second Amendment infringement because "bans on carrying only in small pockets of the outside world (e.g., near 'sensitive' sites) impose only lightly on most people's right to 'bear arms' in public." (quotation omitted)); cf. Lucha El Libertad, No. 22-CR-644, 2023 WL 4378863 at *3 (constitutional scrutiny not triggered by regulations that "do not substantially burden the rights in question and leave open ample means of exercising them").

The Court need not wade into a historical inquiry, as "plaintiffs have failed to show" that carriage of deadly weapons in summer camp is "covered by the plain text of the Second Amendment." Oregon Firearms Federation, 2022 WL 17454829 at *9 (citing Bruen, 142 S.Ct. at 2129-30). Accordingly, "the burden does not shift to the government to support the regulations with a historical analysis, and [Plaintiffs'] Second Amendment challenge – at least for purposes of this motion – fails at the threshold stage of the inquiry." Defense Distributed, 2022 WL 15524977 at *5 (quotation omitted).

2.   The Supreme Court's Jurisprudence Makes Clear That Schools And Places Like Them Are Sensitive Locations Where Guns May Be Prohibited

Even if the burden does shift to New York to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," Bruen, 142 S.Ct. at 2130, the prohibition on firearms in summer camps is manifestly constitutional under the Supreme

Court's sensitive places jurisprudence, which recognizes that "laws forbidding the carrying of firearms in sensitive places such as schools" are "presumptively lawful." District of Columbia v. Heller, 554 U.S. 570, 626-27 & n.26. (2008); accord McDonald v. City of Chicago, 561 U.S. 742, 786 (2010); Bruen, 142 S.Ct. at 2133; see also Bruen, 142 S.Ct. at 2133 ("we are also aware of no disputes regarding the lawfulness of such prohibitions.").

Federal courts interpreting Heller, McDonald, and Bruen have made clear that the term "schools" is not limited to K-12 schools during the school year, but rather extend to all locations analogous to schools, where children are particularly concentrated and vulnerable, and where the presence of deadly weapons would be inherently disruptive to their growth and security. See Nordyke v. King, 563 F.3d 439, 459 (9th Cir. 2009), vacated, 611 F.3d 1015 (9th Cir. 2010) (noting that the Heller court "listed schools and government buildings as examples, presumably because possessing firearms in such places risks harm to great numbers of defenseless people (e.g., children)"); Solomon v. Cook Cty. Bd. of Commissioners, 559 F. Supp. 3d 675, 693 (N.D. Ill. 2021) (remarking that "[w]hen a location is designated as a 'sensitive place,' all examples of that location tend to have the trait that justifies the designation," such as, "[f]or instance, all schools have groups of children present").  "Put another way, schools and government buildings are presented as broadly as possible [in Heller and Bruen], allowing the reader to consider all possible subtypes that fall within those two examples."  United States v. Robertson, No. 22-po-867, 2023 WL 131051, at *5 (D. Md. Jan. 9, 2023)); accord Bruen, 142 S.Ct. at 2133 ("courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.").

Accordingly, federal courts both before and after Bruen have broadly held that places analogous to schools are sensitive locations where the Second Amendment does not apply.  See Miller v. Smith, No. 18-CV-3085, 2022 WL 782735, at *8-9 (C.D. Ill. Mar. 14, 2022) (collecting cases where federal courts "have held or implied that the presence of children militates in favor of a given place being sensitive" and concluding that "a ban on firearms in day cares is closely analogous to a ban on firearms in schools, which is one of the core 'presumptively lawful' measures referenced in Heller."), vacated, 2023 WL 334788 (7th Cir. 2023); see also, e.g., Maryland Shall Issue, Inc. v. Montgomery Cty., Md., No. TDC 21-1736, 2023 WL 4373260, at *9 (D. Md. July 6, 2023) ("Although childcare facilities are not listed among the 'sensitive places' identified in Bruen, the Court finds that they are properly deemed to be sensitive places because they are analogous to schools."); Christopher v. Ramsey County, 621 F. Supp. 3d 972, 981 (D. Minn. 2022) ("During the State Fair, the Fairgrounds are a sensitive location with thousands of people and children present in often crowded conditions."); United States v. Walter, No. 20 Cr. 39, 2023 WL 3020321, at *8 (D.V.I Apr. 20, 2023) ("the area within 1,000 feet of the school grounds is within the scope of 'sensitive places' as contemplated by Heller"); Hall v. Garcia, No. C 10-3799, 2011 WL 995933, at *4 (N.D. Cal. Mar. 17, 2011) (1,000 foot area around schools); United States v. Masciandaro, 638 F.3d 458, 473 (4th Cir. 2011) ("a national park area where large numbers of people, including children, congregate for recreation" was a place that "justif[ies] reasonable measures to secure public safety"); Warden v. Nickels, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010) ("the Court sees no logical distinction between a school on the one hand and a community center where educational and recreational programming for children is also provided on the other."); cf. Antonyuk v. Hochul, __ F. Supp. 3d __, No. 1:22-CV-0986, 2022 WL 16744700, at *65 (N.D.N.Y. Nov. 7, 2022) ("Antonyuk III") (ban on firearms on playgrounds

"finds support in those historical analogues prohibiting firearms in schools given that, by their very nature, both places often contain children"); id. at *68 (prohibition on guns in "nursery schools" and "preschools" is constitutional because "[i]t appears that the Supreme Court has already recognized the permissibility of this restriction as it applies to 'schools.'" (quoting Heller, 554 U.S. at 626)).

The Second Amendment analysis regarding summer camps should reach the same outcome as the analyses of playgrounds, fairgrounds, daycares, nursery schools, schoolgrounds, community centers, and "childcare facilities" in the other federal cases cited above.   Summer camps, like schools, "are tasked with providing education and socialization to attendees," and the prohibitions on firearms in both locations "are meant to protect the same or similar vulnerable populations." Maryland Shall Issue, 2023 WL 4373260 at *9.   Indeed, the same children who are in schools in March will be in summer camps in July, and measures to protect them from firearms will be no less constitutional during the summer months.   Cf. Bruen, 142 S.Ct. at 2133 ("we are also aware of no disputes regarding the lawfulness of such prohibitions").

> 3.   Prohibiting Guns In Summer Camp Is Consistent With American Legal History And Tradition

Even if the Court were to require an analysis of historical statutes to ascertain the constitutionality of the prohibition on guns in summer camps – which it need not do, as Plaintiffs have not carried their burden at Bruen Step One, and because summer camps are manifestly analogous to schools, which the Supreme Court has recognized as indisputably sensitive – the law still comfortably passes constitutional scrutiny.

As an initial note, summer camps are a development that postdates the Bruen timeframe. They did not exist at the time of the nation's founding, or even at the time of the ratification of the Fourteenth Amendment in 1868, instead emerging at the end of the Nineteenth Century in response

19

to concerns about the impact of urban industrialization on children. See Michael B. Smith, "'The Ego Idea of the Good Camper' and the Nature of Summer Camp." *Environmental History* 11 (January 2006): 70-101, at 71. The first formalized summer camp with "principles that would be recognizable to camp directors of the twentieth century," was founded in 1881 in New Hampshire for wealthy boys from northeastern cities. Id., 75. The defining feature of these camps were the formalized outdoor activities and organizational foundations distinct from existing schools. W. Barksdale Maynard, "'An Ideal Life in the Woods for Boys': Architecture and Culture in the Earliest Summer Camps." Winterthur Portfolio 34, no. 1 (1999): 3-29, at 4. Summer camps as an institution spread only slowly and did not take off until the 20th Century. Rough estimates indicate that there were fewer than one hundred summer camps nationwide in 1900, but by 1918 there were over one thousand. Smith, The Ego Ideal of the Good Camper, at 77; see also Joseph Reimer, Making Shabbat – Celebrating And Learning At American Jewish Summer Camps 27-28 (Brandeis Univ. Press 2022) (discussing the history of Jewish summer camps, which "first opened[] around 1900"). Accordingly, any Second Amendment analysis regarding summer camps must be a flexible one, recognizing that camps as an institution were not substantially present during the historical period considered by the Bruen doctrine. See Bruen, 142 S.Ct. at 2132 (recognizing that later developments "require a more nuanced approach" because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868."); Frey v. Nigrelli, _ F. Supp. 3d __, No. 21-CV-5334, 2023 WL 2473375, at *18 (S.D.N.Y. Mar. 13, 2023) (where place at issue did not exist in the founding or reconstruction eras, "the Court will consider historical laws that are analogous in purpose").

20

At the same time that the first American summer camps were coming into existence, American States were recognizing the danger caused by persons carrying firearms into vulnerable locations, and passing laws to protect the people who congregate there.  See Id. at *17 (discussing "laws from the latter half of the 19th Century that prohibited firearms involving instances where there are public gatherings engaged in recreational, entertainment, or expressive purposes," which "support [New York's] argument that there was an ongoing trend in American history of banning firearms in locations where people heavily congregate.").  As enumerated below and in the accompanying declaration of expert historian Patrick Charles (the "Charles Dec."), States across the country enacted laws prior to the advent of summer camps that protected analogous places from the danger of firearms.

For example, Texas in 1870 enacted a law prohibiting the carrying of guns and other weapons into "any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct . . . or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly."  1870 Tex. Gen. Laws 63; see Charles Dec. ¶ 14.[3]  The year before, Tennessee had enacted a law prohibiting deadly weapons in any "fair, race course, or public assembly of the people."  1869-70 Tenn. Pub. Acts 23; see Charles Dec. ¶ 14.  Georgia enacted a law prohibiting deadly weapons in courts, elections, "any place of public worship, or any other public gathering in this State."  1870 Ga. Laws 421, see Charles Dec. ¶ 14.  In 1883, Missouri prohibited "any deadly or dangerous weapon" in any "place where people have assembled for religious worship," any "place where people are assembled for educational, literary, or social

---

[3] The Charles Declaration contains hyperlinks to many of the cited historical laws.

21

purposes," and "any other public assemblage of persons met for any lawful purpose other than for militia drill," as well as courtrooms, churches, and election precincts.  1883 Mo. Laws 76; <u>see</u> Charles Dec. ¶ 15.  Idaho prohibited "any person," other than specified law enforcement officers, to carry "deadly weapons, within the limits or confines of any city, town or village or in any public assembly of the State of Idaho."  Penal Code of the State of Idaho § 4781 (1901) (reprinting 1889 statute).  Arizona banned guns in "any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct . . . or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly."[4]  1889 Ariz. Sess. Laws 17; <u>see</u> Charles Dec. ¶ 16.  And Oklahoma in 1890 prohibited weapons in "any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention,

---

[4] Although some courts have sought to ignore laws, like the Arizona and Oklahoma statutes cited here, that were passed by territories pre-statehood, that approach makes little sense, particularly since federally-overseen territories were one of the few places at the time where the Second Amendment would have directly applied, as the amendment was not incorporated against state governments until 2010.  <u>See generally</u> Andrew Willinger, <u>The Territories Under Text, History, and Tradition</u>, 101 Wash. U. L. Rev. __ (forthcoming), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4372185.  In any event, these laws may be treated as state laws because both Arizona and Oklahoma adopted their territorial laws upon statehood.  <u>See</u> Ariz. Const. art. XXII § 2 (1912) ("All laws of the Territory of Arizona now in force, not repugnant to this Constitution, shall remain in force as laws of the State of Arizona . . ."), available at https://cptl.asu.edu/arizona-constitution/1912-edition#ArticleXXII; Okla. Const. Schedule § 2 ("All laws in force in the Territory of Oklahoma at the time of the admission of the State into the Union, which are not repugnant to this Constitution, and which are not locally inapplicable, shall be extended to and remain in force in the State of Oklahoma . . ."), available at https://www.oscn.net/applications/oscn/DeliverDocument.asp?CiteID=441197.

or to any other public assembly." 1890 Okla. Stat. 495-96; see Charles Dec. ¶ 16.  Moreover, the vast majority of firearms regulation took place at the town or city level, and the Charles Declaration contains a host of examples of additional local laws and ordinances protecting sensitive locations analogous to summer camps.  See Charles Dec. ¶¶ 17-20.

Each of these laws protects a set of places that is "relevantly similar" to summer camps. Bruen, 142 S.Ct. at 2132-33.  Bruen requires only a "historical *analogue*, not a historical *twin*," and a modern law need not be "a dead ringer for historical precursors" in order to pass constitutional muster.  Id. at 2133. Summer camps are "place[s] where persons are assembled for educational, literary or scientific purposes," as in the Texas, Missouri, Arizona, and Oklahoma laws.[5]  And summer camps constitute "public assembl[ies]," "social gathering[s] composed of [young] ladies and gentlemen," and "public assemblage[s] of persons met for a[] lawful purpose." A modern summer camp would manifestly fall within the scope of these Nineteenth Century laws, placing Penal Law § 265.01-e(2)(f) firmly "in line with the historical tradition of banning firearms in locations where large groups of people are congregated for commercial, social, and cultural activities."  Frey, 2023 WL 2473375 at *17 (S.D.N.Y. Mar. 13, 2023); accord Maryland Shall Issue, No. TDC-21-1736, 2023 WL 4373260 at *11 (recognizing "well-established and representative historical analogues" prohibiting guns in "locations where large numbers of people gather to engage in recreation.").

### C.   The Constitution Does Not Require Guns In Places Of Worship

The Plaintiffs have not made any more significant of a showing with regards to places of worship than they have regarding summer camps – basing their Bruen Step One showing on

_____

[5] Several of these laws, such as Texas' and Arizona's, specifically prohibit guns in "school room[s]" as well, providing further support for the historical tradition of keeping guns out of schools and analogous locations, discussed in Section II(B)(2), above.

nothing but their own say-so and adducing no historical evidence of their own regarding whether places of worship were historically viewed as sensitive. New York Penal Law § 265.01-e(2)(c) would comfortably pass the Bruen test, but the exceptions to the law may scuttle Plaintiffs' challenge before it begins.

1. The Law Protecting Places Of Worship Contains Exceptions That Require Dismissal

As a threshold matter, the prohibition on guns in places of worship contains an exception that necessarily defeat Plaintiffs' constitutional challenge. As part of New York's 2023 budget package, the State Legislature recently added language to the statute, which now prohibits guns in "any place of worship, *except* for those persons responsible for security at such place of worship." N.Y. Penal Law § 265.01-e(2)(c) (emphasis added); see 2023 N.Y. Sess. Laws ch. 55 (A. 3005-C). The law became effective on May 3, 2023, see id., well before the filing of this case. Although Plaintiffs' preliminary injunction papers do not specify whether Plaintiff Mintz and Plaintiff Schwartz are responsible for security at the synagogues where they wish to carry firearms, see ECF No. 4-2 ¶¶ 13, 29; ECF No. 4-3 ¶ 20, the existence of the exception renders their challenge meritless.

If Plaintiff Mintz and Plaintiff Schwartz *are* "responsible for security at [the] place of worship," N.Y. Penal Law § 265.01-e(2)(c), then they lack standing to challenge the statute because they are not subject to its prohibition. "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013). If plaintiffs are responsible for security at the places of worship where they want to carry guns, then there is no concrete, actual, or imminent injury that is fairly traceable to Penal Law § 265.01-e(2)(c). See Kearns v. Cuomo 981 F.3d 200, 211 (2d Cir. 2020) (Plaintiff "lacks standing to

challenge the [designated] provision because it does not apply to him.").  And that lack of standing would mandate dismissal of their challenge to the law.  See N.Y. State Corr. Officers & Police Benevolent Ass'n, Inc. v. Hochul, 607 F. Supp. 3d 231, 237 (N.D.N.Y. 2022).

On the other hand, if Plaintiff Mintz and Plaintiff Schwartz *are not* "responsible for security at [the] place of worship," N.Y. Penal Law § 265.01-e(2)(c), but want to carry guns into the synagogue anyway, their case faces significant headwinds.  As the U.S. Court of Appeals for the Eleventh Circuit has noted, "there is no constitutional infirmity when a private property owner exercises his, her, or its—in the case of a place of worship—right to control who may enter, and whether that invited guest can be armed, and the State vindicates that right."  GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1264 (11th Cir. 2012), abrogated in part on other grounds, Bruen, 142 S.Ct. at 2127 n.4. [6]  If Plaintiffs want to take up arms to defend a congregation that has not authorized them to do so, their claim is deeply dubious, as the GeorgiaCarry court recognized.  See id. at 1265 ("Plaintiffs, in essence, ask us to turn Heller on its head by interpreting the Second Amendment to destroy one cornerstone of liberty—the right to enjoy one's private property—in order to expand another—the right to bear arms.  This we will not do.").

2.  Plaintiffs Have Not Carried Their Burden To Demonstrate That The Second Amendment Applies

As with their challenge to the prohibition on guns in summer camp, see Section II(B), above, Plaintiffs have done nothing to carry their burden at Step One of the Bruen test to demonstrate that the Second Amendment protects their course of conduct in their challenge to

---

[6] GeorgiaCarry remains good law even after the recent decision in Bruen.  Although the Eleventh Circuit noted that the test applicable at the time involved two steps, with the second one involving strict or intermediate scrutiny, the Court found that "[i]n this case, we need only reach the first step," and declined to apply any mode of means-ends analysis.  687 F.3d at 1260 n.34; cf. Bruen 142 S.Ct. at 2127 ("Step one of the predominant framework is broadly consistent with Heller, which demands a test rooted in the Second Amendment's text, as informed by history.").

Penal Law § 265.01-e(2)(c). The portion of Plaintiffs' moving brief addressing Step One amounts to a simple assertion that "[t]he conduct being regulated by each of the regulations challenged by Appellants is the public carriage of handguns for self-defense," followed by a citation to <u>Bruen</u>'s holding that public carrying of weapons is covered by the Amendment and an assertion that the burden shifts to the Defendants. PI Br. at 8-9. But as "[m]uch as [Plaintiffs] would like to move history and tradition forward in the course of relevant analysis under <u>Bruen</u>, [their] attempt does not survive a careful, and intellectually-honest reading of that decision." <u>Defense Distributed</u>, 2022 WL 15524977 at *5.

The statute Plaintiffs are challenging does not prohibit public carriage of handguns for self-defense. Instead, Penal Law § 265.01-e(2)(c) keeps guns out of a very specific, *private* place – houses of worship – and even then only for persons who are not "responsible for security at such place of worship." Plaintiffs have provided no basis to conclude that the Second Amendment's text includes a right to carry guns to protect a synagogue other than at that synagogue's request, and there is no basis to believe that it does. <u>Cf.</u> <u>GeorgiaCarry</u>, 687 F.3d at 1264 ("property law, tort law, and criminal law provide the canvas on which our Founding Fathers drafted the Second Amendment. A clear grasp of this background illustrates that the pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place of worship against the owner's wishes."). Plaintiffs have not even attempted to carry their burden at <u>Bruen</u> Step One, and cannot avoid that step simply by giving the court the broadest possible definition of the conduct at issue. <u>See</u> <u>Reyna</u>, 2022 WL 17714376 at *4. Accordingly, "Plaintiffs fail to demonstrate that the Second Amendment's plain text covers the conduct regulated by the statutory provisions at issue." <u>Gazzola v. Hochul</u>, __ F. Supp. 3d __, No. 22-CV-1134, 2022 WL 17485810, at *14 (N.D.N.Y. Dec. 7, 2022) (denying preliminary injunction on Second Amendment claim

where "Plaintiffs have not cited any authority supporting a Second Amendment right" to engage in the conduct at issue).

### 3. Prohibiting Guns In Places of Worship Is Consistent With American Legal History And Tradition

Even if Plaintiffs had carried their burden at Step One of the <u>Bruen</u> analysis, the prohibition on guns in places of worship (for persons not responsible for security) would comfortably pass Step Two of the <u>Bruen</u> test. As discussed extensively in the accompanying declaration of expert historian Patrick Charles, there is a strong record of state laws restricting firearms in religious institutions, establishing that such regulations are "deeply rooted" in American society. <u>See also</u> <u>Goldstein</u>, 2023 WL 4236164 at *13 (collecting historical antecedents and recognizing "a robust tradition of considering houses of worship as Sensitive Locations").

For centuries, English law contained a broad understanding of what was considered a sensitive place where firearms could be prohibited, and although there was generally no need to carve out specified locations, churches or places of worship were a notable exception. <u>See</u> Charles Dec. ¶¶ 10-13 (citing inter alia 4 Hen 4, c. 29 (1403) ("no Man be armed nor bear defensible armor to Merchant Towns *Churches nor Congregations* in the same, nor in the Highways, in affray of the Peace or the King's Liege people" (emphasis added)). In the years directly following the passage of the Fourteenth Amendment,[7] multiple states passed laws explicitly and directly

---

[7] Although Plaintiffs argue in passing that "the State is constrained to identifying laws from the Founding Era (1791)," PI Br. at 9-10. they cite to no authority making such a holding and the law does not support their assertion. The Supreme Court in <u>Bruen</u> disclaimed that it was weighing whether the period around 1791 (when the Second Amendment was ratified) or that around 1868 (when the Fourteenth Amendment, incorporating the Second Amendment against the states, was ratified) is more relevant to the historical analysis. <u>Bruen</u>, 142 S. Ct. at 2138. Rather, the Court gave consideration to laws passed during both periods. <u>Id.</u> at 2136-56. And federal courts applying <u>Bruen</u> have accordingly given weight to laws passed throughout the Eighteenth and Nineteenth Centuries, particularly because, in cases such as this one that challenge a state law, "the more appropriate barometer is the public understanding of the right when the States ratified the

prohibiting the carrying of firearms in religious institutions. For example, in 1870, Texas passed a

law providing that "if any person shall go *into any church or religious assembly* . . . and shall have

about his person . . . fire-arms, whether known as a six-shooter, gun, or pistol of any kind, such

person so offending shall be deemed guilty of a misdemeanor[.]" 1870 Tex. Gen. Laws 63, Charles

Dec. ¶ 14 (emphasis added). That same year, Georgia provided that "no person in said State of

Georgia be permitted or allowed to carry about his or her person any . . . pistol or revolver, or any

kind of deadly weapon, to any . . . *place of public worship*[.]" 1870 Ga. Laws 421, Charles Dec. ¶

14 (emphasis added).  In 1874, Missouri passed a law mandating fines or imprisonment "[i]f any

person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall

go *into any church or place where people have assembled for religious worship*." Charles Decl. ¶

15 (emphasis added).  In 1877, Virginia prohibited persons from "carrying any gun, pistol, . . . or

other dangerous weapon, *to any place of worship* while a meeting for religious purposes is being

held at such place[.]" 1877 Va. Laws 305 (emphasis added). Arizona likewise prohibited guns

from places of worship.  1889 Ariz. Sess. Laws 16, Charles Dec. ¶ 16. ("If any person shall go *into*

*any church or religious assembly* . . . and shall have or carry about his person a pistol or other

firearm . . . he shall be punished by a fine not less than fifty nor more than five hundred dollars,

and shall forfeit to the County the weapon or weapons so found on his person." (emphasis added)).

The territory of Oklahoma followed in 1890. 1890 Okla. Stat. 495-96, Charles Decl. ¶ 16. ("It shall

---

Fourteenth Amendment and made the Second Amendment applicable to the States."  <u>NRA v.</u>
<u>Bondi</u>, 61 F.4th 1317, 1323 (11th Cir. 2023); <u>see also, e.g.</u>, <u>United States v. Alaniz</u>, 69 F.4th 1124,
1129 (9th Cir. 2023) (considering "several States [that] enacted laws throughout the 1800s");
<u>Goldstein</u>, 2023 WL 4236164 at *11 ("[A]fter discussing the law behind the concept of a sensitive
place, I will then look to both time periods for historical evidence."); <u>Frey</u>, 2023 WL 2473375 at
*13 ("the Court finds no issue in considering the abundance of examples provided by the
Defendants regarding the existence of municipal gun regulations from 1750 to the late 19th
century.").

be unlawful for any person, except a peace officer, to carry *into any church or religious assembly* . . . any of the weapons designated in sections one and two of this article." (emphasis added)).[8] Though these were many examples of state laws protecting houses of worship as a sensitive place, firearm regulation at the time was primarily done at a local level, see Joseph Blocher, Firearms Localism, 123 Yale L.J. 82, 112-16 (2013), and the Charles Declaration contains a host of examples of local ordinances from localities prohibiting guns in places of worship and other vulnerable locations. See Charles Dec. ¶¶ 17-22.

In addition to these statutes passed in the Reconstruction Era, state courts at the time also made clear that government could prohibit firearms in religious institutions – and often opined that it would be absurd if they could or did not. In 1871, the Tennessee Supreme Court held that "a man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them." Andrews v. State, 50 Tenn. 165, 182 (1871). In 1871, the Texas Supreme Court announced that "[w]e confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance, into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are

---

[8] Notably, these statutes are in addition to the substantial number of jurisdictions that did not need to pass laws specifically prohibiting weapons in places of worship during this time period, because they already had on their books broad prohibitions of public carry. See, e.g., Charles Decl. ¶ 19 (listing numerous municipalities' 19-century prohibitions of public carry); id. at ¶ 14 (describing Tennessee's 1689 prohibition on the carrying of dangerous weapons into "any election…fair, race course, or other public assembly of the people."); Eric Ruben and Saul Cornell, Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 Yale L.J. Forum 121, 132-33 (2015) (noting that states including Massachusetts, Wisconsin, Maine, Michigan, Virginia, Minnesota, Oregon, and Pennsylvania passed laws beginning in the 1830s broadly regulating public carrying of firearms).

congregated together." <u>English v. State</u>, 35 Tex. 473, 478-79 (1871).[9]  In 1874, the Georgia Supreme Court held that "[t]he practice of carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee." <u>Hill v. State</u>, 53 Ga. 472, 475 (Ga. 1874). And in 1878, the Missouri Supreme Court upheld the constitutionality of the state's law prohibiting concealed firearms in, <u>inter alia</u>, "any church or place where people have assembled for religious worship," describing the law as "nothing more than a police regulation, made in the interest of peace and good order, perfectly within the power of the legislature to make." <u>State v. Reando</u> (Mo. 1878), Charles Decl. ¶ 22 n.32 & Ex. 37.  The court takes specific note that similar laws had been upheld by the courts of Georgia, Louisiana, Alabama, Arkansas, and Texas. <u>Id</u>

This body of history is large and compelling, and more than carries the burden placed on the government at <u>Bruen</u> Step Two, which "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." <u>Bruen</u>, 142 S.Ct. at 2133 (emphasis in the original).  New York has done so: any clear-eyed look at the applicable history – uncontradicted by the Plaintiffs, who have put forward no history of their own – demonstrates that Americans have historically passed laws restricting the presence of guns in places of worship, and did so to protect the people within.  <u>Cf.</u> <u>Bruen</u>, 142 S.Ct. at 2133 ("whether modern and historical regulations impose a comparable burden on the right of armed self-defense, and second, whether

---

[9] The Supreme Court, in <u>Bruen</u>, described <u>English</u> as an "outlier" on the question of whether it evinced a historical tradition of a "proper cause" requirement for public carry. However, the Court did not speak on the utility of <u>English</u> on the question of sensitive place restrictions, and in tandem with the other cited cases and statutes, it is unquestionably aligned with the public consensus at the time.

that regulatory burden is comparably justified." These two metrics are "*central* considerations when engaging in an analogical inquiry." (quotation omitted, emphasis in the original)).

Although federal district courts both inside and outside New York have split on whether the Bruen test permits states to protect places of worship, a comprehensive historical analysis shows that such laws are constitutional.  Compare Goldstein, 2023 WL 4236164 at *13 (affirming the constitutionality of New York's law based on "the finding that there is a robust tradition of considering houses of worship as Sensitive Locations") with Hardaway v. Nigrelli, No. 22 Civ. 771, 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022), and Antonyuk III, 2022 WL 16744700 ("Antonyuk III") (finding the statute unconstitutional); compare also, e.g., Maryland Shall Issue, 2023 WL 4373260 at *10 (finding Maryland's equivalent law constitutional based on "a well-established and representative number of statutes that prohibited firearms in places of worship"); with Koons v. Platkin, _F.Supp.3d_, No. 22-CV-7464, 2023 WL 3478604 (finding New Jersey's equivalent statute unconstitutional).

Both sets of cases look at the same historical analogues, but what separates the federal cases upholding state laws from the cases that reject them is that the former cases comprehensively review the historical evidence, while the latter cases disregard relevant sources based on arbitrary criteria, or add additional requirements not present in either the Constitution or in Bruen.  The Hardaway opinion, for instance, dismissed all the state and local laws cited above as "a handful of enactments" along with "[a] few additional municipal enactments of similar vintage," before declaring that the State needed to show not only the laws' existence but also their duration, concluding that because "[t]hese enactments are of unknown duration, [] the State has not met i[t]s burden to show *endurance* (of any sort) *over time*." 2022 WL 16646220 at *16, n.17.  But nothing in Bruen requires a showing of endurance – instead the Supreme Court "requires only that the

government identify a well-established and representative historical *analogue*," and cautioned that analogical reasoning must not be a "regulatory straightjacket." 142 S.Ct. at 2133. Antonyuk III, meanwhile, "assume[s] that these laws constituted a tradition that was sufficiently *established*," but did not find them to be "*representative* of the Nation's laws, given that they came from states that contained only about 12.9 percent of the national population." 2022 WL 16744700 at *61.[10] But nothing in Bruen states that historical analogical reasoning requires a comparison of state populations, and it is antithetical to our federal system to suggest that laws passed by small states deserve less respect than laws passed by large ones.

Instead, the better approach is the one followed in Goldstein and Maryland Shall Issue, which employ the Bruen test as it was designed. See Goldstein, 2023 WL 4236164 at *12 ("I now apply the Court's instruction in Bruen that lower courts use analogies to the historical regulations of sensitive places to determine that modern regulations prohibiting the carrying of firearms in new and analogous sensitive places—here, houses of worship—are constitutionally permissible.").

---

[10] The Antonyuk court came to multiple different conclusions about the constitutionality of protecting places of worship. In an initial opinion, the court concluded that the plaintiff did not have standing, but nonetheless issued a lengthy "judicial dictum" containing what "would constitute the Court's holding" if standing had been present. See Antonyuk v. Bruen, 624 F. Supp. 3d 210, 246 (N.D.N.Y. 2022) ("Antonyuk I"). That "dictum" opinion would have held that the entire list of sensitive locations was unconstitutional, finding that the historical sources offered by New York "ignores the fact that the vast majority of other states . . . did not have statutes restricting firearms at those very locations (suggesting that Defendant's 'historical analogs' might represent exceptions to a tradition more than a tradition)." Id., 256. When the Antonyuk plaintiff re-filed the case with additional co-plaintiffs and filed for a TRO, the court *denied* preliminary relief with regard to the place of worship provision and upheld it as constitutional, finding that "[b]ased on the historical analogues, it is permissible for New York State to *generally* restrict concealed carry in 'any place of worship or religious observation," so long as there was a security exception of the kind the State Legislature would later adopt. See Antonyuk v. Hochul, _ F.Supp.3d _, No. 22 Civ. 986, 2022 WL 5239895, at *15 (N.D.N.Y. Oct. 6, 2022) ("Antonyuk II"). But when the plaintiffs later moved for a preliminary injunction, the court reversed itself, finding the law unconstitutional based on the population-count method described above. 2022 WL 16744700.

If Bruen sets forth a "straightforward historical inquiry," 142 S.Ct. at 2131, then the significant body of historical analogues for prohibitions on guns in places of worship is surely enough to pass constitutional scrutiny.

## III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST DO NOT SUPPORT GUNS IN SUMMER CAMP OR PLACES OF WORSHIP

Lastly, the balance of equities and the public interest, which "merge when the Government is the opposing party," Nken v. Holder, 556 U.S. 418, 435 (2009), weigh strongly against enjoining the prohibition on guns in summer camps and places of worship. In addressing the equities, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Winter v. NRDC, 555 U.S. 7, 24 (2008). Here, the effect on the Plaintiffs if an injunction were to be denied would be negligible. Activities at Oorah's Schoharie County campgrounds will continue without the presence of firearms, just as they have over the past year since the July 1, 2022 enactment of the statutes Plaintiffs are challenging. See 2022 N.Y. Sess. Laws Ch. 371. Plaintiffs' papers make clear that the campgrounds have been "used year-round to host many programs and activities" during that period, including "a boys and girls' summer camp, a winter program for families, Torah Mates retreats, a retreat for participants in [Oorah's] singles program, and a retreat for the staff of Oorah/Kars 4 Kids and their families, among other things." Mintz Dec., ECF No. 4-2 ¶ 4 (parentheses and footnotes omitted); see also id. ¶ 14 ("Outside of the summer months, the Boys' camp location is also used to host programs during the Jewish holidays of Rosh Hashanah, Sukkot, Passover and Shavurot."). Absent an injunction, these programs will simply continue on the same terms as they have over the past year, without the disruptive presence of deadly weapons.

Should Plaintiffs conclude that the presence of armed persons at the campgrounds is indispensable, they can retain someone who meets one of the many categories of exclusions in

Penal Law 265.01-e(3), such as active or retired peace officers or licensed security guards – persons with special training in keeping the public safe and (in most cases) a sworn duty to protect the vulnerable.  Oorah's publicly-available charities filings show that it had revenues of nearly $78 million in 2021 and $183 million in net assets on hand at the end of that year, meaning that the organization could easily afford to hire professional security if it deems armed guards to be necessary.  See Oorah 2021 Form 990, Thompson Declaration Ex. 1.  Similarly, to the extent that Oorah wishes Plaintiff Mintz and Plaintiff Schwartz in specific to serve as armed security at the camp, they could simply become licensed as security guards.  See N.Y. Penal Law § 265.01-e(3)(e).  And to the extent that Plaintiffs Mintz and Schwartz wish to carry firearms in a place of worship, they may do so as long as the Rabbi or congregation designates them as "persons responsible for security at such place of worship."  Id. § 265.01-e(2)(c).

On the other hand, if the Court were to sustain Plaintiffs' facial challenge and issue a preliminary injunction against Penal Law § 265.01-e(2)(f), children and parents across New York State would wake up in a world where the camps that their children are attending – right now, this summer – would be open to strangers with guns.  Summer camps across the State would need to evaluate the effect of the injunction, figure out what steps (if any) courts will allow them to utilize in order to protect their children from guns, and weigh their exposure to potential liability, all while fielding questions from parents and children that they may not be able to answer.  Some may choose to close rather than take the risk.  Each parent would need to evaluate the new risks to their child and determine whether they feel that their children are safe at camp, which is often a place far away from home.  And children will have to come to terms with new dangers from their exposure to guns in a place where they are entitled to feel safe.

An injunction against Penal Law § 265.01-e(2)(c) would be just as disruptive, forcing persons of faith across New York State to come to terms with the fact that the houses of worship that they trust to be places of prayer, fellowship, and contemplation can now be filled with deadly weapons.  That is not what the Constitution requires, and it is certainly not in the interest of New York children and families.  Cf. Deferio v. City of Syracuse, 306 F. Supp. 3d 492, 520-21 (N.D.N.Y. 2018) (declining to issue injunction despite merits success on constitutional claim because "injunctions are an 'extraordinary remedy' and 'courts of equity should pay particular regard for the public consequences in employing them.'" (quoting Winter, 555 U.S. at 24)).

## IV.   ANY INJUNCTION SHOULD BE LIMITED TO THE PARTIES AND STAYED PENDING APPEAL

For all the reasons discussed above, the Plaintiffs have not carried their burden on the motion for a preliminary injunction.  But even if the Court were to issue a preliminary injunction, its effect should be limited to the Plaintiffs, or alternatively confined in operation to the Northern District of New York.  The Second Circuit has emphasized that "as a general rule, injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." Kane v. De Blasio, 19 F.4th 152, 173 (2d Cir. 2021) (emphasis added) (collecting cases); see also Trump v. Hawaii, 138 S.Ct. 2392, 2427 (2018) (Thomas, J., concurring) ("American courts' tradition of providing equitable relief only to parties [i]s consistent with their view of the nature of judicial power.").  Similarly, in the event that the Court were to issue a preliminary injunction, the Superintendent requests that the Court stay the injunction pending appeal, or at a minimum, stay it for five business days to allow the State Defendants to seek emergency relief in the Second Circuit.  See Fed. R. App. P. 8(a)(1); Nken v. Holder, 556 U.S. at 427 ("The power to grant a stay pending review" is "part of a court's traditional equipment for the administration of justice." (quotation omitted)).

## CONCLUSION

For the foregoing reasons, Superintendent Nigrelli asks the Court to deny the motion for a preliminary injunction and grant such other and further relief in favor of the Defendants that it deems just and proper.

Dated: Albany, New York
      July 14, 2023

                                      LETITIA JAMES
                                      Attorney General
                                      State of New York
                                      Attorney for Superintendent Nigrelli

By: *s/ Michael McCartin*
Michael G. McCartin
Assistant Attorney General | Special Counsel
Bar Roll No. 511158
The Capitol
Albany, New York 12224
Tel.: (518) 776-2620
Michael.McCartin@ag.ny.gov

By: _____
James M. Thompson
Special Counsel
Bar Roll No. 703513
28 Liberty Street
New York, NY 10005
Tel.: (212) 416-6556
james.thompson@ag.ny.gov