**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ELIYOHU MINTZ and ERIC SCHWARTZ,**

                                        **Plaintiffs,**

        **vs.**                                        **1:23-CV-795**
                                                       **(MAD/CFH)**

**DOMINICK L. CHIUMENTO,** *in his official capacity***;**
**RONALD STEVENS,** *in his official capacity***; and**
**SUSAN J. MALLERY,** *in her official capacity***,**

                                        **Defendants.**
_____

| | |
|---|---|
| **APPEARANCES:** | **OF COUNSEL:** |
| **THE BELLANTONI LAW FIRM, PLLC** | **AMY L. BELLANTONI, ESQ.** |
| 2 Overhill Road | |
| Suite 400 | |
| Scarsdale, New York 10583 | |
| Attorneys for Plaintiffs | |
| **OFFICE OF THE NEW YORK STATE** | **JAMES M. THOMPSON, AAG** |
| **ATTORNEY GENERAL** | **MICHAEL G. McCARTIN, AAG** |
| The Capitol | |
| Albany, New York 12224 | |
| Attorneys for Defendant Nigrelli | |
| **SOKOLOFF STERN, LLP** | **LEO DORFMAN, ESQ.** |
| 179 Westbury Avenue | |
| Carle Place, New York 11514 | |
| Attorneys for Defendants Stevens and Mallery | |

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

        Plaintiffs commenced this action on June 30, 2023, seeking declaratory and injunctive

relief, alleging that New York State Penal Law §§ 265.01-e(2)(c) and (f) violate the First, Second

and Fourteenth Amendments to the United States Constitution. *See* Dkt. No. 1.  That same day,

Plaintiffs filed an emergency motion for a preliminary injunction. *See* Dkt. No. 4. Defendants have responded to Plaintiffs' motion and the Court held oral argument on July 28, 2023. *See* Dkt. No. 19. As set forth below, Plaintiffs' motion is denied.

## II. BACKGROUND

**A.** ***Bruen*** **and the CCIA**

On July 1, 2022, the Concealed Carry Improvement Act ("CCIA") was passed by the New York State Legislature in special session and signed into law. The bill was specifically designed "to align with the Supreme Court's recent decision in [*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)]." *Press Release,* Governor Kathy Hochul (July 1, 2022), *available at* https://on.ny.gov/3BM6Hz7. In *Bruen*, the Supreme Court found that a single provision of New York's gun licensing regime was unconstitutional – the provision that required an applicant to demonstrate "proper cause" to obtain a license to carry a concealed weapon. The Court held that requiring such a heightened, individualized need for self-defense to obtain a license violated the Second Amendment. *See Bruen*, 142 S. Ct. at 2156. The Supreme Court did not address any other provision of New York's gun licensing laws or related statutes, and in fact held that "nothing in our analysis should be interpreted to suggest the unconstitutionality of ... 'shall issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].'" *Id.* at 2138 n.9 (quotation omitted).

The Sponsor's Memo of the CCIA states that the bill was enacted to comply with *Bruen* and to respect Second Amendment rights:

> The proposed legislation creates a new licensing procedure that
> satisfies the requirements set forth by the United States Supreme
> Court decision in *New York State Rifle & Pistol Association, Inc., v.*
> *Bruen, et al.* Notably, this replaces the "proper cause" requirements
> of New York's current conceal carry law, with a new set of
> requirements that protects individuals' Second Amendment rights as

> determined by the Supreme Court.  Under this bill, applicants who
> successfully meet New York's conceal carry license applications
> requirements will receive their license.  The bill furthers the State's
> compelling interest in preventing death and injury by firearms.

*New York Sponsor's Memorandum*, Senate Bill S51001 (2022).

As part of the new law, New York enumerated the vulnerable locations where guns would not be permitted, in keeping with *Bruen*'s recognition of "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2133.  Among the sensitive places protected under the CCIA are "places of worship" and "summer camps." N.Y. Penal Law §§ 265.01-e(2)(c) and (f).  The State Legislature also included a number of exceptions allowing certain trained professionals or sworn officers to carry weapons inside a sensitive location, including specially-qualified active or retired law enforcement officers, licensed security guards, or active-duty military personnel.  *See* N.Y. Penal Law § 265.01-e(3).  In a more recent legislative session, New York adopted an additional exception to the prohibition on carrying weapons at a place of worship, allowing for armed carriage by "those persons responsible for security at such place of worship." N.Y. Penal Law § 256.01-e(2)(c); *see also* N.Y. Sess. Laws ch. 55 (A. 3005-C).  This new exception became effective on May 3, 2023.  *See id.*

## B.    The Complaint

Plaintiffs are employed by Oorah, Inc. ("Oorah"), a non-profit corporation that provides year-round activities for Orthodox Jewish children, adults, and families on over 1,000 acres of land in a rural part of Schoharie County, New York.  *See* Dkt. No. 1 at ¶ 35.  Oorah's summer camp program ("The Zone") consists of two "sleepaway camps," one for boys and one for girls, ages nine through eighteen.  *See id.* at ¶ 36.  The boys' camp is located in the Town of Jefferson and the girls' camp is located in the Town of Gilboa.  *See id.*  Each campus consists of more than 500 acres and numerous buildings.  *See id.*  At any given point in the day, the campers are

3

engaged in a wide variety of indoor and outdoor activities: from arts and crafts, to swimming, to playing with the animals on the farms, with campers traveling between numerous locations and activities. *See id.* There are numerous multi-purpose buildings at each of the campuses in which camp-focused activities and worship/religious instruction take place, including synagogues where religious services are held. *See id.* at ¶ 37. Plaintiffs reside at the camp year-round on a full-time (Schwartz) and part-time (Mintz) basis. *See id.* at ¶ 38.

In the event of an active threat, the campers could be located anywhere from boating on the lake, swimming in the pool, hiking, or engaging in any number of indoor and outdoor activities. *See id.* at ¶ 39. An immediate response from law enforcement to an acute emergency involving an active threat to life and safety at the camps is highly improbable, as the Schoharie County Sheriff's Office is located approximately forty minutes away and traveling to the Oorah campuses requires traversing winding rural local roads. *See id.* Likewise, the New York State police barracks are a similar distance away. *See id.*

The Zone is a well-known facility in upstate New York – among the Orthodox Jewish community as well as the local community. *See* Dkt. No. 1 at ¶ 40. As Orthodox Jews, Plaintiffs, the staff, and patrons of The Zone are easily recognizable and identifiable to the public as such, based on their manner of dress and customs, and have been openly targeted over the years for discriminatory acts including yelling ethnic and hateful slurs and throwing objects, including Molotov cocktails. *See id.* There have been prior incidents where intruders passing by the camp have stopped their cars, entered onto the camp properties, and chased children while shouting ethnic slurs. *See id.* at ¶ 41. In the winter of 2022, three of the residential buildings across from the main girls' campus were burned down under mysterious circumstances. *See id.*

4

Plaintiffs each hold an unrestricted New York State handgun license that authorizes them to possess handguns in their homes and carry handguns concealed on their person for self-defense. *See id.* at ¶ 43. Since the issuance of their licenses, Plaintiffs have possessed and carried their firearms on a regular basis for protection while at the Oorah property. *See id.* Before New York enacted laws criminalizing the possession of firearms at "summer camps" and "places of religious observation," Plaintiff Mintz encouraged other licensed patrons and staff members to carry a handgun while on the property, including Plaintiff Schwartz. *See id.* In the complaint, Plaintiffs contend that, "[b]ecause of the passage and enforcement of Penal Law 265.01-e(c) and (f), which arbitrarily criminalized the peaceable possession and/or carriage of firearms at 'summer camps' and 'places of worship,' Plaintiffs' exercise of such protected conduct subjects them to felony arrest and prosecution, state prison, the permanent loss of Second Amendment rights, and other penalties." *Id.* at ¶ 44.

Summer camp began on June 22, 2023. *See* Dkt. No. 1 at ¶ 45. Plaintiffs have expressed their intention to continue possessing and carrying firearms while on the Oorah properties, during summer camp, in the synagogues, and buildings in which religious observation is held throughout the year and into the future, as they did before the laws were enacted. *See id.* at ¶ 46. Plaintiffs claim that they face a credible and concrete risk of enforcement of criminal penalties against them because of their intention to continue possessing and carrying firearms on the Oorah properties during/at the summer camp, in the synagogues, and in other buildings in which religious observation is held. *See id.* at ¶ 47. Based on this risk of enforcement, Plaintiffs have moved for a preliminary injunction, arguing that enforcement of New York Penal Law §§ 265.01-e(2)(c) and (f) violates their rights protected by the Second and Fourteenth Amendments to the United States Constitution. *See* Dkt. No. 4.

Following oral argument in this case, the Court stayed this case with the parties' consent in anticipation of the Second Circuit's forthcoming decision in *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023).  A decision was issued by the Second Circuit on December 8, 2023 and the Court will now address the pending motion.

### III. DISCUSSION

**A.    Standing**

As noted above, the New York Legislature recently amended the place of worship provision.  Initially, the State Legislature included a number of exceptions allowing certain trained professionals or sworn officers to carry weapons inside a sensitive location, including specially-qualified active or retired law enforcement officers, licensed security guards, or active-duty military personnel.  *See* N.Y. Penal Law § 265.01-e(3).  Effective May 3, 2023, the Legislature added an additional exception to the prohibition on carrying weapons at a place of worship, allowing for armed carriage by "those persons responsible for security at such place of worship." N.Y. Penal Law § 256.01-e(2)(c); *see also* N.Y. Sess. Laws ch. 55 (A. 3005-C).

In *Antonyuk*, the Second Circuit found that the statutory amendment mooted the plaintiffs' challenge to this provision, which was brought before the amendment, since the plaintiffs stated in their complaint that they would grant themselves permission to carry firearms in order to protect their churches if they could.  *See Antonyuk*, 89 F.4th at 343.  Here, this action was filed after the amendment took effect and, therefore, Plaintiffs claims are not moot.  However, as in *Antonyuk*, Plaintiffs' amended complaint and the declarations submitted in support of their motion for a preliminary injunction make clear that Plaintiffs have day-to-day authority over the synagogues on the property and can be designated "responsible for security." Dkt. No. 4-2 at ¶¶ 3-4, 13 (noting that Plaintiff Mintz is the "CEO of Oorah, Inc.," which owns the properties on

which the synagogues are located); Dkt. No. 4-3 at ¶ 21 (noting that Plaintiff Schwartz was

previously encouraged "by Rabbi Mintz to carry a handgun while on the property, particularly

during the summer camp").  Because Plaintiff Mintz "can freely designate himself and [others] as

'persons responsible for security'" Plaintiffs have failed to demonstrate an injury-in-fact necessary

to demonstrate standing.  *See Antonyuk*, 89 F.4th at 345; *see also Srour v. New York City*, ___ F.

Supp. 3d ___, 2023 WL 7005172, *10-11 (S.D.N.Y. 2023); *Nastri v. Dykes*, ___ F. Supp. 3d ___,

2023 WL 4491621, *6-7 (D. Conn. 2023).

Accordingly, the Court finds that Plaintiffs lack standing to challenge the prohibition on

carrying weapons inside a place of worship.[1]

**B.      Standard of Review**

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear

showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 22 (2008).  A party seeking a preliminary injunction "must demonstrate that it will suffer

irreparable harm absent injunctive relief and either (1) that it is likely to succeed on the merits of

the action, or (2) that there are sufficiently serious questions going to the merits to make them a

fair ground for litigation, provided that the balance of hardships tips decidedly in favor of the

moving party." *Mullins v. City of New York*, 626 F.3d 47, 52–53 (2d Cir. 2010) (citing *Citigroup*

*Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34-35 (2d Cir.

2010)).

Where "a party seeks an injunction that will affect governmental action taken in the public

interest pursuant to a statutory or regulatory scheme, the plaintiff must typically show a likelihood

---

[1] This finding necessarily means that Plaintiffs are unlikely to succeed on the merits of
their challenge to this provision as well.

of success on the merits – a serious question going to the merits is usually insufficient[.]" *Mullins*, 626 F.3d at 53.  However, where a party seeks a mandatory injunction "altering, rather than maintaining, the status quo," such as in this case, that party "must meet [a] more rigorous standard." *Almontaser v. N.Y. City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) (internal alterations omitted); *see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995) ("[W]e have required the movant to meet a higher standard where ... an injunction will alter, rather than maintain, the status quo ...."). The moving party must establish "a clear showing that the moving party is entitled to the relief requested," or show that "extreme or very serious damage" would result in the absence of preliminary relief. *Tom Doherty Assocs.*, 60 F.3d at 34.

Finally, "[t]o prevail on a facial challenge, the plaintiff must 'establish that no set of circumstances exists under which the [challenged] Act would be valid.'" *Community Housing Improvement Program v. City of New York*, 59 F.4th 540, 548 (2d Cir. 2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "In other words, the plaintiff must show that the statute 'is unconstitutional in all of its applications.'" *Id.* (quoting *Wash. State Grange v. Wash. State Rep. Party*, 552 U.S. 442, 449 (2008)); *see also Antonyuk v. Chiumento*, 89 F.4th 271, 313 (2d Cir. 2023) (applying *Salerno* to a Second Amendment facial challenge and noting that facial challenges are "'the most difficult to mount successfully'") (quoting *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015)).[2]

### 1. Irreparable Harm and Laches and Balance of Equities

---

[2] As Defendants note, Plaintiffs' challenge is clearly facial in nature, as their complaint demands an injunction against any enforcement of the prohibition on guns in summer camps or places of worship, with no attempt to tie the relief requested to any particular set of circumstances applicable to Plaintiffs' situation. *See* Dkt. No. 1 at ¶¶ 6, 56-58; Dkt. No. 23 at ¶¶ 6, 56-58.

Since "[i]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction[,] ... the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (quotations and citations omitted); *see also JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 Fed. Appx. 31, 33 (2d Cir. 2015) (holding that since irreparable harm "is the *sine qua non* for preliminary injunctive relief[,] ... the moving party must first demonstrate that irreparable harm would be 'likely' in the absence of a preliminary injunction before the other requirements for the issuance of a preliminary injunction will be considered") (quotations and citations omitted); *Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 221 (S.D.N.Y. 2019) ("[I]f a party fails to show irreparable harm, a court need not even address the remaining elements" of the preliminary injunction standard).  "Irreparable harm is defined as certain and imminent harm for which a monetary award does not adequately compensate[,] ... [and] exists where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Allstate Ins. Co. v. Harvey Family Chiropractic*, 677 Fed. Appx. 716, 718 (2d Cir. 2017) (quotations and citations omitted); *see also WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012) (holding that irreparable harm is "harm to the plaintiff's legal interests that could not be remedied after a final adjudication").

"Harm may be irreparable where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss." *WPIX*, 691 F.3d at 285; *accord Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010).  Thus, unless the movant demonstrates "an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages[,] ... a motion for a preliminary injunction should be denied." *Rodriguez*,

175 F.3d at 234 (quotations and citation omitted); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (holding that before a court may grant injunctive relief, the plaintiff must demonstrate, among other things, "that remedies available at law, such as monetary damages, are inadequate to compensate for [its] injury").

"Where the alleged irreparable injury is a prospective constitutional violation, however, 'the question of plaintiff's delay is appropriately addressed under the rubric of laches, not the irreparable harm prong of the preliminary injunction standard.'" *Five Borough Bicycle Club v. City of New York*, 483 F. Supp. 2d 351, 361 (S.D.N.Y. 2007) (quotation and other citation omitted); *see also Gallagher v. New York State Bd. of Elections*, 477 F. Supp. 3d 19, 41-42 (S.D.N.Y. 2020) (holding that, "'where, as here, an alleged wrongful governmental act has resulted in an ongoing deprivation of constitutional rights, delay in seeking relief does not defeat the presumption of irreparable harm – at least when the delay is not so severe as to implicate the equitable doctrine of laches'") (quoting *Yafari v. Cuccinelli*, No. 20-cv-2932, 2020 WL 2836975, *4 (S.D.N.Y. June 1, 2020)). "Laches is an equitable defense which bars injunctive relief where a plaintiff unreasonably delays in commencing an action." *H2O v. Town Bd. of East Hampton*, 147 F. Supp. 3d 80, 98 (E.D.N.Y. 2015) (citations omitted). "Laches can be asserted as a defense only when plaintiffs are 'guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant.'" *Gallagher*, 477 F. Supp. 3d at 42 (quoting *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997)); *see also Republic of Turkey v. Christie's Inc.*, 62 F.4th 64, 71 (2d Cir. 2023).

Here, Plaintiffs waited 364 days to file this lawsuit: the CCIA was passed on July 1, 2022, but they waited until June 30, 2023, after the start of the summer camp season, to bring this action. Plaintiffs then moved by order to show cause for injunctive relief, arguing that proceeding

by the traditional notice of motion would be inadequate to address the alleged ongoing harm caused by the enforcement of New York Penal Law §§ 265.01-e(2)(c) and (f).  *See* Dkt. No. 4 at ¶¶ 4-5.[3]  The alleged emergency nature of these proceedings was entirely of Plaintiffs' own making, which has prejudiced Defendants by forcing them to prepare for and contest litigation involving significant historical and constitutional issues in a short period of time.  *See Defense Distributed v. Bonta*, No. 22-cv-6200, 2022 WL 15524977, *5 n.9 (C.D. Cal. Oct. 21, 2022) ("[The plaintiff] obtaining a preliminary injunction ... was wishful thinking, at best" because it was unreasonable to expect California "to be able to present the type of historical analysis conducted in *Bruen* on 31 days' notice (or even 54 days' notice)").  Even in cases involving alleged constitutional injuries, courts have found that delays of this nature warrant denying preliminary injunctive relief.  *See Million Youth March, Inc. v. Safir*, 18 F. Supp. 2d 334, 340 n.37 (S.D.N.Y. 1998) (noting that where "the relief sought via preliminary injunction in practical effect will give the plaintiff substantially all the relief sought in the complaint, it is reasonable to consider the applicability of the laches doctrine in the preliminary injunction context"); *Shady v. Tyson*, 5 F. Supp. 2d 102, 108-09 (E.D.N.Y. 1998) (holding that although the plaintiff's one year delay in filing his complaint did not preclude him from seeking permanent injunction, such delay warranted denying his request for a preliminary injunction); *Wallikas v. Harder*, 78 F. Supp. 2d 36, 42-43 (N.D.N.Y. 1999) (finding that the plaintiff's ten-month delay in bringing preliminary injunction motion based on alleged constitutional violations weighed against finding of irreparable harm); *Perry v. Judd*, 840 F. Supp. 2d 945, 954-55 (E.D. Va. 2012) (holding that the plaintiffs claim for injunctive relief was barred by laches where the plaintiffs waited nearly half a

---

[3] In *Goldstein v. Hochul*, ___ F. Supp. 3d ___, 2023 WL 4236164 (S.D.N.Y. 2023), the plaintiffs, members of the Congregation Bnei Matisyahu, brought suit on September 29, 2022, challenging New York Penal Law § 265.01-e(2)(c) and sought both a temporary restraining order and preliminary injunctive relief.

year before seeking judicial relief and the state was harmed by the delay), *aff'd* 471 Fed. Appx. 219 (4th Cir. 2012).  With the parties' consent, however, the Court agreed to stay this action pending resolution by the Second Circuit of the appeal in *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023).  As such, Plaintiffs' delay notwithstanding, the Court will address the merits of the claims.

Plaintiffs also contend that, "[t]o the extent that the State claims lack of sufficient notice to present a historical justification for its regulations, Gov. Hochul spent the <u>year</u> preceding the *Bruen* decision to be 'ready for it' with her 'partners' NYPD Commissioner Sewell and 'advocates' like the Gifford Law Center and Everytown for Gun Safety with whom she has 'been joined at the hip' who were 'helpful in the whole process of writing legislation' (including 265.01-e) that she 'believe[s] is responsive to the Supreme Court decision [in *Bruen*] and that they 'fought back' against the Supreme Court." Dkt. No. 28 at 8 n.4 (quotation omitted).  Again, Plaintiffs' argument misses the mark.  The fact that Governor Hochul was working on legislation in response to the Supreme Court's anticipated decision in *Bruen* that would be able to pass both houses of the legislature and appease various competing interests is not relevant to the prejudice suffered by Plaintiffs' delay in bringing this action.  It is true that the State has previously had to address the merits of the new restrictions on "any place of worship," but they have not been required to litigate the merits of the "summer camps" restriction.

In their reply, Plaintiffs also contend that their case would have been dismissed on ripeness grounds if it had been commenced at an earlier date because Oorah's summer camp did not begin until June 23, 2023.  *See* Dkt. No. 28 at 8; *see also* Dkt. No. 28-2 at 2.  Plaintiffs' argument is entirely without merit.  The ripeness doctrine, "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction,"

protects the government from "judicial interference until a[ ] ... decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal citations omitted).  It is well-established that one "does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending that is enough." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979).  And the injury need not even be certain, as a claim is justiciable so long as "there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

As noted, the law Plaintiffs are challenging was on the books for one year, and Plaintiffs were well-aware that their summer camp would be opening in the summer.  Instead of filing sooner, Plaintiffs waited until after their summer camp had opened for the season before seeking judicial intervention.  Pre-enforcement review of the validity of a statute or regulation is warranted "principally when an individual would, in the absence of court review, be faced with a choice between risking likely criminal prosecution entailing serious consequences, or forgoing potentially lawful behavior." *Thomas v. City of New York*, 143 F.3d 31, 35 (2d Cir.1998).  That is the case here.  Indeed, pre-enforcement challenges to recently enacted legislation are regularly brought, often even before the legislation's effective date.  *See New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 990 F. Supp. 2d 349, 378-79 (W.D.N.Y. 2013) (holding that the plaintiffs commerce clause challenge to a provision of the New York State SAFE Act was ripe for review despite the fact that the plaintiffs brought suit nine months before the law's effective date of January 15, 2014), *rev'd in part on other grounds*, 804 F.3d 242 (2d Cir. 2015); *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1113-14 (S.D. Cal. 2017) (holding that the plaintiffs' Second Amendment challenge to a recently enacted California law was ripe for review when the law's

effective date was approaching which would criminalize previously legal conduct and the state had not indicated that it would not enforce the law on its effective date); *Ward v. New York*, 291 F. Supp. 2d 188, 198-99 (W.D.N.Y. 2003) ("'When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief'") (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *Koons v. Platkin*, ___ F. Supp. 3d ___, 2023 WL 3478604, *36 (D.N.J. May 16, 2023) (holding that the plaintiffs' pre-enforcement Second Amendment challenge was ripe for review even though the challenged law did not take effect until July 2023 and the plaintiffs' failure to abide by the law would expose them to criminal liability) (citations omitted).  As the Supreme Court has noted, "[w]here the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974).

There was nothing hypothetical about the situation that Plaintiffs faced.  Plaintiffs knew that they would be injured by New York's enactment of the CCIA for an entire year and their injury was not contingent on future events.  Rather, Plaintiffs knew in the months leading up to the opening day of the summer camps that the CCIA would criminalize the carrying of firearms at summer camps and places of worship.  This is precisely the type of action that was ripe for review for nearly a year prior to when they filed this action and sought injunctive relief by order to show cause.  Oral argument was held on Plaintiffs' motion on July 28, 2023, and the final day of Oorah's 2023 summer camps was August 24 for the girls' camp and August 16 for the boys' camp. Even if the Court had issued an exceedingly expedited decision on the merits of Plaintiffs' request

for injunctive relief, at best, it would have only provided a couple of weeks of relief because, once the properties are no longer operating as "summer camps," Plaintiffs are no longer prohibited from exercising their Second Amendment rights pursuant to Section 265.01-e(2)(f).  Generally, courts are loathe to rush decisions on the merits on such a truncated schedule when complex and novel constitutional law questions are at issue.  *See A.S. v. Lee*, No. 3:21-cv-600, 2021 WL 3421182, *9 (M.D. Tenn. Aug. 5, 2021) (exercising its discretion in applying laches to the plaintiffs' request for a temporary restraining order where the challenged law was enacted on May 14, 2021, went into effect on July 1, 2021, and plaintiffs filed their motion for temporary restraining order on August 2, 2021, noting that the defendants were prejudiced by the delay and that the court "would have inadequate time to do the issues full justice in the extremely limited amount of time it would have to decide the TRO motion on the merits").

As the Supreme Court has held, "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, ___ U.S.___, 138 S. Ct. 1942, 1944 (2018) (citations omitted).[4] Had the Court proceeded to a decision on the merits immediately following oral argument on the motion, it would have undoubtedly denied Plaintiffs' request for injunctive relief based on their unreasonable delay in seeking relief.  However, as previously mentioned, the Court stayed this matter pending resolution by the Second Circuit of the appeals filed in *Antonyuk v. Nigrelli*, No. 22-2972 (2d Cir.) and *Hardaway v. Nigrelli*, No. 22-2933 (2d Cir.).  Those appeals have now been decided and the Court finds it appropriate to address the merits of Plaintiffs' claims.

### 2. Likelihood of Success on the Merits

---

[4] The Supreme Court has also considered undue delay in finding that the balance of equities weighed against granting injunctive relief.  *See Benisek*, 138 S. Ct. at 1944.

The Second Amendment states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In *Bruen*, the Supreme Court rejected the two-step approach adopted by many of the Courts of Appeal to assess Second Amendment claims, abandoning the second step of the analysis at which courts "appl[ied] means-end scrutiny in the Second Amendment context." *Bruen*, 142 S. Ct. at 2127.  Relying on its precedential decisions in *Heller* and *McDonald*, the Supreme Court explained that it had not once, but twice "declined to engage in means-end scrutiny because 'the very enumeration of the right takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.'" *Id.* at 2129 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008) (emphasis in original)*); see also McDonald v. Chicago*, 561 U.S. 742, 790-91 (2010) (explaining that the Second Amendment does not permit "judges to assess the costs and benefits of firearms restrictions" under a means-end scrutiny analysis).

By making "the constitutional standard endorsed in *Heller* more explicit," the *Bruen* Court clarified that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The Government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition." *Bruen*, 142 S. Ct. at 2129-30.  Drawing an analogy to the First Amendment, the *Bruen* Court reasoned that when the Government restricts constitutionally protected conduct like speech, "the Government bears the burden of proving the constitutionality of its actions." *Id.* at 2130 (citations omitted).  Thus, the State must be able to

meet its burden of proof in the Second Amendment context and "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.

The *Bruen* Court was clear in its instruction to the district courts when undertaking a constitutional analysis of a state's gun control legislation.  This Court must rely on history to inform the meaning of constitutional text rather than make empirical judgments about the costs and benefits of firearms restrictions.  As the Supreme Court explained, "[i]f the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of 'intermediate scrutiny' often defer to the determinations of legislatures." *Bruen*, 142 S. Ct. at 2131.  And,

> while that judicial deference to legislative interest balancing is understandable — and, elsewhere, appropriate — it is not deference that the Constitution demands here.  The Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law- abiding responsible citizens to use arms" for self-defense ... It is this balance — struck by the traditions of the American people — that demands our unqualified deference.

*Id.* (quotation omitted).

The *Bruen* Court then applied the test set forth in *Heller* to the challenged legislation, further instructing district courts considering Second Amendment challenges "to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131.  The *Bruen* Court gave important examples indicating how the district courts might detect unconstitutional legislative overreach in Second Amendment terms:

> [i]n some cases, that inquiry will be fairly straightforward.  For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with

17

> the Second Amendment.  Likewise, if earlier generations addressed
> the societal problem, but did so through materially different means,
> that also could be evidence that a modern regulation is
> unconstitutional.  And if some jurisdictions actually attempted to
> enact analogous regulations during this timeframe, but those
> proposals were rejected on constitutional grounds, that rejection
> surely would provide some probative evidence of
> unconstitutionality.

*Id.*  By contrast, in "other cases implicating unprecedented societal concerns or dramatic

technological changes," historical analogies will not be as easy to draw and "may require a more

nuanced approach." *Id.* at 2132.  Nevertheless, "the Constitution can, and must, apply to

circumstances beyond those the Founders specifically anticipated." *Id.* (citing *United States v.*

*Jones*, 565 U.S. 400, 404-05, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012)).

Thus, in keeping with *Heller*, the district courts must look to historical context because "it

has always been understood that the Second Amendment ... codified a *pre-existing* right." *Id.* at

2127 (quoting *Heller*, 554 U.S. at 592, 128 S. Ct. 2783) (emphasis in original).  The *Bruen* Court

also emphasized the important balance that district courts must strike when considering statutes

that plainly implicate the Second Amendment:

> analogical reasoning under the Second Amendment is neither a
> regulatory straightjacket nor a regulatory blank check.  On the one
> hand, courts should not "uphold every modern law that remotely
> resembles a historical analogue," because doing so "risk[s]
> endorsing outliers that our ancestors would never have accepted."
> *Drummond v. Robinson*, 9 F.4th 217, 226 ([3rd Cir.] 2021).  On the
> other hand, analogical reasoning requires only that the government
> identify a well-established and representative historical analogue,
> not a historical twin.  So even if a modern-day regulation is not a
> dead ringer for historical precursors, it still may be analogous
> enough to pass constitutional muster.

*Id.* at 2133.

The *Bruen* Court further instructed "that *Heller* and *McDonald* point toward at least two

metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."

*Id.*  And as stated in those precedential cases, "'individual self-defense is "the central component"

of the Second Amendment right.'" *Id.* (quotations and emphasis omitted).  And central to the

consideration of a reviewing district court is "whether modern and historical regulations impose a

comparable burden on the right of armed self-defense and whether that burden is comparably

justified." *Id.* (citations omitted).

Of critical importance to the current controversy, the *Bruen* Court expressly considered

and commented upon the permissibility of the type of "sensitive place" legislation at issue here:

> Consider, for example, *Heller*'s discussion of "longstanding"
> laws forbidding the carrying of firearms in sensitive places such as
> schools and government buildings. ... Although the historical record
> yields relatively few 18th- and 19th-century "sensitive places"
> where weapons were altogether prohibited — *e.g.*, legislative
> assemblies, polling places, and courthouses — we are also aware of
> no disputes regarding the lawfulness of such prohibitions. ... We
> therefore can assume it settled that these locations were "sensitive
> places" where arms carrying could be prohibited consistent with the
> Second Amendment.  And courts can use analogies to those
> historical regulations of "sensitive places" to determine that modern
> regulations prohibiting the carry of firearms in new and analogous
> sensitive places are constitutionally permissible.
>
> Although we have no occasion to comprehensively define
> "sensitive places" in this case, we do think respondents err in their
> attempt to characterize New York's proper-cause requirement as a
> "sensitive-place" law.  In their view, "sensitive places" where the
> government may lawfully disarm law-abiding citizens include all
> "places where people typically congregate and where
> law-enforcement and other public-safety professionals are
> presumptively available." ... It is true that people sometimes
> congregate in "sensitive places," and it is likewise true that law
> enforcement professionals are usually presumptively available in
> those locations.  But expanding the category of "sensitive places"
> simply to all places of public congregation that are not isolated
> from law enforcement defines the category of "sensitive places" far
> too broadly.  Respondents' argument would in effect exempt cities
> from the Second Amendment and would eviscerate the general right
> to publicly carry arms for self-defense that we discuss in detail
> below. ... Put simply, there is no historical basis for New York to
> effectively declare the island of Manhattan a "sensitive place"

simply because it is crowded and protected generally by the New York City Police Department.

*Id.* at 2133-34 (quotations omitted).[5]

### a. Step One

*Bruen*'s first step asks "whether the plain text of the Second Amendment protects [the plaintiff's] proposed course of conduct[.]" *Bruen*, 597 U.S. at 31.  This step "requires a textual analysis, determining whether the challenger is part of 'the people' whom the Second Amendment protects, whether the weapon at issue is 'in common use' today for self-defense, and whether the proposed course of conduct falls within the Second Amendment." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (quoting *Bruen*, 142 S. Ct. at 2134-35) (other quotation omitted); *see also Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101 (3d Cir. 2023) (explaining that *Bruen*'s first step looks to "whether the text of the Second Amendment applies to a person and his proposed conduct").

Here, Plaintiffs are "ordinary, law-abiding, adult citizens," and are therefore "part of 'the people' whom the Second Amendment protects." *Bruen*, 597 U.S. at 31-32.  Moreover, Defendants do not contend that the firearms Plaintiffs seek to carry into the proscribed places are not "'in common use' today for self defense." *Id.* at 32.  And the plain text of the Second Amendment unquestionably protects Plaintiffs' proposed course of conduct of carrying handguns outside the home for self-defense.  *See id.* at 10.

---

[5] *Bruen* acknowledges there is an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope." *Bruen*, 142 S. Ct. at 2138.  However, the Supreme Court did not address the issue of which time period was the appropriate historical period to consider for *Bruen* analysis as "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.*  Accordingly, the Court will reference examples from around both time periods.

*Bruen*'s first step is therefore met.[6]  *See Hardaway v. Nigrelli*, 639 F. Supp. 3d 422, 439 (W.D.N.Y. 2022) (finding step one met when ordinary, law-abiding citizens challenged law designating places of worship as sensitive places), *affirmed in part, vacated in part, and remanded by Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023).

### b. Step Two

Since the relevant provisions implicate conduct the Second Amendment protects, they are presumptively unconstitutional unless the government can meet its burden to demonstrate that the provisions are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.  To carry its burden, the government must provide "'historical precedent' from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Id.* at 27 (quotation omitted).  "*Bruen* requires courts to engage in two analytical steps when assessing Second Amendment challenges: first, by interpreting the plain text of the Amendment as historically understood; and second, by determining whether the challenged law is consistent with this Nation's historical tradition of firearms regulation, as 'that delimits the outer bounds of the right to keep and bear arms.'" *Antonyuk*, 89 F.4th at 300.

In *Antonyuk*, the Second Circuit recently provided guidance on this issue.  First, the Second Circuit acknowledged that "'not all history is created equal'" and, therefore, "historical practices that long predate or postdate codification of the relevant constitutional provision may not have much bearing on the provision's scope if the practices were obsolete or anomalous." *Antonyuk*, 89 F.4th at 301 (quoting *Bruen*, 142 S. Ct. 2136).

"Second, in examining history and tradition, a court must identify the 'societal problem' that the challenged regulation seeks to address and then ask whether past generations experienced

---

[6] The Court notes that Defendants have not disputed that step one is met.

that same problem and, if so, whether those generations addressed it in similar or different ways." *Id.* (citing *Bruen*, 142 S. Ct. at 2131). "'For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century,' that regulation might more likely be unconstitutional if there is a 'lack of a distinctly similar historical regulation addressing that problem,' or if 'earlier generations addressed the societal problem ... through materially different means,' or if state courts struck down similar regulations addressing the same problem on 'constitutional grounds.'" *Id.* (quotation omitted). "Conversely, 'where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide [a court's] interpretation of an ambiguous constitutional provision.'" *Id.* (quotation omitted).

Third, the Second Circuit reasoned that "the absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much." *Id.* "Legislatures past and present have not generally legislated to their constitutional limits. Reasoning from historical silence is thus risky; it is not necessarily the case that, if no positive legislation from a particular place is in the record, it must be because the legislators there deemed such a regulation inconsistent with the right to bear arms." *Id.* (footnoted omitted). The Second Circuit noted that there are many reasons why the historical record may not evince statutory prohibitions on a given practice. *See id.* "For example, lawmakers are not moved to forbid behavior that is governed by custom, universal practice, or private warning. No legislation is needed to forbid zoo patrons form entering the lion's enclosure[.]" *Id.* at 301-02.

Fourth, the Second Circuit instructed that "courts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction. To put it plainly, our era does not

resemble those." *Id.* at 302.  As such, the lack of a distinctly similar historical regulation, though undoubtedly relevant, "may not be reliably dispositive in Second Amendment challenges to laws addressing modern concerns." *Id.*[7]  A "'more nuanced approach' is necessary in cases concerning 'new circumstances' or 'modern regulations that were unimaginable at the founding,' such as regulations addressing 'unprecedented societal concerns or dramatic technological changes.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2132).

Fifth, the Second Circuit reasoned that, "under the more nuanced approach, the 'historical inquiry that courts must conduct will often involve reasoning by analogy.'" *Antonyuk*, 89 F.4th at 302 (quoting *Bruen*, 142 S. Ct. at 2132).  In making this determination, the court must ask whether the challenged regulation and the proposed historical analogue are "'relevantly similar.'" *Id.*  Specifically, the court must determine "'whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified[.]'" *Id.*  *Bruen* emphasized that a court should not search in vain for a "historical twin;" rather, "a well-established and representative historical analogue" is sufficient.  *Bruen*, 142 S. Ct. at 2133.

"Sixth, just as the existence *vel non* of a *distinctly similar* historical regulation is not dispositive, it is likewise not dispositive whether *comparable* historical regulations exist in significant numbers." *Antonyuk*, 89 F.4th at 303 (emphasis in original).  The Second Circuit noted that in *Bruen*, the Supreme Court made reference to permissible restrictions in legislative assemblies, polling places, and courthouses.  *See id.*  Despite the fact that there were very few laws cited in the *Bruen* decision relating to those "sensitive places," "the *Bruen* Court examined

---

[7] The Second Circuit noted that the lack of precedent was likely dispositive in *Bruen* "due to the exceptional nature of New York's proper-cause requirement, which conditioned the exercise of a federal constitutional right on the rightholder's reasons for exercising the right." *Antonyuk*, 89 F.4th at 302.

those few prohibitions in context and explained that it was 'aware of no disputes regarding the lawfulness of such prohibitions.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2133).

Seventh, the Second Circuit noted that the right to keep and bear arms is applicable to the States through the Fourteenth Amendment, which was adopted in 1868. *See id.* at 304. "Acknowledging as much, however, *Bruen* expressly declined to decide 'whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2138). Significant here, the Second Circuit concluded that "[b]ecause the CCIA is a state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis." *Id.* (citation omitted). "And, to the extent *Bruen* did rely on those later prohibitions, that confirms our conclusion that courts – rather than ignoring laws because they are 'too old' or not 'old enough' – should consider this Nation's whole tradition." *Antonyuk*, 89 F.4th at 304 n.11.[8]

To summarize, "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check," and to carry its burden to show a regulation is supported by the nation's historical tradition of firearm regulation, the government need only "identify a well-established and representative historical analogue, not a historical twin." *Bruen*, 597 U.S. at 30. "The core question is whether the challenged law and proffered analogue are 'relevantly similar.'" *United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023), *cert. granted*, ___U.S. ___, 143 S. Ct. 2688 (2023) (quoting *Bruen*, 597 U.S. at 29). In determining whether the

---

[8] Plaintiffs have taken issue with the fact that Defendants relied primarily on statutes, regulations, and ordinances from after the enactment of the Fourteenth Amendment, rather than from when the Second Amendment was enacted. *See* Dkt. No. 28 at 13. Plaintiff contends that the Supreme Court found "post-ratification regulations ... unreliable for determining the original meaning of the Bill of Rights." *Id.* (emphasis in original). The Second Circuit has now made clear that "[b]ecause the CCIA is a state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis" and, therefore, Plaintiffs' objection is without merit. *See Antonyuk*, 89 F.4th at 304 (citations omitted).

modern regulation and the historical analogue are "relevantly similar," courts must look to the "how and why" of the two regulations; that is, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Bruen*, 597 U.S. at 29.

The history and tradition inquiry involves additional nuance when it comes to sensitive-place restrictions. The Supreme Court mentioned in *Bruen* that it is "settled" that certain, "relatively few" locations are "sensitive places" "where arms carrying c[an] be prohibited consistent with the Second Amendment." *Bruen*, 597 U.S. at 30. These locations include schools, government buildings, "legislative assemblies, polling places, and courthouses." *Id.* The Supreme Court explained that this is so even though there are few laws evidencing a history and tradition of prohibiting firearms in those places. *See id.* (citing David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 235-36 (2018)). Indeed, the law review article the Supreme Court cited regarding historical support for designating these places as sensitive found a "rather short" list of "laws from the colonial period and the Founding Era" justifying such sensitive places: only two Maryland statutes forbidding carrying arms in the legislature and provisions in Delaware's constitution prohibiting them in polling places. *See* Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. at 235-36.

"So where does that leave the many locations in a modern city with no obvious 18th- or 19th-century analogue? What about subways, nightclubs, movie theaters, and sports stadiums? The Court does not say." *Bruen*, 597 U.S. at 114 (Breyer, J., dissenting). Rather, the Supreme Court stated that courts "can use analogies to those historical regulations of 'sensitive places' to

determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.* at 30.  That is what the Court is tasked to do here, particularly with respect to summer camps.

In response to Plaintiffs' motion, Defendants submitted the declaration of Patrick J. Charles, who is identified as "a historical and constitutional expert on Second Amendment matters." Dkt. No. 19-1 at ¶ 2.  In his declaration, Mr. Charles notes that one regulatory area that the *Bruen* Court expounded upon was that of "sensitive places," *i.e.*, locations "where arms carrying could be prohibited consistent with the Second Amendment." *Id.* at ¶ 9 (quotation omitted).  In expounding on this rule, the Supreme Court singled out prohibitions on carrying in "schools and government buildings," "legislative assemblies, polling places, and courthouses" as constitutionally permissive examples.  *See Bruen*, 142 S. Ct. at 2133 (citations omitted).  As Mr. Charles notes, the Supreme Court "upheld arms carrying prohibitions at these locations despite 'the historical record yield[ing] relatively few' examples." Dkt. No. 19-1 at ¶ 9 (quoting *Bruen*, 142 S. Ct. at 2133).  In other words, the Court found it "settled" that "these locations were [indeed] 'sensitive places'" because it was not made "aware of [any] disputes regarding the lawfulness of such prohibitions." *Bruen*, 142 S. Ct. at 2133.

After discussing the English history regarding sensitive places restrictions, Mr. Charles proceeds to explain that early in the United States, most instances of legal enforcement regarding firearms restrictions were done at the local level.  *See* Dkt. No. 19-1 at ¶ 12.  Unfortunately, according to Mr. Charles, most of these local government records have not survived.  *See id.* "What the historical record does unequivocally inform is that armed carriage restrictions and the English common law against 'going armed' in urban and densely populated locations indeed made their way into the American Colonies and subsequent United States." *Id.* at ¶ 13 (citations

26

omitted).  "Additionally, historians can state with certainty that state and local governments were well within their authority to prohibit armed assemblies circa the late eighteenth century, no matter whether said assemblies were deemed the militia or not." *Id.* (citations omitted). According to Mr. Charles, "[t]his is because it had long been understood that any armed assemblage required the consent of government officials." *Id.*

It was not until the mid-to-late nineteenth century that state and local governments within the United States began enacting express, location specific armed carriage restrictions.[9] Beginning with state laws, in 1869 Tennessee enacted a law that restricted the carrying of dangerous weapons into "any election, ... fair, race course, or other public assembly of the people." PUBLIC STATUTES OF THE STATE OF TENNESSEE SINCE THE YEAR 1858, at 108 (James H. Shankland ed., 1871), *available at* https://catalog.hathitrust.org/Record/010432413.  Thereafter, in 1870, Texas enacted a law restricting the carrying of dangerous weapons "into any church or religious assembly, any school-room or other place where persons assembled for educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering, composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly…"  2 GEORGE W. PASCHAL, A DIGEST OF THE LAWS OF TEXAS: CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST FROM 1864 TO 1872, at 1322 (1873), *available at* https://catalog.hathitrust.org/Record/010448003.  That same year, Georgia

---

[9] The record indicates that there are, of course, a few exceptions, such as two mid-seventeenth century Maryland laws that prohibited dangerous weapons within legislative assemblies.  *See* 1647 Md. Laws 216; 1650 Md. Laws 273.  But other than these two Maryland laws, the historical record until the mid-to-late nineteenth century provides very little in the way of express "sensitive" locations where armed carriage could be prohibited.

enacted a law providing that "no person in said State of Georgia be permitted or allowed to carry about his or her person any ... pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State ..." ACTS AND RESOLUTIONS OF THE GENERAL ASSEMBLY OF THE STATE OF GEORGIA PASSED ... AT THE SESSION OF 1870, at 421 (1870), *available at*

https://catalog.hathitrust.org/Record/100143502.

In 1874, Missouri followed suit by enacting a restriction on carrying "any kind of fire-arms ... or other deadly weapon" into "any church or place where people have assembled for religious worship, or into any school-room, or into any place where people may be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for other than militia drill or meetings ..." ACTS OF THE ... GENERAL ASSEMBLY OF THE STATE OF MISSOURI 43 (1874), *available at* https://catalog.hathitrust.org/Record/000534559.  In 1883, Missouri amended the law to increase the fine.  LAWS OF MISSOURI PASSED AT THE SESSION OF THE THIRTY-SECOND GENERAL ASSEMBLY 76 (1883), *available at*

https://catalog.hathitrust.org/Record/000534559.

In 1889, Arizona enacted a law providing that "[i]f any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall carry about his person a pistol or other

firearm ... he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person." ACTS, RESOLUTIONS AND MEMORIALS OF THE FIFTEENTH LEGISLATIVE ASSEMBLY OF THE TERRITORY OF ARIZONA 30-31 (1889), *available at* https://catalog.hathitrust.org/Record/010083734.  Then, there was Oklahoma, which in 1890 restricted the carrying of dangerous weapons "into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly ..." STATUTES OF OKLAHOMA 1890, at 495-96 (Will T. Little, L.G. Pitman & R.J. Barker eds., 1891), *available at* https://catalog.hathitrust.org/Record/010447936.

As Mr. Charles notes, in addition to the above state laws, there was an abundance of mid-to-late nineteenth century ordinances restricting the carrying of dangerous weapons in so-called sensitive places.[10]  According to Mr. Charles, the reason that so many localities enacted these ordinances was the prevalence of the legal concept of "firearms localism" – this concept being a preference among state and local lawmakers to regulate firearms and deadly weapons more strictly at the local rather than the state level.  *See* Dkt. No. 19-1 at ¶ 17 (citing Joseph Blocher,

---

[10] *See, e.g.*, *An Ordinance*, July 9, 1891, *reprinted in* WACO DAILY NEWS (Tx), July 12, 1891, at 8 ("If any person shall go into any church or religious assembly, any schoolroom, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or social party or social gathering or to any election precinct on the day or the days of any election, where any portion of the people of the State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any public duty, or to any other public assembly, and shall have or carry about [their] person a pistol or other fire-arm…[they] shall be punished by a fine…").

*Firearms Localism*, 123 YALE L.J. 82, 112-16 (2013)).[11]  One example is that of Columbia,

Missouri, which in 1890 passed an ordinance expressly restricting the carrying of dangerous

weapons "into any church, or place where people have assembled for religious worship; or into

any school room, or place where people are assembled for educational, literary or social purposes;

or into any court room, during the sitting of court, or to any election precinct on any election day;

or into any other public assemblage of persons for any lawful purpose ..." *Chapter XVII: Carrying*

*Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc.*, May 22, 1890, *reprinted in*

GENERAL ORDINANCES OF THE TOWN OF COLUMBIA, IN BOONE COUNTY, MISSOURI 34, 35 (Lewis

M. Switzler ed., 1890), *available at* https://catalog.hathitrust.org/Record/001754262.5.  The

Columbia ordinance mirrored Missouri state law, and was not the only Missouri locality to do so.

The localities of Gainesville (1896), Huntsville (1894), Leonard (1891), Marceline (1892),

Ridgeway (1893), Rocheport (1895), and Warrensburg (1890), all enacted similar provisions.  *See*

Dtk. No. 19-1 at ¶ 17 n. 6-12.

---

[11] As Mr. Charles notes, many mid-to-late nineteenth century state laws and local government charters weigh this out.  *See, e.g.*, THE LAWS OF THE STATE OF KANSAS 118, 134 (1871) (providing all Kansas cities "of the third class" wide latitude to "prohibit and punish the carrying of firearms or other deadly weapons, concealed or otherwise"); LAWS OF THE STATE OF INDIANA PASSED AT THE FIFTY-FIRST REGULAR SESSION OF THE GENERAL ASSEMBLY 201, 202 (1879) (1879 law providing all Indiana towns the authority "to regulate or prohibit the use of firearms, fireworks, or other things tending to endanger persons and property"); ACTS OF TENNESSEE: EXTRAORDINARY SESSION 48, 55 (1885) (providing the mayor and alderman of the city of Knoxville the authority to "prevent and suppress the sale of fire-arms and carrying of concealed weapons"); ACTS OF THE ONE HUNDRED AND TWELFTH LEGISLATURE OF THE STATE OF NEW JERSEY AND THE FORTY-FOURTH UNDER THE NEW CONSTITUTION 483, 501 (1888) (1888 law providing all New Jersey towns the authority "to regulate or prohibit the use of firearms and the carrying of weapons of any kind"); THE COMPLETE CODES AND STATUTES OF THE STATE OF MONTANA IN FORCE JULY 1, 1895, at 424, 427 (1895) (providing all Montana "city or town council[s]" the authority to "prevent and suppress the sale of firearms the carrying of concealed weapons"); *see also* Patrick J. Charles, *The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It*, 71 CLEV. ST. L. REV. 623, 662 n.256, 685 n.406 (2023) (providing more than two dozen examples of firearms localism within state laws and local government charters).

Localities throughout the state of Kansas enacted similar ordinances.  Indeed, in the case of Stockton, Kansas, persons were prohibited from carrying dangerous weapons "into any church or place where the people have assembled for public worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons ... or shall group on the public streets or public places of the city ..." *Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons*, July 1, 1887, *reprinted in* STOCKTON REVIEW AND ROOKS COUNTY RECORD (KS), July 1, 1887, at 1; *see also* Dkt. No. 19-14.  However, as Mr. Charles notes, most Kansas localities that enacted restrictions on the carrying of dangerous weapons in "sensitive places" did so by making their entire "corporate" or "incorporate" area off limits whether such carrying was open, concealed, or both.  *See* Dkt. No. 19-1 at ¶ 18 (citing ordinances for Abilene (1870), Arkansas City (1885), Beloit (1872), Caldwell (1885), Coolidge (1886), Elk City (1898), Harper (1887), Howard (1889), Kendall (1887), Meade Center (1885), Mount Hope (1887), and Scandia (1893) as a few examples).

Mr. Charles also notes that ordinances restricting the carrying of dangerous weapons in localities' entire "corporate" or "incorporate" areas were not limited to the states of Missouri and Kansas.  *See* Dkt. No. 19-1 at ¶ 19.  Rather, much like armed carriage licensing laws, ordinances restricting the carrying of dangerous weapons in "corporate" or "incorporate" areas proliferated across the United States during the mid-to-late nineteenth century.  *See id.* (citing Patrick J. Charles, *The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It*, 71 CLEV. ST. L. REV. 623, 565-69 (2023)).  Some such examples are from the Ashville, North Carolina in 1882, Lake Charles, Louisiana in 1874, Harrisburg, Pennsylvania in 1873, Lawrenceburg, Tennessee in 1895, Perry, Oklahoma in 1895, Provo City, Utah in 1893, Omaha,

Nebraska in 1889, Rapid City, Dakota Territory in 1882, Tucson, Arizona in 1883, Galveston, Texas in 1873, and Nebraska City, Nebraska in 1869.  *See id.* at ¶¶ 19-20 (citations omitted).[12]

Finally, in addition to the above-mentioned ordinances, at least two regulations prohibited the carrying of firearms on campgrounds when individuals were assembled for public worship. *See, e.g.*, *Stanley Creek Camp Ground, Gaston County, N.C.—Laws and Regulations, reprinted in* SOUTHERN HOME (Charlotte, NC), Sept. 22, 1873, at 2 (Dkt. No. 19-36) (prohibiting "the carrying of guns or pistols within the incorporate limits of the Camp Ground" when people were "assembled for public worship...."); *Rock Spring Camp Ground, Lincoln Co., N.C.: Laws and Regulations, reprinted in* CHARLOTTE DEMOCRAT, July 30, 1872, at 2 (Dkt. No. 19-37) (same). Both of these religious camp grounds had obtained the consent of the North Carolina Assembly to pass these firearms prohibitions.  *See id.*; *see also* Charles, *The Fugazi Second Amendment*, 71 CLEV. ST. L. REV. at 709.[13]

According to Mr. Charles, despite being unable to fully reconstruct the exact number of "sensitive places" laws, "what is known upon examining all the state and local 'sensitive places' laws from a macro level is that come the mid-to-late nineteenth century state and local

---

[12] Mr. Charles notes that although it is known that other localities enacted similar provisions around this time, "it is impossible to state with specificity just how many localities maintained 'sensitive places' ordinances by the close of the nineteenth century.  Like most local government records up to the close of the nineteenth century, many local ordinances have been lost to time.  Indeed, often localities published their ordinances in local newspapers," which is where Mr. Charles was able to locate many of the "sensitive places" ordinances discussed above. *See* Dkt. No. 19-1 at ¶ 20.  "But as any professional historian or archivist cant attest, the records of local ordinances that have survived for historical posterity are only a fragment of the whole." *Id.*

[13] The Court also notes that between 1871 and 1898, the cities of New Haven, Connecticut, Buffalo, New York, Chicago, Illinois, Cincinnati, Ohio, Saint Paul, Minnesota, Spokane, Washington, Philadelphia, Reading, and Williamsport, Pennsylvania, Wilmington, Delaware, and others outright prohibited the carrying and discharging of firearms in urban based parks.  *See* Charles, *The Fugazi Second Amendment*, 71 CLEV. ST. L. REV. at 710-12 (citations omitted).

governments maintained the authority to restrict the carrying of dangerous weapons in a variety of 'sensitive places' where people were known to congregate." *Id.* at ¶ 21.  "Such 'sensitive places' categories included  1) churches and places of worship; 2) places where large public assemblies generally took place, *i.e.*, parks, town squares, and the like; 3) polling places and other buildings where political activity generally took place; 4) schools and institutions of higher learning; 5) places where events of amusement took place, *i.e.*, places where people congregate for large planned events; and 6) bars, clubs, social venues, or anywhere in which alcohol or psychoactive or mood altering drugs were purchased or consumed." *Id.* (footnotes omitted).

Having considered "the Nation's historical tradition of firearm regulation" as relevant to this case, the Court finds that the restrictions on carrying firearms in both places of worship and summer camps are likely constitutional.  As to the restriction on carrying a firearm at a place of worship, as set forth above, the historical record in the years following the ratification of the Fourteenth Amendment, as presented by Defendants, demonstrates a well-established and representative number of statutes and ordinances that prohibited firearms in places of worship. These statutes and ordinances evince "a comparable tradition of regulation" of firearms at places of worship, which is "consistent with the Nation's historical tradition of firearms regulation." *Bruen*, 142 S. Ct. at 2131-32.  Accordingly, even assuming that Plaintiffs still had standing to challenge the places of worship provision, they would be unlikely to succeed on the merits.  *See Goldstein v. Hochul*, ___ F. Supp. 3d ___, 2023 WL 4236164, *11-13 (S.D.N.Y. 2023) (holding that "[t]his review of the historical record indicates that there is a longstanding historical tradition of regulating firearm carriage in houses of worship comparable to that of settled sensitive places like schools and government buildings.  Indeed, the number of historical legislative references that support a finding that a house of worship is a sensitive place far surpasses the number of

references cited in *Bruen* and *Heller* as support for finding schools and government buildings as sensitive places"); *Maryland Shall Issue, Inc. v. Montgomery Co.*, ___ F. Supp. 3d ___, 2023 WL 4373260, *10 (D. Md. 2023) (holding that the plaintiffs were unlikely to succeed on the merits of their challenge to a local ban on carrying firearms in places of worship).

As to the prohibition on carrying firearms at summer camps, the Court also finds Plaintiffs are unlikely to succeed on the merits.  Initially, the Court notes that summer camps are a development that postdates the *Bruen* timeframe.  Such camps did not exist at the time of the Nation's founding, or even at the time of the ratification of the Fourteenth Amendment in 1868, instead emerging at the end of the nineteenth century in response to concerns about the impact of urban industrialization on children.  *See* Michael B. Smith, *"The Ego Ideal of the Good Camper" and the Nature of Summer Camp*, Environmental History 11(1) (Jan. 2006): 70-101, at 71. The first formalized summer camp with "principles that would be recognizable to camp directors of the twentieth century," was founded in 1881 in New Hampshire for wealthy boys from northeastern cities.  *See id.* at 75.  The defining features of these camps were the formalized outdoor activities and organizational foundations distinct from existing schools.  *See* W. Barksdale Maynard, *"'An Ideal Life in the Woods for Boys': Architecture and Culture in the Earliest Summer Camps,"* Winterthur Portfolio 34, No. 1 (1999): 3-29, at 4.  Summer camps as an institution spread slowly and did not take off until the twentieth century.  Rough estimates indicate that there were fewer than 100 summer camps nationwide in 1900, but by 1918 there were over 1,000.  *See* Smith, *"The Ego Ideal of the Good Camper,"* at 77; *see also* Joseph Reimer, *Making Shabbat – Celebrating and Learning at American Jewish Summer Camps* at 27-28 (Brandeis Univ. Press 2022) (discussing the history of Jewish summer camps, which "first opened[ ] around 1900").  Accordingly, any Second Amendment analysis regarding summer

34

camps must be a flexible one, recognizing that summer camps as an institution were not substantially present during the historical period that the Court must consider under *Bruen*. *See Bruen*, 142 S. Ct. at 2132 (recognizing that later developments "require a more nuanced approach" because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868"); *see also Frey v. Nigrelli*, ___ F. Supp. 3d ___, 2023 WL 2473375, *18 (S.D.N.Y. Mar. 13, 2023) (holding that where the place at issue did not exist in the Founding or Reconstruction eras, "the Court will consider historical laws that are analogous in purpose").

At the same time that the first American summer camps were coming into existence, States were recognizing the danger caused by persons carrying firearms into vulnerable locations, passing laws to protect the people who congregate there. *See Frey*, 2023 WL 2473375, at *17 (discussing "laws from the latter half of the 19th Century that prohibited firearms involving instances where there are public gatherings engaged in recreational, entertainment, or expressive purposes," which "support [New York's] argument that there was an ongoing trend in American history of banning firearms in locations where people heavily congregate"). As set forth above, a common theme among the law and regulations were those that prohibited carrying firearms into places that were populated by vulnerable individuals, such as children. These locations included places of worship, schools, playgrounds, parks, and places where individuals assembled for educational purposes. In *Antonyuk*, the Second Circuit recognized "this Nation's tradition of firearm regulation in locations where vulnerable populations are present," which includes "the tradition of prohibiting firearms in places frequented by children." *Antonyuk*, 89 F.4th at 349-40. These findings led the Second Circuit to uphold New York's laws prohibiting guns in parks and zoos. *See id.* at 361-64.

The Second Circuit's *Antonyuk* decision, along with a large body of federal case law, supports Defendants' position that the State can protect children and other vulnerable individuals by prohibiting guns not only in schools, but also in analogous sensitive locations where children congregate, such as daycares, preschools, playgrounds, community centers, and other places where they congregate for educational purposes.[14]   Section 265.01-e's firearm ban in summer camps "is consistent with the State's analogues that establish a history of regulating firearms in crowded places and locations frequented by children.  Although [summer camps] are relatively modern institutions, the *Bruen* analysis remains valid and useful, subject to the more 'nuanced approach' announced in *Bruen*." *Antonyuk*, 89 F.4th at 363.  Summer camps, like schools, "are tasked with providing education and socialization to attendees," and the prohibitions on firearms in both locations "are meant to protect the same or similar vulnerable populations." *Maryland Shall Issue, Inc. v. Montgomery Co.*, ___ F. Supp. 3d ___, 2023 WL 4373260, *9 (D. Md. 2023).[15]

---

[14] In the declarations in support of their motion, Plaintiffs provide the following examples of activities that the children engage in while at The Zone: "arts and crafts, culinary arts, woodworking, photography, painting, music instruction; dancing and singing; swimming and water sports; outdoors sports including archery, bike riding, ziplining, and rock climbing; an animal farm where they can feed camels, ride horses, and play with bunnies; and inside games that include ping pong, gaming, and billiards." Dkt. No. 4-3 at ¶ 9.  They also note that there are aspects of daily worship, religious services held in the synagogues, and both religious and secular educational activities.  *See* Dkt. No. 4-2 at ¶¶ 12-13.

[15] In another case, although the court did not reach the merits of the plaintiffs' challenge to the CCIA's summer camp prohibition because the plaintiffs' lacked standing, the court made the following observation in *dicta*: "The Court would add only that, even if this finding of lack of standing were incorrect, the Court would, after more carefully considering the standard set forth in *NYSRPA*, and the apparent justification for the numerous historical analogues prohibiting guns in schools, deny Plaintiffs' motion to the extent it regards children's 'summer camps': the burdensomeness of this regulation (*i.e.*, its burden versus its justification) appears proportionate to the burdensomeness of its historical analogues." *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 274 n.35 (N.D.N.Y. 2022), *abrogated in part on other grounds by Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023).

(continued...)

Section 265.01-e(f) is within the Nation's history of regulating firearms in places where children congregate and the burdensomeness of this regulation is proportionate to the burdensomeness of its historical analogues. *See Antonyuk*, 89 F.4th at 356. Accordingly, Plaintiffs are unlikely to succeed on the merits as to this provision.

### 3. Balance of Equities

Finally, Plaintiffs must demonstrate "that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Where the State is the opposing party, the balance of the equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) ("These factors merge when the Government is the opposing party"). *Nken* applies both when a federal official or a state official is an opposing party in a lawsuit. *See Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 224 (2d Cir. 2021) (merging balance of equities and public interest factors where Connecticut state officials opposed a motion for a preliminary injunction); *see also Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) ("The final two factors merge when an injunction is to be issued against the government"). In assessing this factor, the Court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," as well as "the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal citations and quotation marks omitted).

Governor Hochul and Lieutenant Governor Delgado stated in a press release about the CCIA that it was passed to "protect New Yorkers," and that "keeping the people of New York State safe" was their greatest priority. *Governor Hochul Signs Landmark Legislation to*

---

[15](...continued)

*Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision*, GOVERNOR.NY.GOV (July 1, 2022), *available at* https://www.governor.ny.gov/news.  At the same event, Senate Majority Leader Andrea Stewart-Cousins added that "New York will continue to prioritize people's safety and lives." *Id.* It is well established that states have "substantial, indeed compelling, governmental interests in public safety and crime prevention." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015).  The Supreme Court has repeatedly acknowledged that governments have a compelling interest in protecting public safety and crime prevention.  *See Salerno*, 481 U.S. at 745 (federal government has "compelling interests in public safety"); *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted ...  We have stressed before that crime prevention is 'a weighty social objective'") (quotations and other citations omitted).  The Supreme Court recognized the connection between regulating firearms and public safety in *Heller*, stating "[t]he Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns" and that "gun violence is a serious problem." *Heller*, 554 U.S. at 636.

There is also a public interest in avoiding violations of constitutional rights, as the "'Government does not have an interest in the enforcement of an unconstitutional law.'"  *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (quoting *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)).  However, as the Court has found that Plaintiffs failed to demonstrate a likelihood of success on any of their claims involving violations of constitutional rights, the Court need not consider this when considering the balance of equities and public interest.

The New York State Legislature has acted in what it considers to be in the best interest of public safety.  The Court's role is to then consider the claims of irreparable harm, the likelihood of success on the merits, and to balance the competing claims of injury and the public consequences of granting injunctive relief.  In this case, for the reasons stated above, the Court finds that the equities and the public interest weigh against the injunctive relief Plaintiffs seek.

### IV. CONCLUSION

The Court ends by adding its voice to the ever-growing chorus of courts across the country that have implored the Supreme Court to answer some of the many questions *Bruen* both created and left unresolved – or even to reconsider its course entirely.  *See, e.g.*, *Goldstein*, 2023 WL 4236164, at *12 n.15; *Range v. Attorney General United States of America*, 69 F.4th 96, 116-17 (3d Cir. 2023) (Krause, J. dissenting).  The United States is gripped by a level of deadly gun violence the Founding Fathers never could have conceived considering that smoothbore, muzzle-loaded, and powder-and-ramrod muskets were not exactly useful to colonial era mass murderers.  The Founders could not have foreseen the extraordinary technological advances of the modern times and they most likely would have thought it permissible to place reasonable limitations on the ownership of a large portion of the weapons that have been made possible through our advances in technology.  Limits on the right to bear arms must necessarily evolve through the changing exigencies of society.

While the *Bruen* Court acknowledged that "the historical record yields relatively few 18th- and 19th- century 'sensitive places' where weapons were altogether prohibited," the Court readily accepted that sensitive places restrictions are permissible under the Second Amendment. *See Bruen*, 597 U.S. at 30 (citing *Heller*, 554 U.S. at 626).  Despite this acknowledgment, courts are now tasked with finding historical analogues to account for both the advances in weapons

technology and the fundamental changes in our society that have occurred since both 1791 and 1868 before a restriction on firearms will be considered permissible under the Second Amendment.  "When it comes to permissible regulation of the right to bear arms, it might make good sense to hew precisely to history and tradition in a world ... where communities were still so small and 'close-knit' that '[e]veryone knew everyone else,' 'word-of-mouth spread quickly,' and the population 'knew and agreed on what acts were right and wrong, which ones were permitted and forbidden.'  But that is not the America of today." *Range*, 69 F.4th at 116-17 (Krause, J. dissenting).

The fact that laws and regulations regarding specific types of firearms or locations where they could be restricted did not exist at the time of the passing of the Second Amendment is not necessarily evidence that the Founders would have found such restrictions impermissible.  More often, a lack of regulation only demonstrates that a problem did not exist and hence there was no legislative need to pass a law.

The federal Constitution is unquestionably king, and the heavy burden of interpreting that all-important document falls solely to the head of the federal judiciary.  Still, to many, the *Bruen* Court's statement that the Second Amendment is meant "to be adapted to the various crises of human affairs" largely rings hollow since the Court has frozen its meaning in time in the ways that matter most.  *Bruen*, 597 U.S. at 28.

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that Plaintiffs' motion for preliminary injunctive relief (Dkt. No. 4) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall terminate the letter motion seeking a stay (Dkt. No. 10) as moot; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 20, 2024
      Albany, New York

Mae A. D'Agostino
U.S. District Judge