**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ELIYOHU MINTZ and ERIC SCHWARTZ,

Plaintiffs, 1:23-cv-795 (ECC/PJE)

v.

STEVEN G. JAMES, in his official capacity as Superintendent of the New York State Police, ALBRO FANCHER, in his official capacity, and CHRISTOPHER LUHR, in his official capacity,

Defendants.

---

Amy L. Bellantoni, Esq., *for Plaintiffs*
Martha Grieco, Asst. Att'y General, *for Defendant James*
Leo Dorfman, Esq., *for Defendants Fancher and Luhr*

**Hon. Elizabeth C. Coombe, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

Plaintiffs Eliyohu Mintz and Eric Schwartz bring this action to challenge the constitutionality of New York Penal Law § 265.01-e(2)(f), which prohibits the possession of firearms in summer camps, against Defendants Steven G. James in his capacity as Superintendent of the New York State Police (the State); Albro Fancher in his capacity as Schoharie County Sheriff; and Christopher Luhr in his capacity as Schoharie County District Attorney (together, the County Defendants). *See* Dkt. No. 23 (Amended Complaint). Presently before the Court are the parties' cross-motions for summary judgment. Dkt. Nos. 81, 87, 89. The Court also considers the State's motion in limine to preclude the testimony of Chuck Haggard, Dkt. No. 85, Plaintiffs' motion in limine to preclude the testimony of Hunter Martaindale, Dkt. No. 92, and Plaintiffs' motion to supplement the summary judgment record, Dkt. No. 100. All motions are fully briefed, *see* Dkt. Nos. 88, 90, 91, 93, 94, 95, 101, 102, and the Court heard oral argument on August 27,

2026. For the following reasons, Plaintiffs' motion for summary judgment is denied, the State's motion for summary judgment is granted, the County Defendants' motion for summary judgment motion is granted in part, Plaintiffs' and the State's motions in limine are denied as moot, and Plaintiffs' motion to supplement the summary judgment record is denied.

## I. BACKGROUND[1]

### A. Oorah, Inc. and The Zone

Plaintiff Eliyohu Mintz is the founder and CEO of Oorah, Inc., a "non-profit corporation that provides year-round activities for Orthodox Jewish children, adults, and families." Dkt. No. 81-1 ¶¶ 1, 3; Dkt. No. 89-2 ¶¶ 1, 3. Plaintiff Eric Schwartz is employed by Oorah, and his responsibilities include payroll, religious duties, and managing family retreats. Dkt. No. 81-1 ¶¶ 6, 14; Dkt. No. 89-2 ¶¶ 6, 14. Both Plaintiffs possess a valid New York State concealed carry license. Dkt. No. 81-1 ¶¶ 4, 7; Dkt. No. 89-2 ¶¶ 4, 7.

Oorah "owns and operates over 1,000 acres of property" in an area of the Catskills in Schoharie County, New York. Dkt. No. 81-1 ¶ 19; Dkt. No. 89-2 ¶ 19. During the summer months, Oorah runs "The Zone," a sleepaway camp for Jewish children and young adults, on this property. Dkt. No. 81-1 ¶¶ 23-24; Dkt. No. 89-2 ¶¶ 23-24. The Zone operates both a "Boys' Camp" and a "Girls' Camp," with approximately 700 children attending each camp. Dkt. No. 81-1 ¶¶ 24, 29; Dkt. No. 89-2 ¶¶ 24, 29. The Zone offers religious instruction and several activities for campers, many of which are held outdoors and spread around the property, including various sports,

[1] The following facts are drawn from the parties' Local Rule 56.1 statements of material facts, Dkt. Nos. 81-1, 88, 89-2, 89-3, 90, 91, 91-2, to the extent those facts are well-supported by pinpoint citations to the record, and from the exhibits the parties have submitted. Disputed facts are noted. Unless otherwise noted, the County Defendants responded to Plaintiffs' statement of material facts by asserting that the facts recited here are "not material" and "defer[ring] to the State's response." *See* Dkt. No. 88.

swimming, fishing, zip line, photography, and go karts. Dkt. No. 81-1 ¶¶ 41-45; Dkt. No. 89-2 ¶¶ 41-45. Mr. Schwartz serves as an Assistant Manager of The Zone Boys' Camp and lives on the Boys' Camp campus year-round. Dkt. No. 81-1 ¶¶ 31-32; Dkt. No. 89-2 ¶¶ 31-32. It is undisputed that Mr. Mintz spends at least a portion of the summer on the Oorah property. *See* Dkt. No. 81-1 ¶ 117; Dkt. No. 89-2 ¶ 117.

As the State acknowledges, and the County Defendants do not meaningfully dispute, Plaintiffs and others associated with The Zone have been subject to many incidents of antisemitic threats, verbal harassment, and insults over the years. *See* Dkt. No. 81-1 ¶¶ 56-62; Dkt. No. 89-2 ¶¶ 56-62; Dkt. No. 88 ¶¶ 56-62. The parties dispute to what extent law enforcement resources are available to The Zone and the length of Schoharie County Sheriff's Office and New York State Police response times. *See generally* Dkt. No. 81-1 ¶¶ 161-276; Dkt. No. 89-2 ¶¶ 161-276; Dkt. No. 88 ¶¶ 161-276.

**B. The Summer Camp Ban**

New York enacted the Concealed Carry Improvement Act (CCIA) in 2022 in response to the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). *See Antonyuk v. James*, 120 F.4th 941, 955-56 (2d Cir. 2024) (*Antonyuk II*). As relevant here, the CCIA "amended various firearms-related provisions of New York's Penal Law," including Penal Law § 265.01-e. *Id.* at 956. Section 265.01-e provides that "[a] person is guilty of criminal possession of a firearm, rifle or shotgun in a sensitive location when such person possesses a firearm, rifle or shotgun in or upon a sensitive location, and such person knows or reasonably should know such location is a sensitive location." N.Y. Penal Law § 265.01-e(1); *see id.* § 10.00(8) (defining "[p]ossess" to mean "to have physical possession or otherwise to exercise dominion or control over tangible property"). Criminal possession of a firearm, rifle, or shotgun in a sensitive location is a class E felony. *Id.* § 265.01-e.

The statute defines "sensitive location" to include:

> nursery schools, preschools, and summer camps; provided that for the purposes of this section, nothing shall prohibit the activity permitted under subdivisions seven-c, seven-d, and seven-e of section 265.20 of this article where such activity occurs at a summer camp in accordance with all applicable local, state, and federal laws, rules, and regulations.[2]

*Id.* § 265.01-e(2)(f) (the summer camp ban). The summer camp ban does not apply to certain classes of people, including certain law enforcement personnel, police officers, military personnel, and security guards. *See id.* § 265.01-e(3).

The Penal Law does not define the term "summer camps." However, the parties appear to agree that The Zone qualifies as a summer camp for purposes of the summer camp ban when it is in session during the summer months.

## II. LEGAL STANDARD

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element

---

[2] Plaintiffs do not fall within any of these exceptions, which relate to youth hunting and firearms instruction.

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Emps. & Rest. Emps. Union, Local*

*100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

## III. DISCUSSION

Plaintiffs seek a declaration that Penal Law § 265.01-e(f) (the summer camp ban) violates the Second and Fourteenth Amendments to the U.S. Constitution and a permanent injunction against its enforcement. *See* Dkt. No. 23 at 13-14.[3] On March 20, 2024, U.S. District Judge Mae A. D'Agostino denied Plaintiffs' motion for a preliminary injunction. *Mintz v. Chiumento*, 724 F. Supp. 3d 40 (N.D.N.Y. 2024). Following discovery, the parties have now cross-moved for summary judgment.

### A. Second Amendment Principles

The Second Amendment to the U.S. Constitution, which is made applicable to the States through the Fourteenth Amendment, "guarantees that 'the right of the people to keep and bear [a]rms [] shall not be infringed." *Christian v. James*, 176 F.4th 189, 194 (2d Cir. 2026) (citations omitted). In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court articulated a two-step framework to evaluate Second Amendment challenges. *See id.* At the first step, the plaintiff "bears the initial burden of establishing that 'the Second Amendment's plain text covers an individual's conduct.'" *Id.* (quoting *Bruen*, 597 U.S. at 24). A challenged law which "falls within the plain text of the Second Amendment" is "presumptively unconstitutional," which "means that it *may* violate the preexisting right that the Amendment codified." *Wolford v. Lopez*, 609 U.S. 185, 146 S. Ct. 2032, 2044 (2026) (citation omitted). If the plaintiff shows that the challenged law falls within the Second Amendment's plain text, "the

[3] Unless otherwise noted, citations to page numbers refer to the pagination generated by the CM/ECF system.

burden shifts to the government [at step two] to prove that the challenged law is 'consistent with the Nation's historical tradition of firearm regulation.'" *Christian*, 176 F.4th at 194 (quoting *Bruen*, 597 U.S. at 24); *accord Wolford*, 146 S. Ct. at 2044 ("[T]he relevant government—federal, state, or local—may be able to show that its challenged law did not infringe the historical understanding of the codified right.").

The "best evidence" relating to the historical analysis required at step two often may be "historical analogues"—"old legal rules from which a court may draw a strong inference that the modern law at issue is consistent with the codified right." *Wolford*, 146 S. Ct. at 2044. The Supreme Court has identified "three important inquires that courts should undertake in evaluating proffered analogues": (1) the "number of jurisdictions in which they were adopted," (2) the "extent to which they were well-accepted," and (3) whether "any analogue or collection of analogues is 'relevantly similar' to the modern law." *Id.* (citations omitted); *see also United States v. Rahimi*, 602 U.S. 680, 692 (2024) ("A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'") (citation omitted). Determining whether an analogue is "relevantly similar" to the modern law "requires consideration of 'how' the analogue restricted the keeping or bearing of arms" and "'why' the analogue restricted the keeping or bearing of arms—that is, whether its rationale was similar to that of the new law." *Wolford*, 146 S. Ct. at 2044.

The Supreme Court has not resolved the question "whether the relevant timeframe for assessing the Second Amendment's original meaning, as applied to the States, is 1791 or 1868." *Id.* at 2058 n.7 (Barrett, J., concurring). However, the Second Circuit has held that "[b]ecause the CCIA is a state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are

both focal points of our analysis." *Frey v. City of New York*, 157 F.4th 118, 128 (2d Cir. 2025) (citation omitted); *see id.* at 128-31 (noting that the Second Circuit has not definitively answered "whether courts should *primarily* rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope" and explaining why courts may "comfortably rely" on "post-Founding history to discern th[e] meaning" of the Second Amendment).

**B. Facial Challenge**

Plaintiffs first challenge the summer camp ban as facially unconstitutional. "To mount a successful facial challenge, the plaintiff 'must establish that no set of circumstances exists under which the law would be valid, or show that the law lacks a plainly legitimate sweep.'" *Antonyuk II*, 120 F.4th at 983 (citations and brackets omitted). Stated differently, a facial challenge is "a claim that the law or policy at issue is unconstitutional in all its applications." *Id.* (citations omitted). Facial challenges are therefore "the most difficult to mount successfully," and the government "need only demonstrate that [the challenged statute] is constitutional in *some* of its applications." *Id.* (citations omitted).

**1. Step One**

Plaintiffs argue that their intended conduct—to possess and/or carry firearms at a summer camp for self-defense—falls within the plain text of the Second Amendment. Dkt. No. 81-33 at 19. Defendants do not challenge this proposition, and the Court agrees that the summer camp ban "clashes with the 'plain text'" of the Second Amendment. *See Wolford*, 146 S. Ct. at 2043. Thus, the burden shifts to the government to show that the summer camp ban does not "infringe the historical understanding" of the right codified in the Second Amendment. *See id.* at 2044.

### 2. Step Two

The State argues that the summer camp ban is consistent with the Second Amendment because the ban falls within the two historical traditions of "regulating firearms in spaces frequented by children" and regulating firearms "where persons are assembled for amusement." Dkt. No. 89-1 at 16-20. In support of its motion for summary judgment, the State submits the Declaration of Patrick J. Charles, a self-described "historical and constitutional expert on Second Amendment matters." Dkt. No. 89-4 ¶ 2. Mr. Charles's declaration marshals and discusses several historical statutes, ordinances, and rules relevant to the State's proffered analogues. *See* Dkt. Nos. 89-4 through 89-179.

#### a. Patrick Charles declaration

As an initial matter, Plaintiffs argue that Mr. Charles's testimony is "inadmissible" and should be disregarded, although they did not separately move to preclude Mr. Charles's testimony. *See* Dkt. No. 91-1 at 10-17. Plaintiffs generally argue that Mr. Charles's declaration should be disregarded because (1) Mr. Charles did not research the history of summer camps or any firearms regulations at summer camp; (2) his declaration omits the history of youth marksmanship, firearms proficiency, and civil war service; and (3) Mr. Charles's opinions in other cases have conflicted with controlling precedent and/or not been adopted by the Supreme Court. *See id.*

Although the Court has considered Plaintiffs' arguments in evaluating Mr. Charles's declaration, the Court concludes that disregarding the declaration in its entirety is not warranted at this stage. The parties agree that summer camps began to develop in the mid- or late-1800s and early 1900s. *See* Dkt. No. 81-33 at 22 (Plaintiffs stating that the "establishment of 'summer camps' did not exist before the mid-1800s" (citations omitted)); Dkt. No. 89-1 at 16 (the State acknowledging that "the concept of 'summer camp' was unfamiliar to the founding generation and perhaps even the Reconstruction generation"); *Mintz*, 724 F. Supp. 3d at 63-64 (noting, at

preliminary injunction stage, that summer camps "emerg[ed] at the end of the nineteenth century" but "did not take off until the twentieth century"). Thus, the fact that Mr. Charles did not research the history of summer camps or any pertinent firearms regulations does not necessarily render his opinions regarding "sensitive places" regulations in the Founding and Reconstruction eras unreliable. Furthermore, as the State notes, Plaintiffs do not challenge the "accuracy of any of the historical sources [Mr. Charles] cites," which can be considered on their own to assess the constitutionality of the summer camp ban. *See* Dkt. No. 94 at 11. The Court has also considered the Declaration of Clayton Cramer submitted by Plaintiffs in response to Mr. Charles's declaration and Mr. Charles's Sur-Rebuttal to Mr. Cramer's declaration. Dkt. Nos. 91-3, 94-1.

**b. Sensitive locations**

New York Penal Law § 265.01-e bans the carriage of firearms in specified "sensitive locations." *Antonyuk II*, 120 F.4th at 957. The Supreme Court recognized in *Bruen* "'longstanding' laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Bruen*, 597 U.S. at 30 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). "Although the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—[the Supreme Court was] also aware of no disputes regarding the lawfulness of such prohibitions." *Id.* (citations omitted). The Supreme Court therefore "assume[d] it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment" and noted that courts can "use analogies to these historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* The *Bruen* Court declined to "comprehensively define 'sensitive places'" but noted that "expanding the category . . . simply to

all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." *Id.* at 31.

Relying on the Supreme Court's rejection of an attempt to expand the category of sensitive places to all places of public congregation, Plaintiffs argue that "crowded places bans" are inconsistent with the Second Amendment and cannot justify the summer camp ban here. Dkt. No. 91-1 at 17-21. Plaintiffs argue that the State's inventory of laws prohibiting firearms in crowded places "begins in the late 1800s" despite addressing a perceived societal problem that was also present in the Founding era and contend that the CCIA effectively declares all of New York State a crowded place. *See id.* But the State does not defend the summer camp ban on the ground that summer camps are crowded places in which the State is free to restrict firearms. Rather, as noted above, the State relies on the more specific historical analogues of regulating firearms in spaces "frequented by children" and where people "are assembled for amusement." The Court therefore proceeds to consider these proffered analogues.

**c. Analysis of the State's proffered analogues**

The first historical tradition on which the State relies is that of regulating firearms in spaces frequented by children. According to the State, the summer camp ban "is meant to protect children, a vulnerable population, from experiencing gun violence in a location where children frequent" and "[h]istorical laws on gun carriage in schools were motivated by the same reasoning." Dkt. No. 89-1 at 18.[4] For example, the State points to (1) an 1870 Texas statute making it unlawful to "go

[4] Although the fact that Section 265.01-e(2)(f) lists "summer camps" as a sensitive location along with "nursery schools" and "preschools" may support the idea that the motivation of the summer camp ban is to protect children, the plain text of the statute does not limit its applicability only to children summer camps. *See Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 274 n.35 (N.D.N.Y. 2022) (doubting whether the summer camp ban could constitutionally be applied to *adult* summer camps).

into any . . . school-room . . . and . . . have about his person . . . firearms";[5] (2) laws of the U.S. territories of Arizona (1889) and Oklahoma (1890) likewise prohibiting firearms in schoolrooms;[6] and (3) the Maryland State Board of Education's 1865 prohibition on firearms "in the School room or on the School premises."[7] The State also points to myriad local ordinances and school rules prohibiting firearms at schools and campuses. *See* Dkt. No. 89-1 at 18; *see* Dkt. No. 89-4 ¶¶ 22-24 and sources collected therein.

Plaintiffs argue that the State's historical rules are not analogues because (1) they are largely "administrative regulations, not criminal statutes," (2) they restrict only *students* from keeping weapons and impose only modest penalties, and (3) the sources are too "[f]ar removed from the ratification" of the Second Amendment. *See* Dkt. No. 91-1 at 21-23.

Plaintiffs' criticisms of the historical evidence marshaled by the State fail in light of controlling Second Circuit precedent. In *Antonyuk II*, the Second Circuit "rel[ied] on *Bruen* for the proposition that the tradition of regulating firearms in spaces frequented by children is [] well-established and representative." 120 F.4th at 1026; *see also id.* at 1019 n.80 ("*Bruen* tells us that tradition [of regulating firearms in places frequented by children] is well-established and representative."). Thus, consistent with *Antonyuk II*, the Court recognizes a well-established and representative historical tradition of regulating firearms in spaces frequented by children.

---

[5] 2 George W. Paschal, A Digest of the Laws of Texas: Containing the Laws in Force, and the Repealed Laws on Which Rights Rest from 1864 to 1872, at 1322 (3d ed. 1873), *available at* https://catalog.hathitrust.org/Record/010448003.

[6] *See* Acts, Resolutions and Memorials of the Fifteenth Legislative Assembly of the Territory of Arizona, at 30-31 (1889), *available at* https://catalog.hathitrust.org/Record/010083734; The Statutes of Oklahoma 1890, at 495-96 (1891), *available at* https://catalog.hathitrust.org/Record/010447936.

[7] By-Laws for the Government of the Boards of School Commissioners of Maryland, at 21 (1865), *available at* https://catalog.hathitrust.org/Record/009600621.

"It is not enough for the State to point to well-established and representative analogues; the contemporary regulation it seeks to defend must also be 'consistent' with the tradition established by those analogues." *Antonyuk II*, 120 F.4th at 1024 (citation omitted). Here, the Court concludes that the summer camp ban, at least insofar as it applies to certain children's summer camps, is consistent with the analogues establishing a tradition of regulating firearms in locations frequented by children.

This conclusion is similar to that reached by the Second Circuit in *Antonyuk II* in relation to a challenge to restrictions on firearms in zoos. The Second Circuit first noted that zoos—like summer camps—are "relatively modern institutions." *Id.* at 1026 & n.98 ("[W]e nonetheless have identified no public zoo that claims to have opened before the Civil War."). But because "70 percent of zoo visitors come accompanied by children, the tradition of prohibiting firearms in places frequented by children straightforwardly supports the regulation of firearms in zoos." *Id.* at 1026-27. Similarly here, the summer camp ban, at least insofar as it applies to certain children's summer camps, is straightforwardly consistent with the tradition of regulating firearms in places frequented by children, especially in schoolrooms where, like at summer camps, children gather for educational instruction and other activities. In other words, the summer camp ban "burdens Second Amendment rights in a distinctly similar way (*i.e.*, by prohibiting carriage) for a distinctly similar reason (*i.e.*, [protecting children in places where they gather])." *See id.* at 1024.

Although the parties do not distinguish between children and adult summer camps, the State's proffered tradition of firearm regulation in places frequented by children is sufficient for the summer camp ban to survive a facial challenge. *Cf. id.* at 1019, 1025-26 (upholding "public parks" sensitive location ban on facial challenge because the law has a "plainly legitimate sweep as to urban parks . . . notwithstanding doubt that there is historical support for the regulation of

firearms in [rural] parks"). The Court therefore need not consider whether the summer camp ban is also consistent with the State's proffered tradition of regulating firearms in places where people assemble for amusement.

Accordingly, the Court grants the State's motion for summary judgment and denies Plaintiffs' motion for summary judgment with respect to Plaintiffs' facial challenge to the summer camp ban. The County Defendants are likewise entitled to judgment on Plaintiffs' facial challenge.[8]

### C. As-Applied Challenge

Plaintiffs also bring an as-applied challenge to the summer camp ban, arguing that the statute is unconstitutional as applied to them at The Zone. Dkt. No. 81-33 at 21-28. Plaintiffs argue that restricting their possession and carriage of firearms at The Zone is unconstitutional because The Zone is private property, The Zone is located in a remote and rural location where law enforcement response times are delayed, and the staff and campers at the Zone have been and are targets of violence and terrorism. *See id.*

As a threshold matter, the County Defendants argue that Plaintiffs "do not plead an as-applied § 1983 claim for damages" because "Plaintiffs do not claim any County Defendant . . . ever enforced [the summer camp ban] against any Plaintiff." Dkt. No. 87-12 at 14-15; *see also* Dkt. No. 93 at 8 ("Because the County Defendants . . . have never applied the statute to Plaintiffs' 'specific and unique circumstances,' an as-applied challenge against them is logically and legally impossible."). The State argues that Plaintiffs' as-applied challenge to the summer camp ban fails but does not contest Plaintiffs' ability to raise such a challenge.

---

[8] The County Defendants' argument that Plaintiffs lack standing to assert claims against them is addressed below, *infra* Section III.D.1.

The County Defendants' argument misapprehends the nature of an as-applied pre-enforcement constitutional challenge. Although a "challenge to a statute before its enforcement will presumptively constitute a facial challenge," prospective as-applied challenges "seek to prove that a statute cannot constitutionally be applied to a specific course of conduct that the challenger intends to follow." *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 107 (2d Cir. 2025) (citations and brackets omitted). Such as-applied pre-enforcement challenges "generally must focus on specific conduct that the plaintiff 'would pursue but for fear of future enforcement'" and "cannot rely on hypothetical situations." *Id.* (citation omitted). Courts in this Circuit have considered pre-enforcement as-applied challenges under the Second Amendment. *See, e.g.*, *Antonyuk v. Chiumento*, 89 F.4th 271, 383-84 & n.111 (2d Cir. 2023) (*Antonyuk I*) (noting that certain plaintiffs brought an "as-applied pre-enforcement challenge to [the CCIA's] restricted location provision only insofar as it applies to private property open to the public" and had "sufficiently alleged how the provision would apply in their specific case"). Here, Plaintiffs—who seek declaratory and injunctive relief but not monetary damages—have both pleaded and submitted evidence regarding how the summer camp ban would apply in their specific case, so the fact that the summer camp ban has not been enforced against them is of no moment. The Court therefore will consider Plaintiffs' as-applied challenge.

**1. Categorical nature of sensitive location bans**

An as-applied challenge "requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." *Higbie v. James*, 795 F. Supp. 3d 307, 335 (N.D.N.Y. 2025) (citation omitted). "A plaintiff generally cannot prevail [on such a challenge] without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally applied to him." *Id.* (quoting *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014)) (brackets omitted).

Here, the State primarily argues that Plaintiffs' as-applied challenge fails because "sensitive locations laws are categorical bans on arms possession in certain areas, regardless of the circumstances of individual persons seeking to carry guns there" and therefore no "as-applied exception[]" to the summer camp ban is required. Dkt. No. 89-1 at 20-24. Plaintiff responds that as-applied challenges, which by their nature consider the individual plaintiff's circumstances, have been considered in the Second Amendment context. Dkt. No. 91-1 at 24-25. At oral argument, the State clarified its argument. Although the State acknowledges that the usual principles governing as-applied challenges apply to Plaintiffs' claims, the State argues that it is nonetheless constitutional to apply the summer camp ban to Plaintiffs at The Zone because there is a historical tradition of sensitive location laws which apply categorically to everyone without regard for their individual circumstances.[9]

Although at first blush there appears to be a mismatch between relying on the categorical nature of sensitive location laws and the typical analytical framework for an as-applied challenge which focuses on the specific individual circumstances of the plaintiff,[10] the Court finds that the

---

[9] To the extent the State's briefing can be read as suggesting that as-applied challenges are not available in the Second Amendment context, the Court disagrees. The Second Circuit has found it "highly unlikely" that the Supreme Court would "upend longstanding principles of constitutional litigation [regarding facial and as-applied challenges] by mere implication [in *Bruen*]" and noted that *Rahimi* "expressly confirmed that those principles apply in the context of Second Amendment challenges." *Antonyuk II*, 120 F.4th at 986. And courts have entertained as-applied challenges in the Second Amendment context. *See, e.g.*, *Range v. Att'y Gen. United States*, 124 F.4th 218, 232 n.13 (3d Cir. 2024) (en banc) (as-applied challenge to disarmament of felons) (noting that the "task is to decide only [the plaintiff's] case, rather than preview how this Court would decide future Second Amendment challenges"); *Nastri v. Dykes*, 807 F. Supp. 3d 112, 115 (D. Conn. 2025) (as-applied challenge to certain state parks and forest); *see also Christian*, 176 F.4th at 192 (declining to consider as-applied challenge to the CCIA's public parks sensitive location restriction "to the extent it applies to rural parks" because plaintiffs failed to raise challenge before the district court).

[10] Indeed, to the extent courts have considered as-applied challenges to sensitive location provisions, their analysis seems to focus more on the characteristics of the particular location at issue, rather than the plaintiff. *See, e.g.*, *Christian*, 176 F.4th at 192 (declining to address as-applied challenge to public parks sensitive locations ban "to the extent it applies to rural parks" on

framework utilized by the Second Circuit in *Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025), is analogous and useful. *Zherka* considered an as-applied challenge to the federal statute prohibiting convicted felons from possessing firearms. *Id.* at 70. The plaintiff argued that the statute was unconstitutional as applied to him because he was not convicted of a violent felony. *Id.* According to the Second Circuit, the "operative question" was "whether the government has justified [the statute's] application to [the plaintiff] by demonstrating that disarmament of nonviolent felons, *as a class or category of persons*, is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 77 (internal quotation marks and citation omitted). The court found a "tradition of status-based, categorical restrictions on firearms possession" which indicated an understanding of a "legislative power, consistent with the Second Amendment, to disarm categories of persons presumed to be dangerous." *Id.* at 90. The court also rejected the plaintiff's argument that the statute's "disarmament of all felons sweeps too broadly because it does not provide an exception for nonviolent felons" because "history d[id] not support the proposition that status-based disarmament laws were permissible *only* if they also provided a mechanism for individuals to prove that they were not too dangerous to own a firearm." *Id.* at 91.

To use the same formulation here, the question is whether the State has justified the summer camp ban's application to Plaintiffs by demonstrating that prohibiting the possession of firearms by Plaintiffs at The Zone is consistent with the Nation's historical tradition of firearm regulation. *See id.* at 77. The Court concludes that, for similar reasons as discussed above, the State has met

procedural ground); *Nastri*, 807 F. Supp. 3d at 115 (considering as-applied challenge to state regulation prohibiting firearm carriage relative to three specific state parks and forest); *see also Antonyuk I*, 89 F.4th at 383 (noting that certain plaintiffs brought "an as-applied pre-enforcement challenge to the restricted location provision only insofar as it applies to private property open to the public"); *Kipke v. Moore*, 165 F.4th 194, 211-12 (4th Cir. 2026) (considering as-applied challenge to statute prohibiting firearms on "public school property" only insofar as it banned firearms on school grounds).

its burden of showing that application of the summer camp ban to Plaintiffs is consistent with the historical tradition of categorically banning firearms at certain sensitive locations, such as schools, frequented by children without regard for individual circumstances. *See Bruen*, 597 U.S. at 30 (recognizing schools as among the "sensitive places" where "weapons were altogether prohibited"). As the State points out, the historical statutes banning firearms at schools were categorical and had limited exceptions, none of which would apply to Plaintiffs' situation. *See* Paschal, *supra* n.5, at 1322 (exempting any person "whose duty it is to bear arms on such occasions in discharge of duties imposed by law"); Acts, Resolutions and Memorials of the Fifteenth Legislative Assembly of the Territory of Arizona, *supra* n.6, at 30-31 (exempting "peace officers" or "other persons authorized or permitted by law to carry arms at the places therein designated"); Statutes of Oklahoma, *supra* n.6, at 495-96 (exempting peace officers). Plaintiffs have not proffered any historical evidence to rebut the evidence submitted by the State, and consequently there is "no historical basis upon which [to] declare" the summer camp ban unconstitutional. *Cf. Zherka*, 140 F.4th at 93.

**2. Plaintiffs' Remaining Arguments**

Plaintiffs' remaining arguments do not alter the conclusion that the State has met its burden of showing that application of the summer camp ban to Plaintiffs is consistent with historical tradition. Plaintiffs first argue that The Zone is located and operated on private property. But Plaintiffs have not cited any authority to support the suggestion that sensitive location bans cannot operate on private property, and the Second Circuit has upheld the constitutionality of sensitive location bans which include private property. *See Antonyuk II*, 120 F.4th at 1026-39 (upholding sensitive location bans at zoos, premises licensed for alcohol consumption, and theaters).

Plaintiffs also argue generally that The Zone is remote and that law enforcement response times can be lengthy. Dkt. No. 81-33 at 23-25. Plaintiffs relatedly argue that, armed with a firearm,

they are "in the best position to immediately react to an active armed threat." *See id.* However, Plaintiffs have not placed any of these facts or assertions in a legal or historical framework relevant to the Second Amendment analysis. Nor do Plaintiffs offer any basis on which the Court could draw a principled line demarcating how rural or isolated a summer camp must be before the sensitive location ban at issue here could no longer apply constitutionally. *See Zherka*, 140 F.4th at 94 (noting that "any effort by the courts to craft a line that would separate some felons from others is fraught with peril").

Further, although Plaintiffs argue that they would be in the best position to stop an active threat at the Zone, the wisdom of the summer camp ban as a policy matter is not before the Court. *See Wolford*, 146 S. Ct. at 2042 (noting that *Heller* "emphatically rejected" an "interest-balancing" approach to the Second Amendment); *Rahimi*, 602 U.S. at 714 (Kavanaugh, J., concurring) (noting that "the Court does not implement its own policy judgments" when performing its Article III duty).

Accordingly, Plaintiffs' as-applied challenge to the summer camp ban also fails, and Defendants are entitled to summary judgment. In light of the above analysis, the parties' factual disputes regarding the extent to which The Zone is vulnerable, isolated, and remote as well as law enforcement availability and response times are immaterial. The Court therefore need not decide the State's motion in limine to preclude the testimony of Mr. Haggard, who opines on the vulnerability of The Zone, or Plaintiffs' motion in limine to preclude the testimony of Hunter Martaindale, who responded to Mr. Haggard's report. Dkt. Nos. 85, 92. These motions are denied as moot.

**D. County Defendants' Remaining Arguments**

Although the conclusion that Plaintiffs' constitutional challenge to the summer camp ban fails warrants judgment in the County Defendants' favor, the County Defendants' arguments that

Plaintiffs lack Article III standing and that the County Defendants are entitled to attorneys' fees must be considered.[11]

### 1. Standing

The County Defendants argue that Plaintiffs cannot establish Article III standing to bring claims against them because there is no evidence of a credible, non-speculative threat of enforcement of the summer camp ban. Dkt. No. 87-12 at 10-14.

To establish Article III standing, "a plaintiff must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Antonyuk II*, 120 F.4th at 976 (citation omitted). In the case of a pre-enforcement challenge to a criminal statute, a plaintiff has Article III standing if he can demonstrate: "(1) an intention to engage in a course of conduct arguably affected with a constitutional interest; (2) that the intended conduct is proscribed by the challenged law; and (3) that there exists a credible threat of prosecution thereunder." *Id.* at 1004 (citation and internal quotation marks omitted). The "'credible threat of prosecution' is a 'quite forgiving' requirement that sets up only a 'low threshold' for a plaintiff to surmount." *Id.* at 1005 (citation omitted). "Courts have not placed the burden on the plaintiff to show an intent by the government to enforce the law against it but rather presumed such intent in the absence of a disavowal by the government." *Id.* (citations and brackets omitted). Courts are generally "willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Id.* (citation omitted).

[11] At oral argument, counsel for the County Defendants indicated that the County Defendants rely on and join the State's arguments for the constitutionality of the summer camp ban. Given the Court's conclusion on that question, the County Defendants' arguments regarding their lack of personal involvement and Plaintiffs' request for attorneys' fees are moot.

Here, the County Defendants challenge Plaintiffs' standing for lack of a "credible threat of enforcement," generally arguing that Plaintiffs have not satisfied the "heightened burden" at summary judgment to "adduce factual evidence proving a credible threat of imminent and redressable enforcement injury." Dkt. No. 87-12 at 11-12 (citing *Bochner v. City of New York*, 118 F.4th 505, 519 (2d Cir. 2024)).[12] Plaintiffs respond that courts presume that the government will enforce the law in the absence of a disavowal and note that the Sheriff's Office represented in this litigation that it is enforcing the summer camp ban "as written." Dkt. No. 90-1 at 8-10 (citing Dkt. No. 81-18 at 18).

The Court concludes that, even at the summary judgment stage, Plaintiffs have made an adequate showing that they face a credible threat of enforcement. Although *Bochner* explains that standing requirements "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation," 118 F.4th at 518-19, the Court does not read *Bochner* as holding that the presumption of enforcement does not apply at the summary judgment stage. In *Bochner*, the Second Circuit held that the plaintiffs "failed to carry their standing burden at summary judgment" because there was no evidence that New York City had ever used its general authority to enforce a variety of local laws to enforce the guaranty law at issue and because the City had "unqualifiedly disavowed any intent to enforce" the challenged law against the plaintiffs. *Id.* at 524-25. In the "face of [the City's] disavowal," the plaintiffs could "no longer rely on a presumption of enforcement." *Id.* at 525 (citations omitted).

---

[12] The County Defendants do not dispute that Plaintiffs' intended conduct is affected with a constitutional interest and falls squarely within the summer camp ban; nor do they dispute Plaintiffs' intentions to engage in that conduct.

Here, by contrast, the County Defendants do not dispute that they have authority to enforce Penal Law § 265.01-e, have not disavowed enforcement of the summer camp ban, and have pointed to no evidence in the record that would rebut the presumption of enforcement. Undersheriff Bruce Baker, as representative of the Sheriff's Office, testified at a deposition that, to his knowledge, the Sheriff's Office was "enforcing the Penal Law as written with regard to [the summer camp ban]." Dkt. No. 81-18 at 18. That Plaintiffs face a credible threat of enforcement of the summer camp ban is further supported by the facts that (1) Penal Law § 265.01-e is a relatively new statute and (2) Plaintiffs' desire to possess firearms at The Zone is well-known to law enforcement and local officials. *See, e.g.*, Dkt. No. 81-5 at 23-28 (Mintz testifying to efforts to receive additional security from former Sheriff at The Zone).

The Second Circuit in *Antonyuk II* found *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979), controlling of the standing issue. In *Babbitt*, the plaintiff's assertion of "an intention only to *risk* lawbreaking" where the state "had not disavowed prosecution" was sufficient to render a "fear of prosecution more than 'imaginary or wholly speculative,'" even though the state "had not specifically threatened the plaintiff organization . . . , had never prosecuted anyone under the challenged provision, and had acknowledged it might never do so." *Antonyuk II*, 120 F.4th at 1006. Procedurally, *Babbitt* was decided by a three-judge district court panel after a four-day trial. *See United Farm Workers Nat'l Union v. Babbitt*, 449 F. Supp. 449, 452 (D. Ariz. 1978); *see also Babbitt*, 442 U.S. at 292. Thus, if the plaintiff in *Babbitt* was "not without some reason in fearing prosecution" under the challenged statute and therefore had standing, 442 U.S. at 302, so too Plaintiffs have cleared the "low" and "quite forgiving" bar for pre-enforcement standing, *cf. Antonyuk II*, 120 F.4th at 1006-07.

Accordingly, the Court denies the County Defendants' motion for summary judgment on standing grounds.[13]

**2. Attorneys' Fees**

The County Defendants argue that they should be awarded their reasonable attorneys' fees under 42 U.S.C. § 1988 because Plaintiffs' claims against them "were legally groundless from the outset." Dkt. No. 87-12 at 23-24. Plaintiffs respond that the County Defendants' request is premature and unsupported, given the County Defendants' undisputed authority to enforce the summer camp ban against them. Dkt. No. 90-1 at 20-22.

In certain types of actions, including those brought pursuant to Section 1983, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). A court should award attorneys' fees to a prevailing defendant under Section 1988 "only if the plaintiff's claim was frivolous, unreasonable, or groundless, or the plaintiff continued to litigate after it clearly became so." *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994) (citation, internal quotation marks, and ellipsis omitted); *see also Christiansburg Garment Co. v. Equal Emp. Opportunity Comm'n*, 434 U.S. 412, 421 (1978) ("[A] district court may in its discretion award attorney's fees to a prevailing defendant in a [civil rights] case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith."). This "high standard reflects the need to 'avoid chilling the

[13] The County Defendants also assert that Plaintiffs' injury is not traceable to them, but raise only the same arguments about whether they are likely to enforce the summer camp ban against Plaintiffs. Dkt. No. 87-12 at 13-14. Where Plaintiffs face a credible threat of enforcement, that injury is fairly traceable to the County Defendants, who undisputedly have the authority to enforce the statute. *See, e.g.*, *Antonyuk II*, 120 F.4th at 977 (holding that the plaintiff's Second Amendment injury was "traceable to the defendants' enforcement" of the statutory provisions at issue and redressable by an injunction); *see id.* at 978 (holding that the plaintiff's injury was "traceable to the challenged provisions and redressable by the injunction he seeks").

initiation and prosecution of meritorious civil rights actions" and means that "it is very rare that victorious defendants in civil rights cases will recover" attorneys' fees. *Brinkmann v. Town of Southold*, No. 24-2763-cv, 2026 WL 184330, at *1 (2d Cir. Jan. 23, 2026) (summary order) (citations omitted). The "fact that a plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment of fees." *Hughes v. Rowe*, 449 U.S. 5, 14 (1980).

Here, the County Defendants have presented no basis on which to conclude that Plaintiffs' action was frivolous, unreasonable, or without foundation. To the extent the County Defendants rely on their assertion that Plaintiffs do not have Article III standing to assert claims against them, the Court has rejected that argument. And although the County Defendants argue that the denial of Plaintiffs' request for a preliminary injunction "confirms the objective unreasonableness of continuing to litigate against the County Defendants," Dkt. No. 87-12 at 24, nothing in the preliminary injunction decision addresses whether Plaintiffs have Article III standing to challenge the summer camp ban or indicates that there is "no basis for judicially sanctioned relief" against the County Defendants, *contra* Dkt. No. 93 at 11. Indeed, it is a relatively common practice for civil rights plaintiffs to sue local officials with authority to enforce a challenged law in their official capacity so that those officials could be enjoined from enforcing the law.

Thus, the Court exercises its discretion to deny the County Defendants' request for attorneys' fees under Section 1988.

**E. Motion to Supplement Summary Judgment Record**

After briefing on the parties' summary judgment motions was complete, Plaintiffs moved to supplement the summary judgment record with new evidence. Dkt. No. 100. The evidence at issue consists of "recent antisemitic threats" on Reddit directed at The Zone specifically. *See generally id.* The State opposes Plaintiffs' motion to supplement, arguing that the Reddit posts are inadmissible because they are irrelevant, their probative value is substantially outweighed by their

prejudicial effect, and they constitute hearsay. *See* Dkt. No. 101; *see also* Dkt. No. 102 (County Defendants' letter "join[ing] in and adopt[ing]" the State's arguments).

"Courts in this Circuit have looked favorably upon efforts to supplement the record absent prejudice or bad faith." *Katz v. Metro. Transp. Auth.*, No. 17-cv-472, 2017 WL 6734185, at *12 (E.D.N.Y. Dec. 29, 2017) (collecting cases). Although there is no suggestion of either here, the Court in its discretion denies Plaintiffs' motion to supplement the summary judgment record. As discussed above, the parties have not placed the extent to which Plaintiffs or The Zone may be subject to threats in a legal or historical framework, *supra* Section III.C.2, and Defendants do not dispute that Plaintiffs and The Zone are subject to antisemitic threats and harassment, *see* Dkt. No. 81-1 ¶¶ 56-62; Dkt. No. 89-2 ¶¶ 56-62. Thus, Plaintiffs' newly proffered evidence of threats made against The Zone is not material to the legal issues before the Court.

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiffs Eliyohu Mintz and Eric Schwartz's motion for summary judgment, Dkt. No. 81, is **DENIED**; and it is further

**ORDERED** that Defendants Albro Fancher and Christopher Luhr's motion for summary judgment, Dkt. No. 87, is **DENIED** to the extent it requests an award of attorneys' fees or dismissal for lack of standing but otherwise **GRANTED**; and it is further

**ORDERED** that Defendant Steven G. James's motion for summary judgment, Dkt. No. 89, is **GRANTED**; and it is further

**ORDERED** that Defendant Steven G. James's motion in limine to preclude the opinions and testimony of Chuck Haggard, Dkt. No. 85, and Plaintiffs Eliyohu Mintz and Eric Schwartz's motion in limine to preclude the testimony of Hunter Martaindale, Dkt. No. 92, are **DENIED as moot**; and it is further

**ORDERED** that Plaintiffs Eliyohu Mintz and Eric Schwartz's motion to supplement the summary judgment record, Dkt. No. 100, is **DENIED**; and it is further

**ORDERED** that the Clerk of the Court is directed to enter judgment in favor of Defendants and close this action.

**IT IS SO ORDERED.**

Dated: September 22, 2026

Elizabeth C. Coombe
U.S. District Judge